1

**LOWEY DANNENBERG, P.C.**

2

Christian Levis

David C. Harrison

3

Andrea Farah

Scott Vincent Papp

4

44 South Broadway, Suite 1100

White Plains, NY 10601

5

Tel: (914) 997-0500

Email: clevis@lowey.com

6

Email: dharrison@lowey.com

Email: afarah@lowey.com

7

Email: spapp@lowey.com

8

*Lead Counsel for Lead Plaintiffs and the Class*

9

**SCHUBERT JONCKHEER & KOLBE LLP**

Willem F. Jonckheer

10

Three Embarcadero Center, Suite 1650

San Francisco, California 94111

11

Tel: (415) 788-4220

Email: wjonckheer@sjk.law

12

*Liaison Counsel for Plaintiffs*

13

[Additional counsel appears on signature page]

14

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

15

16

THOMAS JEDRZEJCZYK, SONNY CHUNG, KEVIN TINKELMAN, AND DAVID LEWIS, individually, and on behalf of all others similarly situated,

17

18

Plaintiffs,

19

v.

20

SKILLZ INC., f/k/a FLYING EAGLE ACQUISITION CORP., ANDREW PARADISE, CASEY CHAFKIN,

21

MIRIAM AGUIRRE, SCOTT HENRY, HARRY

22

SLOAN, JERRY BRUCKHEIMER, CHRISTOPHER GAFFNEY, VANDANA MEHTA-KRANTZ, KENT E.

23

WAKEFORD, CITIGROUP GLOBAL MARKETS, INC., GOLDMAN SACHS & CO. LLC, JEFFERIES

24

LLC, UBS SECURITIES LLC, WEDBUSH

SECURITIES INC., WELLS FARGO SECURITIES,

25

LLC, CANACCORD GENUITY LLC, STIFEL,

NICOLAUS & COMPANY, INC.,

26

27

Defendants.

No. 3:21-cv-03450-RS

**CLASS ACTION AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**CLASS ACTION**

**(DEMAND FOR JURY TRIAL)**

28

1

**TABLE OF CONTENTS**

2  NATURE OF THE ACTION .................................................................................... 1

3  JURISDICTION AND VENUE ............................................................................... 8

4  PARTIES ................................................................................................................ 9

5  SUBSTANTIVE ALLEGATIONS ....................................................................... 15

6    A.    Blank Check Companies and SPACs ..................................................... 15

     B.    Skillz Business And Operations ............................................................ 17

7    C.    Defendants' Materially False And Misleading Statements And Omissions ............ 27

8          1.    Declining Game Play in Key Games ............................................ 27

9          2.    Unrealistic Expansion to India .................................................... 31

           3.    Overstated Technical Capabilities - Synchronous Play ............. 32

10         4.    Low Paid User Engagement ........................................................ 34

11         5.    Defendants Falsely Claimed that Revenue Was Primarily Driven by MAU
12               Rather Than Paying Users and Concealed That Average Monthly Revenue
                 Of Paying Users Was Declining ................................................. 35

13         6.    Defendants' Financial Statements Violated SEC Disclosure Rules ............ 40

14         7.    Defendants Materially Understated Skillz's Liabilities In Its 2020 Financial
                 Statements and Misrepresented that Internal Disclosure Controls Were
15               Adequate ..................................................................................... 41

16   D.    The Truth Is Gradually Revealed .......................................................... 42

17  ADDITIONAL ALLEGATIONS REGARDING ................................................. 46

    THE EXCHANGE ACT DEFENDANTS' SCIENTER .......................................... 46

18
     A.    Defendants' Statements and Disclosures Contradicting Their Prior Disclosures Are
19         A Strong Indicator of Scienter ............................................................... 47

20   B.    Paradise Refused to Answer Analysts Questions Concerning the Decline in
           Downloads of Games on Skillz .............................................................. 49

21   C.    Proprietary Platform Is Its Only Core Operation .................................. 50

22   D.    Defendants Personally Profited By Selling Their Skillz Stock At Inflated Prices
           While in Possession of Material Non-Public ......................................... 52

23   E.    CFO Resignation ................................................................................... 53

24  APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD  ON THE MARKET
    DOCTRINE ........................................................................................................... 53
25
    LOSS CAUSATION .............................................................................................. 54

26

27                                                     i

28

NO SAFE HARBOR.................................................................................................55

PLAINTIFFS' CLASS ALLEGATIONS.................................................................56

COUNT I.....................................................................................................................58

    For Violations of Section 10(b) of the Exchange Act ......................................58

    And Rule 10b-5 Promulgated Thereunder ......................................................58

    Against the Company and Officer Defendants ...............................................58

COUNT II...................................................................................................................60

    Violations of Section 20(a) of the Exchange Act ...........................................60

    Against the Officer Defendants .......................................................................60

COUNT III.................................................................................................................61

    Violations of Section 11 of the Securities Act ...............................................61

    Against All Defendants Except Aguirre ..........................................................61

COUNT IV..................................................................................................................63

    Violation of Section 12(a)(2) of the Securities Act  Against Skillz and the Underwriter Defendants ............................................................................................................63

COUNT V....................................................................................................................65

    Violations of Section 15 of the Securities Act ...............................................65

    Against the Individual Defendants ..................................................................65

PRAYER FOR RELIEF ...........................................................................................67

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Thomas Jedrzejczyk, Sonny Chung, Kevin Tinkelman, and David Lewis (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, hereby bring this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against the Defendants identified herein, based upon, *inter alia*, personal knowledge as to the Plaintiffs and the Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and under the supervision of Plaintiffs' counsel, which included a review of the Skillz, Inc.'s ("Skillz" or the "Company")  public documents filed with the United States Securities and Exchange Commission ("SEC"), conference calls,  investor presentations and press releases published by and regarding the Company, analysts' reports, interviews with former Company employees and other readily obtainable information. Plaintiffs' counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and the other Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of  all persons who purchased or otherwise acquired Skillz common stock  between December 16, 2020 and May 4, 2021, inclusive (the "Class Period") and all persons who purchased Skillz's common stock in the Company's March 19, 2021 public offering (the "March 2021 Offering"), against the Defendants identified herein for violations of Section 10 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and/or Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act").

2.      During the Class Period, Defendants made numerous false and misleading statements and/or omissions concerning the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements concerning, and/or failed to disclose: (1) its declining downloads of top games; (2) its declining revenues per paying user; (3) its highly touted

1    synchronous game play that was only in its testing phase; (4) that the expansion of its platform to India
2    was, in reality, years away from completion, (5) its overstated revenue from Bonus Cash, (6) that the
3    millions of SPAC warrants were required to be treated as liabilities, rather than equities in its financial
4    statements, and (7) that Skillz had deficient disclosure controls and procedures and deficient internal
5    controls over its financial reporting.

6            3.      Skillz was founded in 2012 as a private company headquartered in San Francisco,
7    California. Skillz provides a mobile gaming platform that allows individuals to play video games in
8    contests against each other, using their smartphone or tablet.  There are two types of contests: "paid"
9    contests, where users wage real money for a chance to win cash prizes by playing against other users, and
10   "practice" contests, where users play games for free.

11           4.      Skillz does not develop or distribute the games that utilize its platform. Rather, it produces
12   a Software Development Kit ("SDK")—a set of software tools and programs—that third party game
13   developers can integrate into their own products if they want to utilize Skillz's platform to provide
14   competitive gameplay for their users.  These third-party games are distributed for free by those studios
15   directly to users through the Apple App Store, or other mobile app stores, available on individual user's
16   devices.  For example, the screenshot below is taken from the Apple App Store listing of Blackout Bingo,
17   one of Skillz's more popular games.  In addition to promoting the ability to "Win Real Cash" in the title,
18   this page lists "Big Run Studios, Inc." (not Skillz) as the game developer just above the "Get" button.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                              CASE NO: 3:21-cv-03450



5.      The ability for users to "Win Real Cash" and wager money on the outcome of Skillz contests is an important part of Skillz's business model because Skillz generates revenue exclusively by collecting a percentage of the total amount of entry fees wagered in paid contests.  Indeed, Skillz acknowledged the importance of paid contests to its business in documents filed with the SEC in connection with its December 2020 merger with a special purpose acquisition company ("SPAC") called Flying Eagle Acquisition Corporation ("FEAC").  Specifically, the proxy statement and prospectus filed with the SEC on Registration Form S-4[1] in connection with the merger stated that Skillz's "business depends on maintaining a successful platform for third-party developed games that users will download and pay cash entry fees to compete for cash with other users."  Skillz, in turn, shares a certain percentage of the revenue collected from these entry fees with the third-party developers that developed that particular game.  This business model requires Skillz to continually acquire new paying users to generate

_____

[1] On September 8, 2020, Skillz filed its initial merger proxy statement on Form S-4. Thereafter, Skillz amended its Form S-4 on October 14, 2020, November 2, 2020, November 17, 2020, and November 30, 2020. Unless otherwise specified, the November 30, 2020 Form S-4 is referred to as the Merger Proxy Statement. As described herein, all versions of Skillz's Form S-4 identified herein were false and misleading.

3

revenue as non-paying users, such as those who download and play games for free, do not generate current revenues for Skillz.

6.      Prior to and throughout the Class Period, Defendants disseminated false and misleading statements and omissions that materially misrepresented Skillz's purported financial condition and prospects and concealed and obscured material facts, that inflated the market price of Skillz common stock from the date it began trading on December 17, 2020 through the close of the Class Period on May 4, 2021.

7.      **Declining Downloads of Top Games**:   As explained above, Skillz requires users to pay money to play games to generate revenue. Downloads, on their own, do not result in profit. Skillz, nonetheless, repeatedly misled investors by promoting growth on its platform through alternative metrics that focused on game downloads and installs.  For example, Skillz boasted that "paying users today have 10 Skillz games installed" as compared to "3 games installed in 2015" without reference to the statistic that really matters: whether anyone was paying to play those games.  Skillz also misleadingly boasted that it continued to experience growth in its top titles,[2] claiming that its most popular games were, "not shrinking or disappearing" and even "continue to grow, often quite substantially, after being displaced from the number one position."  This was materially misleading in failing to inform investors that downloads of its top games had been steadily declining since at least June 2020.

8.      **Declining Revenues Per Paying User**: Skillz also repeatedly boasted that it had "extraordinary user engagement," claiming that "its end-users have played more games" because "its platform features more content," and that in 2019 "the average paying user spent an estimated average of 62 minutes per day of game play on Skillz, exceeding the engagement levels of some of the most successful and well known on-line and mobile platforms in social media, games and general entertainment."[3]

---

[2] Skillz investor call transcript dated September 2, 2020 (the "September 2 Investor Call").
[3] Merger Proxy Statement at 94.

4

9.      However, Skillz's discussion of revenues in the Company's financial results for Q3 2020 and the nine months ended September 30, 2020 misrepresented that its revenues were primarily driven by a metric that counted the gross number of monthly active users (or "MAU") on Skillz's platform. That was false because more than 80% of MAUs played games for free and only a small percentage actually entered into paid competitions that generated revenue for Skillz.

10.     As Defendants knew full well and as Chief Executive Officer, Defendant Andrew Paradise ("Paradise") subsequently conceded, paying game users (referred to as paying monthly actives users, or "paying MAUs"), "is perhaps the most important metric to our business."  It was paying users, and not MAU, that primarily drove the Company's revenue growth.

11.     Skillz and its senior executives further misled investors by disclosing average monthly revenues in terms of MAUs, a metric Skillz referred to as "ARPU," or average revenue per user. Disclosure of only ARPU, which as noted above, was comprised mostly of non-paying MAUs, created the misleading impression that user engagement (and thus Skillz average monthly revenues) was increasing when, in fact, it was declining.

12.     Skillz and the other Defendants failed to identify, let alone disclose, the more significant metric that was based on the average revenues generated by paying MAUs (referred to as "ARPPU").[4] Unbeknownst to investors, ARPPU declined 8% in Q3 2020 as compared to Q3 2019, and the decline continued to increase to 12% in Q4 2020 as compared to the prior year period.  Disclosure of the declines in ARPPU would have informed investors that paying user engagements based on average revenues had declined from 2019.

13.     In short, by solely disclosing the increase in ARPU, without also disclosing the ARPPU metric, Defendants at best obscured the fact that average revenues from paying users were declining during the second half of 2020, prior to Skillz's merger with FEAC.

---

[4] ARPPU refers to the average revenue per paying user on a monthly basis.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                CASE NO: 3:21-cv-03450

14.     As described herein, Skillz's senior management acknowledged when reporting results for the quarter following the merger that, contrary to their prior representations, (1) paying MAU, not MAU, was the primary metric driving revenues, and (2) ARPPU, which was derived from paying MAU, was added as a key metric in order to provide a more complete picture of the Company's financial condition that was missing from its earlier misleading disclosures.

15.     Skillz also misled investors into believing that the Company was well-positioned to take advantage of broader industry-wide trends that it could not actually capitalize on.  For instance, Defendants repeatedly pointed to its plans to expand into the international gaming market, with Defendant Paradise, Skillz Chief Executive Officer, touting the Company's anticipated 2021 launch into the India as a source of growth when, in reality, the Company lacked the capability to meaningfully organically scale into this market at the time.  Similarly, Skillz promoted its entry into the market for synchronous game play—an increasingly popular gaming format where users compete against each other in real-time, as opposed to in turn-based games (*e.g.*, like bingo) —as a source of growth when it had not yet developed the ability to host synchronous games and was still in the testing phase for that technology.

16.     These and other bullish market pronouncements misled investors into believing that the Company was well-positioned for rapid long-term growth.

17.     On March 8, 2021, the truth began to emerge when Wolfpack Research released a report titled, "SKLZ: It Takes Little Skill to see this SPACtacular Disaster Coming" (the "Wolfpack Report"). The Wolfpack Report, based on an independent investigation which included "conversations with former employees, employees of Skillz's two largest developers, and independent third-party app download data," concluded that Defendants' growth speculations were "entirely unrealistic." Among other revelations, the report disclosed that Skillz's top three games which represent over 80% of Skillz's revenue, had been in consistent decline in downloads since at least the third quarter of 2020.  Further, the Wolfpack Report stated that the games Skillz relies on for 88% of its revenue—21 Blitz, Solitaire Cube, and Blackout Bingo— had begun to decline *prior* to Skillz's merger in December 2020:  by 52% (21 Blitz), 40% (Solitaire Cube), and 20% (Blackout Bingo) in the fourth quarter of 2020, respectively.

18.     The Wolfpack Report also sheds light on the fact that Skillz is not taken seriously by industry experts because Skillz's platform is not robust enough to handle synchronous play and international matchmaking.  These facts have been independently confirmed by former Company employees who are knowledgeable concerning Skillz's technical capabilities.

19.     Upon release of the Wolfpack Report, Skillz stock plummeted 10.9% to close at $24.45, down $3 from the previous day.  This decline represented approximately $762 million in losses in market value.

20.     **Overstated Revenue from "Bonus Cash"**: These were not Skillz's only problems. On April 19, 2021, a report posted on Twitter by Eagle Eye Research (the "Eagle Eye Report") claimed that, through providing users with incentive Bonus Payments, Skillz "likely recognizes substantial non-cash revenue, and [] cash revenues" which had declined during the first half of 2020, "may be less than ½ of GAAP revenue."  On this news, SKLZ shares declined 6.61% to close at $14.11 (decline of $1 from the previous day) on April 19, 2021 and shares further declined the next day to an all-time low of $12.55. The Company subsequently acknowledged in its Q1 2021 Earnings Call at the end of the Class Period that end-user net cash deposits only represented 60% of GAAP revenue.

21.     **Restatement Related to FEAC's Warrants**:  Skillz falsely assured investors that its financial statements for the year ended December 31, 2020, released on March 10, 2021, were accurate and that is had effective disclosure controls and procedures.  Yet, when the SEC announced that companies should have been treating warrants issued in connection with SPAC mergers as a liability, and not equity, Skillz was forced to restate its 2020 financial statements.  On May 4, 2021, Skillz admitted that it had incorrectly accounted for the warrants it issued as part of its SPAC merger as equity when those warrants should have been treated as a liability.  Skillz also acknowledged material weaknesses in its financial disclosure controls that it had assured investors were effective two months earlier.  The resulting restatement by Skillz increased its liabilities from $47.4 million to $178.2 million.   In addition, Skillz's net loss for 2020 increased from $122 million to $145 million.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                      CASE NO: 3:21-cv-03450

22.     The Company also acknowledged on May 4, 2021 that Skillz's highly touted synchronous game play was still in development, directly refuting prior statements that gave the false impression that synchronous play was available.  The Company also announced the resignation of its Chief Financial Officer ("CFO"), Scott Henry, after only 8 months on the job.

23.     On this news, Skillz stock substantially declined by 8.72% to close at $15.48, on May 4, 2021.  This represented an additional market loss of approximately $376 million.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and Section 11 of the Securities Act (15 U.S.C. § 77k).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

26.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with the judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Company is also headquartered in this district.

27.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District and the Company is based in this district.

28.     In connection with the acts alleged in this Complaint, Skillz, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

**PARTIES**

**Plaintiffs**

29.     Lead Plaintiff Thomas Jedrzejczyk purchased the Company's securities at artificially inflated prices during the Class Period, as set forth in his Certification previously filed with the Court and annexed hereto as Exhibit A, and was damaged as a result.

30.     Lead Plaintiff Sonny Chung purchased the Company's securities at artificially inflated prices during the Class Period, as set forth in his Certification previously filed with the Court and annexed hereto as Exhibit A, and was damaged as a result.

31.     Lead Plaintiff Kevin Tinkelman purchased the Company's common stock in and traceable to Skillz's March 2021 Offering, as set forth in his Certification previously filed with the Court and annexed hereto as Exhibit A, and was damaged as a result.

32.     Plaintiff David Lewis purchased the Company's securities at artificially inflated prices during the Class Period, as set forth in his Certification previously filed with the Court and annexed hereto as Exhibit A, and was damaged as a result.

**The Company Defendant**

33.     Defendant Skillz is incorporated in Delaware and maintains its principal executive offices at P.O. Box 445, San Francisco, CA  94104. As of March 31, 2021, Skillz had approximately 326 million shares of Class A stock outstanding, and 70 million shares of Class B common stock outstanding.

**The Officer Defendants**

34.     Defendant Paradise is a co-founder of Skillz and currently serves as the Company's Chief Executive Officer.  Pursuant to SEC Form 13D, Paradise held 68,601,268 shares of Skillz Class B common stock as of March 18, 2021.  In addition, pursuant to SEC Form 4, Paradise acquired 16,119,540 shares of Skillz Class A commons stock as stock options from Skillz on September 14, 2021.  Paradise holds voting power of over 81% of the Company through his holdings of Skillz's Class B stock.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

35.     Paradise signed several of the Company's SEC filings during the Class Period, including the materially false and misleading registration statement on Form S-1,[5] effective March 19, 2021 (the "March 2021 Registration Statement") for the public offering of Skillz common stock (the "March 2021 Offering")[6] and Skillz's Form 10-K for the fiscal year ended December 31, 2020, filed on March 12, 2021 (the "2020 Form 10-K").  Defendant Paradise also signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that were attached to the 2020 Form-10-K.

36.     Paradise sold 8.4 million shares of Skillz stock in the March 2021 Offering while in the possession of material inside information.

37.     Defendant Henry served as the Company's Chief Financial Officer from August 2020 through the announcement of his retirement on May 4, 2021, effective as of June 20, 2021.  Henry signed several of the Company's SEC filings during the class period, including the 2020 Form 10-K and the March 2021 Registration Statement.  Defendant Henry also signed a SOX certification for the 2020 Form 10-K.

38.     Defendant Casey Chafkin ("Chafkin") is a co-founder of Skillz and currently serves as the Company's Chief Revenue Officer. Chafkin signed each of the Company's SEC filings, including the materially false and misleading March 2021 Registration Statement for the March 2021 Offering.

39.     Chafkin sold 1.7 million shares of Skillz stock in the March Offering while in the possession of material inside information.

40.     Defendant Miriam Aguirre ("Aguirre") has served as the Company's Chief Technology Officer since November 2013.  Aguirre sold 274,825 million shares of Skillz stock in the March 2021 Offering while in the possession of material inside information.

---

[5] Skillz filed its initial a registration statement on Form S-1 on February 8, 2021 (the "February 2021 Registration Statement."

[6] As part of the March 2021 Offering, on March 18, 2021, Skillz filed a prospectus pursuant to Rule 424(b)(3) (the "March 2021 Prospectus").

41.     Defendants Paradise, Henry, Chafkin, and Aguirre are collectively referred to herein as "Officer Defendants."  The Officer Defendants and Skillz are collectively referred to herein as the "Exchange Act Defendants."

**The Director Defendants**

42.     Defendant Harry Sloan ("Sloan") is currently a Director on Skillz's Board of Directors. Sloan signed the Company's SEC filings, including the materially false and misleading March 2021 Registration Statement.  Sloan was also the President and Chairman of FEAC from January 2020 to December 2020, prior to its merger with Skillz in December 2020.

43.     Defendant Jerry Bruckheimer ("Bruckheimer") is currently a Director on Skillz's Board of Directors.  Defendant Bruckheimer was a signatory to the March 2021 Registration Statement.

44.     Defendant Christopher Gaffney ("Gaffney") is currently a Director on Skillz's Board of Directors.  Defendant Gaffney was a signatory to the March 2021 Registration Statement for the March 20201 Offering.

45.     Defendant Vandana Mehta-Krantz ("Mehta-Krantz") is currently a Director on Skillz's Board of Directors.  Defendant Mehta-Krantz was a signatory to the March 2021Registration Statement.

46.     Defendant Kent Wakeford ("Wakeford") is currently a Director on Skillz's Board of Directors.  Wakeford was a signatory to the March 2021 Registration Statement.  Defendant Wakeford also sold 42,465 shares of Skillz stock in the March 2021 Offering while in the possession of material inside information.

47.     Defendants Bruckheimer, Gaffney, Mehta-Krantz, and Wakeford are collectively referred to herein as the "Director Defendants" and together with the Officer Defendants are referred to as the "Individual Defendants."

48.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

11

49.     The scienter of the Exchange Act Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

**The Underwriter Defendants**

50.     Defendant Citigroup Global Markets, Inc. ("Citigroup") is a New York corporation with its principal place of business at 388 Greenwich Street, New York, NY 10013. Citigroup served as an underwriter for the March 2021 Offering.

51.     Defendant Goldman Sachs & Co. LLC ("Goldman") is a New York limited liability company with its principal place of business at 200 West Street, New York, NY 10282. Goldman served as an underwriter for the March 2021 Offering.

52.     Defendant Jefferies LLC ("Jefferies") is a Delaware limited liability company with its principal place of business at 520 Madison Ave., New York, NY 10022. Jefferies served as an underwriter for the March 2021 Offering.

53.     Defendant RBC Capital Markets, LLC ("RBC") is a Minnesota limited liability company with its principal place of business at Principal Office: 200 Vesey Street, 5th Floor, Three World Financial Center, New York, NY 10281. RBC served as an underwriter for the March 2021 Offering.

54.     Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company with its principal place of business at 11 Wall St., New York, NY 10005. UBS served as an underwriter for the March 2021 Offering.

55.     Defendant Wedbush Securities Inc. ("Wedbush") is a California corporation with its principal place of business at 1000 Wilshire Blvd., Suite 900, Los Angeles, CA 90017. Wedbush served as an underwriter for the March 2021 Offering.

56.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") is a Delaware limited liability company with its principal place of business at 550 South Tryon Street, 6th Floor, Charlotte, NC 28202. Wells Fargo served as an underwriter for the March 2021 Offering.

57.     Defendant Canaccord Genuity LLC ("Canaccord") is a Delaware limited liability company with its principal place of business at 535 Madison Ave., 3rd Floor, New York, NY  10022. Canaccord served as an underwriter for the March 2021 Offering.

58.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") is a Missouri corporation with its principal place of business at 501 N. Broadway, St. Louis, MO  63102.  Stifel served as an underwriter for the March 2021 Offering.

59.     Defendants Citigroup, Goldman, Jefferies, RBC, UBS, Wedbush, Wells Fargo, Canaccord, and Stifel are collectively referred to herein as the "Underwriter Defendants."

60.     The Company, the Officer Defendants, the Director Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

61.     The Underwriter Defendants offered and sold 32,000,000 shares of Skillz Class A common stock in the March 2021 Offering to investors at $24 per share.  The Underwriter Defendants purchased 17,000,000 Class A shares from the Company, and 15,000,000 Class A shares from certain selling shareholders, including the Officer Defendants and Defendant Wakeford, at a discount to the public offering price.  The Underwriter Defendants thereafter exercised their option to purchase an additional 4,800,000 shares of Class A shares from the selling shareholders at the same discount to the initial $24 public offering price.

62.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially false and misleading statements in the March 2021 Registration Statement and accompanying prospectus as follows:

    a)  The Underwriter Defendants are investment banking houses that specialize in, *inter alia*, underwriting public offerings of securities.  They served as the underwriters of March 2021 Offering and shared millions in fees collectively for their services.  The Underwriter Defendants determined that in return for their share of March 2021 Offering proceeds, they were willing to solicit purchases of Skillz common stock in the March 2021 Offering. Each of the Underwriter Defendants designated personnel to the March 2021 Offering

13

working group, including investment bankers, analysts, associates, and counsel, to market Skillz common stock sold in the March 2021 Offerings, and those personnel worked on and approved the content of the March 2021 Registration Statement and March 2021 Prospectus other solicitation materials.

b) In addition, representatives of the Underwriter Defendants assisted Skillz and the Individual Defendants in planning some or all of the March 2021 Offering and purportedly conducted an adequate and reasonable investigation into the business and operations of Skillz, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the March 2021 Offering.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning March 2021 operations and financial prospects.

c) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Skillz management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the March 2021 Offering.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the March 2021 Offering; (ii) the terms of the March 2021 Offering, including the price range at which Skillz common stock would be sold; (iii) the language to be used in the March 2021 Registration Statement and Prospectus; and (iv) what disclosures about Skillz would be made.

d) As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Skillz's management and top executives, such as the Individual Defendants, the Underwriter Defendants should have known of material information about Skillz's business operations and prospects as detailed herein.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

14

1    e)  The Underwriter Defendants solicited and sold Skillz common stock from the March

2    2021 Offering to Lead Plaintiffs and other members of the Class.

3                                    <u>SUBSTANTIVE ALLEGATIONS</u>

4    **A.    Blank Check Companies and SPACs**

5         63.    FEAC was formed in early 2020 as a "blank check" company.  A "blank check" company

6    is a company that has no specific established business plan or purpose or has indicated that its business

7    plan is to engage in a merger or acquisition with an unidentified company, entity, or person.

8         64.    One type of "blank check" company is a "special purpose acquisition company," or

9    "SPAC."  A SPAC is a publicly traded company created specifically to pool funds through an initial public

10   offering for the purpose of completing an acquisition or other business combination with an existing

11   company.  Generally, SPACs are founded by public companies or private asset managers.

12        65.    In order to create a SPAC, founders must invest the initial capital to recruit an investment

13   bank to structure capital raising terms, prepare and file initial public offering documentation, and pre-

14   market the investment offering to interested investors.  A target company cannot be identified before

15   the SPAC's initial public offering is completed.  Once capital is raised through the initial public offering,

16   at least 90% of the proceeds must be deposited into a trust account, and any interest is paid to the

17   investors.  An appointed management team (typically the SPAC's founders) then has a specified time

18   period, typically between 18 and 24 months, in which to identify an appropriate target to complete the

19   merger or acquisition.  NASDAQ rules dictate the initial business combination must be with one or more

20   target businesses that together have a fair market value equal to 80% of the balance in the SPAC trust

21   account.  Although the only purpose of a SPAC is to acquire a target company, SPACs generally have

22   corporate governance structures similar to that of other operating companies.

23        66.    Typically, common stockholders of the SPAC are granted voting rights to approve or

24   reject the business combination proposed by the management team.  Thus, when the management team

25   identifies a target, a merger proxy statement must be filed on Form S-4 with the SEC and distributed to

26   all SPAC stockholders.  The Form S-4 will incorporate information prepared by and supplied by the

                                              15

27

28

target company regarding its business and financial condition, including audited financials.  This information is highly material to securities analysts and other investors in the market in valuing the shares and deciding whether to invest both before and after the business combination is completed.

67.     FEAC was formed as a SPAC in early January 2020 by its sponsor Eagle Equity Partners II, LLC, led and controlled by Defendant Sloan.  Following its initial public offering on March 10, 2020, the company's shares were listed and traded on the New York Stock Exchange ("NYSE").

68.     Within eight months, Defendants FEAC and Sloan had secured $158 million in private placement commitments in connection with a business combination between FEAC and its target – Skillz.  On September 1, 2020, a definitive merger agreement (the "Merger Agreement") and subscription agreements were executed by Sloan on behalf of FEAC and Paradise on behalf of Skillz.

69.     Pursuant to § 6.06(a) of the Merger Agreement, Skillz provided material information about Skillz's business and financial condition for inclusion in the Merger Proxy Statement.  This included Skillz's audited financial statements for 2017, 2018 and 2019, as well as unaudited financial statements for the current period in 2020, which were updated by Skillz in later version of Merger Proxy Statement.  Skillz warranted under § 4.24 that the information it supplied did not contain an untrue statement of material fact or omit information necessary to make its statements not misleading.

70.     The Merger Proxy Statement specifically represented that (1) the "[i]nformation contained in this proxy statement/prospectus regarding FEAC has been provided by FEAC and information contained in this proxy statement/prospectus regarding Skillz has been provided by Skillz;[7] and (2) "Skillz is providing the following summary historical financial information to assist you in your analysis of the financial aspects of the Business Combination."[8]

71.     On September 2, 2020, Defendants Sloan and Paradise participated in an Investor Presentation, during which Paradise provided information about Skillz's business operations, financial

[7] Merger Proxy Statement at 11 "About this Document."
[8] *Id.* at 38-39 "Summary of Historical Financial Information of Skillz" *id.* "Selected Historical Financial Information of Skillz" at 178-79.

16

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

1  results, and growth prospects.  A transcript of the investor presentation was filed in a Form 8-K with the

2  SEC.

3    72.    On September 8, 2020, FEAC, through its Board of Directors, filed the initial merger

4  proxy statement on Form S-4 with the SEC. The Registration/Proxy Statement attached the Merger

5  Agreement and other documents related to the impending transaction.

6    73.    After a series of amendments to the merger proxy statement were filed with the SEC over

7  the next several months (the last of which was November 30, 2020), FEAC filed its final prospectus on

8  December 1, 2020.  FEAC and Skillz consummated their merger on December 16, 2020.  In connection

9  with the completion of the merger, FEAC was renamed Skillz, Inc.

10    74.    From the announcement of the Merger Agreement, Skillz made its business and financial

11  information readily available to market analysts and investors who assessed the value of the Company

12  and its securities in advance of the merger.  On December 17, 2020, immediately following the merger,

13  Skillz shares began trading on the NYSE under the symbol "SKLZ

14    75.    As described herein, Defendants' false and misleading Merger Proxy Statement and other

15  misstatements inflated the market price of Skillz' stock from the date it began publicly trading through

16  May 4, 2021.

17    **B.    Skillz Business and Operations**

18    76.    Skillz is an online mobile multiplayer gaming platform that is integrated into a number of

19  iOS and Android video games. Individuals that download games integrated with Skillz platform can use

20  the platform to compete against other players of the same game. This kind of competitive game play is

21  generally referred to as "esports" (short for electronic sports) and is a subset of the mobile gaming market.

22    77.    Skillz holds itself out as "the world's leading mobile esports platform, hosting over two

23  billion esports tournaments per year."[9]  The Company aggressively touts its performance claiming to

24

25  ────────────────

26  [9] April 8, 2021 Blog Post, attached to the Company's April 8, 2021 Form 8-K (the "April 8, 2021
   Blog Post") at 2.

27

28  CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
   AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

have "been able to double or triple the business every year"[10] and has reported consecutive increases in revenues for each quarter over the past five years. Skillz claims that its "platform has over 40 million registered users and hosts an average of over 5 million daily tournaments, including 1.5 million paid entry daily tournaments offering over $100 million in prizes each month."[11] Skillz also claims over 9,000 registered game developers on its platform that have launched a game integration, although only two developers account for the bulk of its gaming business.[12]

78.     Defendants also boasted that Skillz is well positioned to take advantage of the overall growth of the broader mobile gaming market outside of esports. According to Defendants, "the mobile gaming market reached $86 billion in 2020, and that's expected to grow to $161 billion by 2025."[13] Moreover, Defendants represented that the 2.7 million MAUs on its platform as of September 30, 2020 represent a mere fraction of the 2.7 billion gamers worldwide.[14]

79.     Skillz business model involves a two-step process: (1) user acquisition, and (2) user engagement. User acquisition refers to the process of adding users to the platform by convincing them to download games that integrate with Skillz. As the Company explained, "the substantial majority of the users access the games featured on our platform through the direct download on their mobile devices of apps developed by our developer partners."[15] To this end, Skillz promotes games that utilize its platform with the goal of increasing downloads of those games.

80.     However, increased downloads do not result in revenue for Skillz. In order to generate revenue, Skillz must convince the users it acquires to engage with the platform by entering paid competitions for its hosted games. This second step in the process is generally referred to as user engagement. As Skillz publicly acknowledges, its "business depends on maintaining a successful platform for third-party developed games that end-users will download and [pay] entry fees to compete

---

[10] September 2 Investor Call.
[11] Merger Proxy Statement at 180.
[12] Id. at 170.
[13] March 2021 Registration Statement at 2.
[14] Merger Proxy Statement at 165.
[15] Id. at 60.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

for cash… with other end-users."[16]  Skillz spends heavily on this process as a result, hoping to encourage user engagement through its "End User Incentives Program."  A primary incentive is Skillz's own currency called "Bonus Cash"—free money that gamers could use to offset the cost of entering paid contests.  Players also earn loyalty currency, called Ticketz, every time they play a paid entry contest.  The frequency and amount of entry fees determine the amount of Ticketz that are earned.  Ticketz earned through the loyalty rewards and awards programs can be exchanged in our in-app Ticketz Store" for Bonus Cash that they can use to pay entry fees for more competitions and other prizes.[17]  For 2020, Skillz spent $91.5 million on its End User Incentives Program to encourage user engagement with the platform.[18]

81.     Skillz emphasized that "in our model, greater user engagement directly leads to more developer revenue" for Skillz which it shares with the game developer.  The Company emphasized that [w]ith our system, the more users enjoy playing in contests for prizes and the longer they play, the more revenue we generate for developers."[19]

82.     In this regard, Skillz's repeatedly proclaimed that it had achieved "Extraordinary User Engagement."[20]  Skillz claimed that the "interactive and highly social experience" on its gaming platform "power our industry leading average user engagement which we estimated at 62 minutes of game play per paying user per day in 2019 and positions us to be the center of users' mobile gaming life."[21]  Defendants also touted the fact that "[o]n average, users that have entered a paid-entry fee tournament download 10 Skillz-hosted games," as compared to 3 games downloaded on average in 2015.[22]

83.     Skillz claimed that "[o]ur competition-based platform offers [mobile game] developers a turn-key go-to-market solution…"[23]  As described above, Skillz provides developers with an SDK that

---

[16] Merger Proxy Statement at 57.
[17] *Id.* at 175.
[18] 2020 Form 10-K at 63.
[19] Merger Proxy Statement at 165, 169.
[20] *Id.* at 29, 94.
[21] *Id.* at 165.
[22] *Id.* at 175.
[23] *Id.* at 165.

19

they can download and integrate with their existing games. The SDK serves as a data interface between Skillz and the game developers that enables Skillz to provide monetization services to the developer. "These monetization services include end-user registration services, player matching, fraud and fair play monitoring, and billing and settlement services."[24] Skillz explained that "[b]y utilizing the Skillz monetization services, game developers can enhance the player experience by enabling them to compete in head-to-head matches, live tournaments, leagues, and charity tournaments and increase player retention through referral bonus programs, loyalty perks, on-system achievements and rewarding them with prizes (including Bonus Cash prizes)."[25] Skillz benefits from the monetization of developers' games as well, collecting a percentage of total entry fees as a commission

84. Skillz emphasized that effective marketing to potential users is an important component of its success. The Company explained that with "a blend of our analytics and data science, we leverage software tools to efficiently acquire, retain and engage users while reinforcing our trusted consumer-facing brand for both the end users and our developer partners. We acquire and engage users primarily through digital ad networks, our game developers and affiliate partners. We use a combination of paid marketing channels, in combination with compelling offers and exciting games, to achieve our objectives. We optimize our marketing investment across all our channels in order to generate strong returns on our marketing spending."[26]

85. The Company also highlighted its growth strategies that it was successfully executing to increase Skillz's market presence in North America and internationally which would grow revenues. Skillz summarized these growth strategies the Merger Proxy Statement[27] as follows:

*Our Growth Strategies*

**Grow the Core:** We reach fewer than 2% percent of mobile gamers in North America markets and are investing in marketing to expand our audience.

---

[24] *Id.* at 182.
[25] *Id.*
[26] *Id.* at 175.
[27] *Id.* at 167.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

**Expand the Content Available on our Platform:** We intend to expand beyond casual content into other genres of interactive entertainment by powering competitive experiences in everything from first-person shooter to racing to real-time strategy games.

**Expand Internationally:** We see a significant opportunity to expand internationally. In 2019, we generated more than 90% of our revenue from users in North America, even though the international market is approximately four times larger than the North American market.

**Increase Brand and Influencer Partnerships:** More than 80% of our GMV is paid out in prizes today. We believe brand advertisers sponsoring those prizes have the potential to broaden our reach and drive increased profitability for our business.

**New Monetization Models:** In 2019, only 10% of our MAUs entered into paid contests. We plan to monetize the remaining 90% through non-intrusive, low friction advertisements, virtual goods or brand-sponsored prizes that will generate new economic opportunities for us and enable more developers to succeed.

**Acquisitions:** We may consider selective acquisitions to accelerate our growth.

86.     As set forth herein, several representations touting the success of Skillz growth strategies were at best grossly exaggerated, and made without a reasonable basis in fact and, therefore, were materially misleading to investors in Skillz stock.

**Skillz Financial Model**

87.     Skillz generates revenues by taking a percentage of entry fees from each paid contest as a commission, which it shares with the developer after deducting user winnings and netting out user incentives such as "Bonus Cash" which the Company treats as a payment to the user that reduces revenues.

88.     Generally, users are required to deposit funds into their Skillz account in order to be eligible to play games for prizes. However, entry fees to play games include cash deposits, prior cash winnings that have not been withdrawn, and end-user incentives, such as Bonus Cash.  Skillz represents that for the year ended December 31, 2019 and the nine months ended September 30, 2020, cash deposits represented approximately 11% of total entry fees; cash winnings that have not been withdrawn

21

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                    CASE NO: 3:21-cv-03450

represented approximately 82% of entry fees; and Bonus Cash accounted for the remaining 7%. Skillz recognizes revenue related to each game regardless of how entry fees are paid. Skillz typically withholds 16% – 20% of the total entry fees when distributing the prize money as a commission. That commission is shared between Skillz and the game developers after accounting for certain costs incurred by Skillz to provide monetization services.

**Key Metrics:**

89.    Skillz does not generate revenue from game downloads—which are free—or the number of users on its platform, but only when those users "engage with" *i.e.*, pay money to enter contests, on its platform. This contrasts with how many websites, apps and other online businesses generate revenues. For example, many free gaming apps and other types of websites derive the bulk of their revenue from advertising dollars. In this ad-based model, revenue is a function of two key metrics: (1) number of users that accessed the company's website or used their product (*e.g.*, a game) and (2) the frequency of use, or user engagement. Thus, businesses that utilize this kind of ad-based business model typically report these key metrics as "Monthly Active Users," or "MAU," which reflects the gross number of users that accessed the website on a monthly basis, and "Average Revenue per User," or "ARPU," which is determined by dividing the average revenues generated for a given period, such as a month, by the average number of MAUs.

90.    Skillz focused on these two metrics—MAU and ARPU—despite not following an ad-based business model. However, as explained herein, these numbers were misleading because, unlike an ad-driven website or business, the MAU metric did not directly translate into revenues for Skillz. This was so because well over 80% of MAUs on Skillz's platform did not generate revenues. MAU refers to the number of users who played free games or entered into a paid contest on Skillz platform at least once a month, averaged over the quarter. Only paying users who entered into a paid competition, referred to as a Paying Monthly Average User ("Paying MAU" or "Payors"), directly generated revenues. In contrast, the vast bulk of MAUs—at best—only represented an opportunity to become Payors at some point in the future.

91.     Although Skillz metrics were interrelated, they were used to measure distinctly different user characteristics and served different purposes. MAU was a gross number–reflecting approximately 2.7 million total monthly average users for the nine months ended September 30, 2020 –that measured the amount of newly acquired and existing users who played at least one game per month on average. However, because more than 80% of MAUs did not enter into paying contests throughout the Class Period, this metric was merely an indicator of the total volume of end-users, not the amount of Payors.

92.     In contrast to MAUs, Paying MAUs are comprised solely of users who paid entry fees to compete for cash with other users, that is, the users who drive Skillz revenue.  Beginning on March 10, 2021, Skillz began reporting a different metric, ARPPU, which reflected the average monthly revenue generated by the Paying MAUs.  Unlike the previously reported MAU metric, ARPPU strips out the 80% of Skillz end-users that do not spend money on the platform to provide a clear indicator of the average rate of engagement of Payors driving Skillz's revenue determination.

93.     Skillz practice of including the 80% of its user base that are not Payors in its average revenue determination was misleading in that it obscured any underlying negative trends involving Payors by spreading those results across its entire end-user base.

94.     Skillz's senior executives have repeatedly acknowledged in the reporting periods following the merger that Paying MAU is a primary metric that should be considered to gauge revenues. For example, Defendant Paradise made clear in a Blog on Seeking Alpha that the Company's revenues were directly attributable to users who entered into paid competition.  He explained that "[t]he returns we generate today only come from paying users" which is "why payors are our primary target" and "for now, we're focused on growing our Paying MAU."[28]  Paradise reiterated in the Company's Earning Call for Q1 2021 on May 4, 2021 that "Skillz generates nearly all of its revenue from paying players" and "is

---

[28] April 8, 2021 Blog Post at 2.

perhaps the most important metric to our business."[29]  In contrast, he noted that "monetizing non-paying

users [*i.e.,* MAUs] is an important future opportunity."[30]

95.     Co-founder CRO Chafkin added that "[f]or a business that generates revenue from

consumer payments, **the most relevant KPI that everyone should be looking at is Paying M-A-U**.

… It wouldn't make sense to evaluate a businesslike Netflix using site visitors rather than subscribers,

and that's really the same way we think about it. … **MAU, simply put, just isn't a metric that**

**correlates with our business performance."**[31]

96.     In addressing a question about the importance of MAU to developers during the earnings

call, Chafkin's response was adamant:

> [I]t's something that I feel very passionate about in terms of how we optimize the
> business. And the top thing that our developers care about is the revenues that they're
> generating on the platform. MAU may be a vanity metric [large numbers], but as I
> mentioned before, **it's not actually correlated to our business performance.** In
> fact, the percent, **the portion of our MAU that are nonpaying users actually cost
> us money** because we provide services for them. We provide customer support for
> them. And so, our non-paying MAU, while they represent an opportunity from a
> revenue perspective for us in the future, are not a contributor to revenue today. And
> so, we don't optimize the business for it. **No one on my team is optimizing the
> business for growing MAU.**[32]

97.     Surprisingly, Skillz took precisely the opposite position in response to the SEC's review

of the Merger Proxy Statement.   In fact, the SEC sent a comment letter, in response to the initial

registration and proxy statement filed September 8, 2020, specifically questioning the Company's basis

for identifying MAU and ARPU as its key metrics.   The SEC letter stated:

> **Our Financial Model, page 176**
>
> On page 71 you identify MAU and ARPU as key metrics. Please disclose MAU and
> ARPU for each period presented, as well as any other metrics you use in monitoring
> your ability to attract and retain users. Also, revise your definition of MAU to clarify
> whether this measure includes both paying and non-paying users. **Tell us the
> number of paying users for each period and specifically tell us whether this is**

---

[29] Transcript of Q1 2021 Earnings Call dated May 4, 2021 (the "Q1 2021 Earnings Call") at 3.
[30] *Id.*
[31] *Id.* at. 5-6.
[32] *Id.* at 13-14.

**a metric used to manage your business and if not, explain why.** Also, please discuss how you monitor your ability to convert active users to paying users, quantifying any additional metrics used for each period presented. In this regard, we note your disclosure on page 164 that only 10% of your MAUs enter into paid contests. Refer to Item 303(a)(3) of Regulation S-K and Section 1 of SEC Release No. 33-10751.[33]

98.     In particular, the Release No. 33-10571 provides "guidance on disclosure of key performance indicators and metrics" in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). The SEC noted that "[f]or each business, there is a limited set of critical variables which presents the pulse of the business." The Commission "previously has emphasized that … [i] 'companies should consider whether disclosure of all key variables and other factors that management uses to manage the business would be material to investors, and therefore required'" and [ii] companies should "identify and address those key variables and other qualitative and quantitative factors that are peculiar to and necessary for an understanding and evaluation of the individual company. Such information could constitute key performance indicators and other metrics."

99.     The release also reminded companies that, when including metrics in their disclosure, they should consider existing MD&A requirements and the need to include such further material information, if any, as may be necessary in order to make the presentation of the metric, in light of the circumstances under which it is presented, not misleading.

100.    Finally, the release cautioned that:

[i]f a company changes the method by which it calculates or presents the metric from one period to another or otherwise, the company should consider the need to disclose, to the extent material: (1) the differences in the way the metric is calculated or presented compared to prior periods, (2) the reasons for such changes, (3) the effects of any such change on the amounts or other information being disclosed and on amounts or other information previously reported, and (4) such other differences in methodology and results that would reasonably be expected to be relevant to an understanding of the company's performance or prospects. Depending on the significance of the change(s) in methodology and results, the company should consider whether it is necessary to recast prior metrics to conform to the current presentation and place the current disclosure in an appropriate context.

101.    Skillz responded on October 13, 2020 as follows:

---

[33] SEC Letter to FEAC dated October 6, 2020 ("SEC Comment Letter") at 6.

> Paying MAU is <u>not</u> a primary metric that we use to manage our business as our primary focus is on growing the total user traffic on our platform. Our focus on growing total user traffic is based on the expectation that, over time, we will be able to monetize all users as the content on our platform evolves and we add new forms of monetization such as advertising. We monitor the ability to convert active users to paying users based on the percentage of acquired users who deposit bash through our platform.

> Historically, the percentage of MAU that are paying users has been stable and this metric has <u>not</u> been a significant or material driver for the financial results for the periods presented.[34]

102.    Skillz's response to the SEC was inaccurate. Management conceded, beginning with the release of Q4 and full year 2020 financial results on March 10, 2021, that "the most relevant KPI that everyone should be looking at is Paying M-A-U." CRO Chafkin explained that "the returns we generate today only come from paying users" which is "why payors are our primary target" and "for now, we're focused on growing our Paying MAU."

103.    Skillz also candidly admitted that "MAU, simply put, just isn't a metric that correlates with our business performance."[35] This was confirmed by Confidential Witness #1 ("CW#1") who worked in the Revenue Department from mid-2020 to early 2021. CW#1 held a management role and participated in Leadership events, like weekly revenue meetings which were typically long hours, and in which Defendant Paradise and Defendant Chafkin attended. CW#1 stated that "we did not even pay attention to MAU."

104.    As more fully described in Section C.5, *infra*, Skillz's financial results for the nine months ended September 30, 2020 included in Merger Proxy Statement and the February 2021 Registration Statement were materially false and misleadingly in attributing revenue growth exclusively to higher MAU. Specifically, Defendants misrepresented that the revenue "increase was attributable primarily to an 80% increase in MAU, driven by sales and marketing investment to acquire new paying users."[36]

---

[34] FEAC Letter to SEC dated October 13, 2020 ("FEAC Response Letter") at 9.
[35] Q1 2021 Earnings Call at 6.
[36] S-1 filed February 9, 2021 at 66.

105.    The Merger Proxy Statement and the February 2021 Registration Statement also contained a comparison of financial results for the years ended December 31, 2019 and 2018.  The MDA discussion was similarly false and misleading in attributing revenue growth exclusively to higher MAU. Specifically, the discussion of 2019 revenues falsely represented that the revenue "increase was attributable primarily to a 99% increase in MAU, driven by sales and marketing investment to acquire new paying users."[37]

106.    The MDA disclosure of ARPU alone was also materially misleading and incomplete. ARPU, by itself, was only of marginal relevance because it lumped in more than 80% of MAUs who were not Payors, and thus did not generate any income for Skillz.  Chafkin explained that "the portion of our MAU that are nonpaying users actually cost us money because we provide services … [and] customer support for them."

107.    Moreover, disclosing ARPU alone obscured the fact that paying users generated lower revenues on average than the prior periods in 2019.  The MDA discussion for the nine months ended September 30, 2020 and the full year 2019 reported only that ARPU had increased 6% and 19%, respectively, over prior year periods.  These disclosures were materially misleading and incomplete in omitting that revenues generated by paying active users (ARPPU) had declined by 8% in Q3 2020 as compared to Q3 2019 and continued to decline by over 12% during in Q4 2020.

C.    **Defendants' Materially False And Misleading Statements And Omissions**

1.    **Declining Game Play in Key Games**

108.    Prior to and throughout the Class Period, Defendants touted the Company's growth, while concealing its decline in game downloads for its top games.

109.    On September 3, 2020, FEAC filed its Form 8-K, which was signed by Defendant Baker with an attachment of a transcript from a September 2, 2020 investor call , where Defendant Paradise touted the growth of Skillz's download numbers:

---

[37] *Id.* at 67

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

Our paying users today have 10 Skillz games installed. In 2015 this number was  3 games installed. Even though the top title continues to rotate over time, they're not shrinking or disappearing. In fact, they continue to grow, often quite substantially, after being displaced from the number one position.[38]

110.     Defendants' statements touting the continuing substantial growth of its top games was materially false and misleading in failing to disclose that downloads for Skillz's top games, which Defendants conceded was a key component to the success of its business, were declining.  As initially revealed by the Wolfpack Report, based upon data obtained from independent third-party apps, installations for three games which make up 88% of Skillz revenue declined substantially.  The report states in pertinent part:

We found that the three games responsible for 88% of SKILZ's revenues in the first 9 months of 2020 had all peaked by Q3 2020. Downloads for SKLZ's full lineup of games began to show overall declines in Q1 2021, while the company has projected 61.4% YoY growth in 1Q21.

*   *   *   *

Third Party app data shows that installs of 21 Blitz, Solitaire Cube, and Blackout Bingo al declined -52%, -40%, and -20%, respectively, in Q4 2020. As of March 3, 2021, those games were on track to continue their declines in Q1 2021.

Based on a careful reading of SKLZ's prospectuses, we estimate that revenue from Solitaire Cube and 21 Blitz, the top two games from Tether studios, shrank -5.9% in Q3 2020.

111.     CW#1 substantially confirmed the findings in the Wolfpack Report.  According to CW#1, Skillz's senior officials were informed about download data in part through regular Sunday evening meetings that Defendant Paradise held every week to go over tasks and targets and to review numbers.  According to CW#1, data presented at these meetings showed that downloads of 21 Blitz and Solitaire Cube declined "consistently" since June 2020.  CW#1 also reported that "top to bottom, they were failing to get more people into the game, failing to keep people in the platform."  CW#1, also stated that "the games were not doing well."  According to CW#1, "Blackout Bingo was essentially eating up all of the new installs because that's what the audience was seeing first," "but it was to the detriment of

---

[38] September 2 Investor Call at 7.

the other games. And that's because all of the advertisements were kind of overlapping and showing the same ads to the same audience."

112.    The Merger Proxy Statement contained the following statements:

**Extraordinary User Engagement.** Skillz has developed a platform for game developers and end-users that has proven engaging and "sticky." Additionally, as its platform features more content, end-users have played more games.

\* \* \*

**Strong Network Effects** We have a vibrant and growing ecosystem of developers and users. Compelling competitive content on our platform attracts users, increasing the size of our audience, which, in turn, attracts more developers to create new interactive experiences using our platform, producing a powerful network effect. We believe this network effect fuels our growth.

\* \* \*

**The scale, growth and engagement of the users —** As we continue to acquire users, our ability to match comparable players, on both skill level and tournament template, in a fair and timely manner improves. Better matching leads to stronger engagement and the ability to create larger tournaments with more profitable take rates. This creates a stickier, more engaging, and continuously improving experience for our players, which in turn attracts more players to our platform, creating a positively reinforcing cycle leading to ever-improving gaming experiences.[39]

113.    Similar representations were made in the February 2021 Registration Statement, the March 2021 Registration Statement and Prospectus, and the 2020 Form 10-K.[40]

114.    Defendants' representations boasting that user engagement was "stickier, more engaging, and continuously improving experience for our players, which in turn attracts more players to our platform," gave the misleading impression that all key growth trends were positive. Defendants' failure to disclose the decline in its downloads during the second half of 2020 was a material omission that made their bullish representations materially false and misleading.

---

[39] Merger Proxy Statement at 29, 94, 172, 181.
[40] February 2021 Registration Statement at 54, 63; March 2021 Registration Statement at 49, 66; 2020 Form 10-K at 40; March 2021 Prospectus at 45, 54.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                              CASE NO: 3:21-cv-03450

115.     During a Q4 2020 Earning Call held on March 12, 2021 (the "March 12 Earnings Call"), Michael Graham from Canaccord Genuity, Inc. directly asked the Company about the issues raised in the Wolfpack report:

> Hi. Thank you, and congrats on getting public and on getting these numbers out. It's exciting.
>
> I wanted to start off with a question just about game concentration and revenue concentration. Through your own disclosures, we know that you have a lot of concentration of revenue and a few games. I think that's been by design, just sort of marketing around those games to grow the ecosystem there, but I just wonder if you can comment on your philosophy there, in general, and then I believe there was a third-party report out there, suggesting that download activity might be slowing down a little bit in some of those key games, and I just wonder if you could maybe talk about what you're seeing there, and how that's shaping the business going forward? Thanks so much.

116.     Tellingly, Defendant Paradise deflected the issue, by refusing to directly address the question concerning the decline in downloads and instead pointing to another metric Gross Market Value, or "GMV," that he claimed was still growing.  Paradise responded as follows:

> Sure, happy to answer your question. This is Andrew Paradise, so thank you for that, Michael.
>
> In terms of developer concentration, I know we're a newly public Company, so people aren't as familiar with how our business mix has always worked. Media businesses always have concentration because consumers seek out the best experiences. The most popular content has the biggest audience, but generally, the rising tide lifts all boats. Our previous number on titles, they've actually all continued to grow in GMV, even after being displaced from their position.

117.     Paradise's answer was nonresponsive because GMV added nothing to the question of download activity.  GMV refers to total entry fees using cash winnings from prior contests, Bonus Cash, or cash deposits.  The fact that user played games with prior winnings or free money (which amounts to almost 90% of total entry fees) gives no indication whether new user downloads was increasing or not. Paradise's failure to acknowledge the downturn in downloads—admittedly a key component of the Company's success—furthered his misleading narrative that emphasized only the positive results while

1  excluding adverse facts that would have tempered the one-sided impression of the Company's financial

2  performance.

3      118.    Skillz had no qualms touting download results when they were favorable.  During the Q1

4  2021 Earnings Call, Defendant Paradise specifically highlighted game downloads as important

5  component of the Company's "most important metric."  Paradise emphasized that "Paying MAU

6  describes our subscriber base, and is perhaps the most important metric to our business. Paying MAU

7  was driven by growth in new paying users*, which is a function of both the number of new installs or downloads, as*

8  *well as the install-to-deposit rate.*"

9      **2.  Unrealistic Expansion to India**

10     119.    Throughout the Class Period, Defendants made several false and misleading statements

11 concerning Skillz's ability to expand into the international market and, in particular, their highly touted

12 launch into India's gaming market.

13     120.    During the March 12, 2021 earnings call for Q4 and year-end 2020, Defendant Paradise

14 told investors that the Company planned to launch in India before the end of 2021, which was highly

15 material given the size of India's user base and rapid growth rate:

16     Third, on international expansion. Today, more than 90% of our revenue comes from
17     North America, and the international market is four times the size of that. Our first
       international market outside of North America is India, and we expect to launch that
18     market later this year. India's mobile gaming market has already reached 137 million
       gamers and is expected to grow at 26% per year. With that perspective, the U.S.
19     market today is approximately 210 million gamers, and it's growing 6% per year.
       **India is already two-thirds the size of the U.S. market, but it's growing four**
20     **times faster.**

21     121.    Paradise's April 8, 2021 Blog Post contained the following statements:

22     We see an opportunity to enable fun and fair competition beyond North America
23     and even beyond video games. The international mobile gaming market is 4x larger
       than North America, but it currently represents less than 10% of our revenue. In fact,
24     we're on track to launch in India later this year and have plans to expand into
       additional new countries after that. We expect India will increase our addressable
25     market by 65% and is projected to grow 4x faster than the United States. The
       potential upside is compelling, to say the least.
26

27                                   31

28

122.     Defendants' statements in ¶¶ 120-121 were materially false and misleading because Skillz knew it lacked the capability to launch in India in 2021.  CW#1 helped with the "planning" and analysis in determining the requirements needed to launch in India.  According to CW#1, Skillz's market analysis for expansion to India showed that it would take approximately 2 years to launch in India. CW#1 also stated that the Company needed a whole ten (10) additional developers to prepare for the India launch.

123.     CW#1 explained that notwithstanding Defendant Paradise's bullish pronouncement about international expansion during an earnings call, it was clear to CW#1 that anyone involved in the planning process knew there was no way Skillz was going to go international this year with its current resources. According to CW#1, launching in India in 2021 would require Skillz to acquire another company in India to do the work.

124.     Accordingly, Skillz's disclosures concerning launching in India by year-end were materially false and misleading without disclosing the current technological difficulties that undermined this pronouncement.

### 3.  Overstated Technical Capabilities - Synchronous Play

125.     Defendants also made several false and misleading statements concerning the Company's platform capabilities during the Class Period.  During the September 2, 2020 Investor Call, Defendant Paradise repeatedly lauded Skillz's platform capabilities:

> Skillz is making fair competition accessible for everyone, everywhere. We do that through 200 different features we built to create a community, and it's a community that loves fair and meaningful competition. These features do everything, ranging from head-to-head tournaments, to multi-hundred-thousand-player week-long leagues, and exciting live events.[41]

126.     The Merger Proxy Statement and prospectus dated December 1, 2020 likewise touted Skillz's platform capabilities:

---

[41] September 2 Investor Call at 4.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                           CASE NO: 3:21-cv-03450

> **Games on Our Platform**
> We offer a wide range of contests for the users. We enable game genres that can be played: (i) asynchronously; (ii) turn-based synchronously; or (iii) synchronously. An example of an asynchronous game would be a match-3 puzzle game or bingo game where users play the exact same game at different times and then the scores are compared when both contestants have played to determine the winner. An example of a turn-based synchronous game would be a dominoes game in which users take turns in real-time and the winner is determined when the game ends. An example of a synchronous game would be a real-time strategy game where users are making multiple moves simultaneously and then the winner is determined when the game ends.[42]

127. The February 2021 Registration Statement, the March 2021 10-K, the March 2021 Registration Statement, and March 2021 Prospectus made similar representations that promoted Skillz's platform capabilities:

> **Games on Our Platform**
> We offer a wide range of contests for the users. We enable game genres that can be played:(i) asynchronously; (ii) turn-based synchronously; or (iii) synchronously. An example of an asynchronous game would be a match-3 puzzle game or bingo game where users play the exact same game at different times and then the scores are compared when both contestants have played to determine the winner. An example of a turn-based synchronous game would be a dominoes game in which users take turns in real-time and the winner is determined when the game ends. An example of a synchronous game would be a real-time strategy game where users are making multiple moves simultaneously and then the winner is determined when the game ends.[43]

128. Defendants' statements that Skillz "offer[s] a wide range of contests" that included synchronous play (¶¶ 126-127) were materially false and misleading because Skillz knew or recklessly disregarded that its platform did not currently have the capability to provide synchronous games to its users, but rather was in the testing stage. In truth, Skillz was nowhere close to launching synchronous games that users could play. According to CW#1, Synchronous gaming was "brand new" at the time CW#1 left Skillz in March 2021, and that the company was "working out bug defects" by asking all employees to test synchronous games.

---

[42] Merger Proxy Statement at 174.
[43] February 2021 Registration Statement at 56; 2020 Form 10-K at 6; March 2021 Registration Statement at 68; March 2021 Prospectus at 47.

129.     As discussed in ¶ 174 below, Skillz has since acknowledged that synchronous game play was in the development and testing phase, further confirming the false and misleading nature of its prior statements.

### 4.  Low Paid User Engagement

130.     Defendants made several false and misleading statements concerning the Company's the level of paid user engagement.

131.     The Merger Proxy Statement contained the following statements:

**Extraordinary User Engagement.** Skillz has developed a platform for game developers and end-users that has proven engaging and "sticky." Additionally, as its platform features more content, end-users have played more games.

* * *

**The scale, growth and engagement of the users** — As we continue to acquire users, our ability to match comparable players, on both skill level and tournament template, in a fair and timely manner improves. Better matching leads to stronger engagement and the ability to create larger tournaments with more profitable take rates. This creates a stickier, more engaging, and continuously improving experience for our players, which in turn attracts more players to our platform, creating a positively reinforcing cycle leading to ever-improving gaming experiences.[44]

132.     The February 2021 Registration Statement contained similar representations:

**The scale, growth and engagement of the users—** As we continue to acquire users, our ability to match comparable players, on both skill level and tournament template, in a fair and timely manner improves. Better matching leads to stronger engagement and the ability to create larger tournaments with more profitable take rates. This creates a stickier, more engaging, and continuously improving experience for our players, which in turn attracts more players to our platform, creating a positively reinforcing cycle leading to ever-improving gaming experiences.[45]

133.     Skillz made the same representations in the 2020 Form 10-K, the March 2021 Registration Statement and March 2021 Prospectus.  However, Defendants' bullish statements touting the "stickier, more engaging, and continuously improving experience for our players" created the materially false and misleading impression that Skillz was acquiring and growing its pool of quality end-

---

[44] Merger Proxy Statement at 29, 94, 181.
[45] February 2021 Registration Statement at 63.

users, *e.g.*, those that spent time playing games that used the platform and were actively engaged in paid competitions.  Yet, most new users who downloaded Skillz games never even opened them and despite reporting several hundred thousand paying MAUs, Skillz derived the bulk of its revenue from a tiny fraction of those users who spent more than $500 in competition and tournaments.  According to CW#1, the majority of people on the platform were "not spending more than a few dollars" and "wouldn't spend a lot of time in the system."  CW#1 reported that Skillz made most of its money off a "very small population" of users, as small as 1% of all users, who spent over $500 or $1,000 on the platform. CW#1 noted that the 1% of users were called "whales" internally and "VIPs" externally.  According to CW#1, user spending was readily available on Skillz Tableau platform and regularly tracked by senior management, including Defendant Paradise.

134.    Accordingly, Skillz's representations concerning the scale, growth and engagement of its user base were materially false and misleading.

**5.    Defendants Falsely Claimed that Revenue Was Primarily Driven by MAU Rather Than Paying Users and Concealed That Average Monthly Revenue Of Paying Users Was Declining.**

135.    Skillz's release of third quarter and nine months year to date 2020 results, filed with the SEC on November 18, 2020 (the "November 18 Release"), which were included in the Merger Proxy Statement and the February 2021 Registration Statement, were materially false and misleading in attributing revenue growth to higher MAU rather than Paying Users, and failing to disclose that the average revenue per Paying User – a significant indicator of user engagement -- was on the decline during the second half of 2020.

136.    The MDA discussion in the Merger Proxy Statement and February 2021 Registration Statement contained identical representations attributing revenue growth for the nine months ended September 30, 2020 to increases in both MAU and the average monthly revenues per MAU (ARPU), without any mention of the significance of Paying MAU and ARPPU (or even identifying ARPPU at all) to reported revenues.

137.    The MDA discussion stated:

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                          CASE NO: 3:21-cv-03450

**Nine Months Ended September 30, 2020 Compared to the Nine Months Ended September 30, 2020**

**Revenue**

Revenue increased by $77.3 million, or 91%, to $162.4 million in the nine months ended September 30, 2020 from $85.1 million in the six months ended September 30, 2019. The increase was attributable primarily to a 91% increase in MAUs, driven by sales and marketing investment to acquire new paying users. ARPU increased 6% over the same period.[46]

138.    The Merger Proxy Statement and February 2021 Registration Statement also contained a comparison of financial results for the years ended December 31, 2019 and 2018. The MDA discussion of yearly results contained similar misrepresentations attributing revenue growth for 2019 to increases in both MAU and the average monthly revenues per MAU, without any mention of Paying MAU and ARPPU. The MDA discussion stated:

**Year Ended December 31, 2019 Compared to Year Ended December 31, 2018**

\*      \*      \*

**Revenue**

Revenue increased by $69.1 million, or 136%, to $119.9 million in 2019 from $50.8 million in 2018. The increase was attributable primarily to a 99% increase in MAUs, driven by sales and marketing investment to acquire new paying users. ARPU increased 19% over the same period.[47]

139.    The November 18 Release also reported increases in both MAU and the average monthly revenues per MAU (ARPU) without disclosing the Paying MAU and ARPPU metrics.

140.    As described in ¶¶ 105-107, *supra,* Skillz's MDA discussion was materially false and misleading in attributing improved revenue to higher MAU rather than Paying MAU. Defendants themselves acknowledged after the release of 2020 full-year results that Paying MAU was the primary driver of revenue.

141.    Henry acknowledged in the March 12 Earnings Call that "the driver that really moves the needle in our business is paying attention to our paying [users] now." Defendant Paradise likewise

---

[46] Merger Proxy Statement at 84; February 2021 Registration Statement at 66.
[47] Merger Proxy Statement at 185; February 2021 Registration Statement at 67.

admitted that "Skillz generates nearly all of its **revenue from paying players**" … which "is perhaps **the most important metric to our business.**"[48]  Paradise also acknowledged that "[t]he returns we generate today only come from paying users" which is "why payors are our primary target" and we're focused on growing our Paying MAU.,

142.    The MDA discussion of improved ARPU, standing alone, was also materially misleading and incomplete in failing to disclose (or even identify) the far more significant ARPPU metric which showed a decline in paying user engagement during the second half of 2020.   ARPU by itself, was only of marginal relevance because it was derived from the MAU metric that included more than 80% non-paying users who played free games that did <u>not</u> generate any income for Skillz.  Chafkin emphasized the distinction explaining that "the portion of our MAU that are nonpaying users actually cost us money because we provide services … [and] customer support for them."

143.    Utilizing a metric that monetized the vast bulk of non-paying users obscured the impact of declining revenues from Paying Users, which is measured by the Average Revenue Per Paying Monthly Active User, or ARPPU.  The MDA discussion of revenues for the nine months ended September 30, 2020 and the full year 2019 stated that ARPU had increased 6% and 19%, respectively, over the prior year periods.  These disclosures highlighting positive ARPU results alone were materially incomplete in failing to disclose that revenues generated by Paying Users (ARPPU) had declined by 8% in Q3 2020 as compared to Q3 2019 and the percentage decline in ARPPU continued to rise to over 12% during Q4 2020 as compared to paying user average revenues for Q4 2019.

144.    As Skillz subsequently conceded, disclosure of the ARPPU was a key metric of user engagement because it focused solely on the paying user base that actually entered into paying competitions that generated revenues.  Identifying ARPPU as a key metric and disclosing the downturn

---

[48] Q1 2021 Earnings Call at 3.

in average revenues per paying user during the second half of 2020 were necessary to make the presentation of positive ARPU numbers not misleading to investors as shown on the table below.[49]

**Three Months Ended September 30, 2020 and September 30, 2019:**

|  | **2020** | **2019** | **% Difference)** |
|---|---|---|---|
| **Reported ARPU** | 7.49 | 6.07 | 23% |
| **Unreported ARPPU** | 58 | 63 | (8)% |

**Three Months Ended December 31, 2020 and December 31, 2019:**

|  | **2020** | **2019** | **%Difference** |
|---|---|---|---|
| **Reported ARPU** | 9.42 | 5.86 | 61% |
| **Unreported ARPPU** | 58 | 66 | (12)% |

145.    Importantly, Skillz's financial results in the periods following the merger recognized ARPPU as a key metric that the Company used in assessing the Company's business performance.[50]

146.    Moreover, beginning with the release of 2020 yearly results, Skillz made a significant change in its financial disclosures, including attributing revenue increases **"primarily to … an increase in paying MAUs**.  The MDA in the 2021 Form 10-K. provided:

> **Year Ended December 31, 2020 v. Year Ended December 31, 2019**
> **Revenue**
> Revenue increased by $110.2 million, or 92%, to $230.1 million in 2020 from $119.9 million in 2019. The increase was attributable primarily to an increase in paying MAUs, driven by sales and marketing investment to acquire new paying users.…[51]

147.    Skillz also retroactively changed its disclosures for year-end 2019 by attributing revenues to paying MAUs rather than MAUs. The 2020 Form 10-K states:

> **Year Ended December 31, 2019 v. Year End Ended December 31, 2018**
> **Revenue**

---

[49] Skillz Presentation: Q4 2020 Financial Results at 6.
[50] *See e.g.*, 2021 Form 10-K at 27 ("Certain of our key metrics, including MAUs, Paying MAUs, ARPU, and ARPPU are calculated used data tracked by our internal analytics system based on tracking action of user accounts").
[51] *Id.* at 43.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                          CASE NO: 3:21-cv-03450

Revenue increased by $69.1 million, or 136%, to $119.9 million in 2019 from $50.8 million in 2018. The increase was attributable primarily to an increase in paying MAUs, driven by sales and marketing investment to acquire new paying users.…[52]

148.    In addition, Skillz began including ARPPU results, a number previously unavailable to investors, as a key metric central to Skillz's business.  The Form 2021 10-K and March 2021 Registration Statement disclosed a year-over-year decline in average revenues generated by paying users, stating: "For each of fiscal years 2020 and 2019 … our Paying MAU was 0.3 million and 0.2 million, respectively and our monthly average revenue per paying user ("ARPPU") was $58 and $62, respectively."[53]  This represented a 6.5% decline year-over-year.  As shown in ¶ 143-144, *supra,* Skillz also broke out ARPPU on a quarterly basis in its Skillz Q4 2020 Financial Presentation, disclosing 8% and 12% declines for 3Q 2020 and 4Q 2020, respectively, as compared to the prior year periods.

149.    Defendants were well aware that using MAU metric was of marginal relevance to the Company's current revenues.  CW#1 confirmed that throughout CW#1's employment in Skillz marketing department, "we did not even pay attention to MAU."  By definition, MAU represented only a "future opportunity" to engage its over 80 percent non-paying users according to Defendants Paradise and Chafkin.  According to CW#1, "all of a sudden when [Skillz] went public, they realized that Wall Street cared about MAUs," and then Skillz began to focus on that metric.

150.    Notwithstanding that Skillz's business model focused on paying users, and that SEC disclosure rules required disclosure of all key metrics "that management uses to manage the business," Defendants initially chose to focus on metrics that Wall Street was familiar with – MAU and ARPU – thereby avoiding disclosing the declines in the average revenues of paying users during the second half of 2020.

151.    The fact that Skillz's did a complete about face in the quarter following the Merger, in conjunction with senior management's emphatic rejection of MAU, is striking.  A comparison of the

---

[52] *Id.*
[53] *Id.* at 40.

MDA discussion in the February 2021 and March 2021 Registration Statements illustrates the point.  The February 2021 Registration Statement falsely claimed that only MAU and ARPU were the metrics driving revenues in presenting nine months results for 2020.   Yet, just over one month later, the Company embraced paying MAU as the primary driver for the full year and for the first time identified ARPPU as a "key metric," disclosing that revenues per paying users had declined from 2019.  The reversal in reporting without explanation is a concession that these known metrics were highly material.  Accordingly, Defendants' failure to disclose the importance of paying MAU and the downturn in ARPPU rendered their more favorable financial disclosures before the release of Q4 2020 results materially false and misleading.

### 6.   Defendants' Financial Statements Violated SEC Disclosure Rules

152.     Skillz's failure to (i) disclose the importance of paying MAU, and (ii) identify and disclose its ARPPU metric was also a material omission because SEC rules required the Company to disclose "all key variables and other factors that that management uses to manage the business [that] would be material to investors, and therefore required."  SEC Release No. 33-10751, citing SEC Release 33-8350, which, provides in relevant part:

> [O]ne of the principal objectives of MD&A is to give readers a view of the company through the eyes of management . . . companies should identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

153.     In fact, as described in ¶ 97, *supra,* the SEC sent Skillz a comment letter, in response to its draft Merger Proxy Statement filed September 8, 2020, specifically questioning whether the Company's used paying MAU as one of its key metrics in managing its business.

154.     Because Skillz's management clearly considered paying users a primary indicator that drive revenues, (¶¶10, 90-94), *supra),* Defendants were required to identify paying MAU as the primary driver of revenues.  Instead, they falsely claimed that "Paying MAU is <u>not</u> a primary metric that we use to manage our business" and misrepresented that that MAU was the primary revenue driver, in violation of SEC disclosure rules and the federal securities laws.

40

155.     Skillz's failure to identify, let alone disclose, the average monthly revenues generated by a paying user (ARPPU) as a key metric, also violated SEC disclosure rules since ARPPU was a key metric management used to manage its business.

156.     As described herein, the Company's subsequently inclusion of ARPPU as a key metric was a concession of its materiality to investors in evaluating the level of user engagement.  Moreover, by solely disclosing the increase in ARPU (derived from a user population comprised of more than 80% non-paying users), without also disclosing the far more significant ARPPU metric, at best obscured the fact that average revenues from paying users were declining during the second half of 2020.  This also violated SEC disclosure rules and the federal securities laws.

### 7.     Defendants Materially Understated Skillz's Liabilities In Its 2020 Financial Statements and Misrepresented that Internal Disclosure Controls Were Adequate

157.     As part of Skillz SPAC merger with FEAC, Skillz issued public and private warrants (the "Warrants") concurrently with its IPO on December 17, 2020.  Skillz classified these Warrants as equity on its financial statements during the Class Period.

158.     The 2020 Form 10-K and the Company's release of Q4 and full-year 2020 financial results, dated March 10, 2021 (the "2020 Release"), included the Company's year-end 2020 financial statements.   The 2020 financial statements improperly classified the Warrants as equity rather than as a liability under Accounting Standards Codification ("ASC") 815-40, "Contracts in Entity's Own Equity."

159.     The 2020 Form 10-K also misrepresented the following:

> Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), as of the end of the period covered by this Annual Report on Form 10-K.  **Based on such evaluation, our principal executive officer and principal financial officer have concluded that, as of such date, our disclosure controls and procedures were effective at a reasonable assurance level.**[54]

---

[54] 2020 Form 10-K at 88.

41

160.     The 2020 Form 10-K included SOX certifications signed by Defendant Paradise and CFO Henry, falsely attesting that "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

161.     Skillz's 2020 financial statements were included in the March 2021 Registration Statement and Prospectus in connection with the March 2021 Offering.   Pursuant to the requirements of the Securities Act of 1933, as amended, The Officer Defendants and the Director Defendants each signed the March 2021 Registration Statement, attesting to the accuracy of the information contained therein.

162.     Skillz and its representatives were well aware of the terms of the public warrants and private warrants, and knew or recklessly disregarded that they did not meet the conditions to be classified as equity under ACS 815-40.

163.     Nonetheless, Skillz and the Officer and Director Defendants authorized the filing of the 2020 Release, the 2020 Form 10-K, and the March 2021 Registration Statement and Prospectus, which contained financial statements that misclassified the warrants and thereby understated the Company's liabilities and net loss.

164.     Less than two months later, on May 4, 2021, Skillz filed a Form 8-K in which it admitted that the 2020 financial statements misclassified the warrants as equity and advised investors that the 2020 financial results could no longer be relied upon.   Skillz also advised investor that it was restating its 2020 financial results.   The restatement constitutes a material misstatement of Skillz's financial results.

**D.     The Truth Is Gradually Revealed**

165.     On March 8, 2021, the Wolfpack Report was publicly released and described, among other things, how: (i) third-party app data shows installations of the three games responsible for 88% of Skillz's revenues (21 Blitz, Solitaire Cube, and Blackout Bingo) all declined substantially; (ii) Skillz did not

42

disclose the substantial decrease in the popularity of these three games (despite their material importance to its growth trajectory); and (iii) Skillz's platform does not support synchronous game play or scaling the business internationally.

166.    The Wolfpack Report stated that installations for these three games declined substantially, stating, in pertinent part: "We found that the three games responsible for 88% of SKILZ's revenues in the first 9 months of 2020 had all peaked by Q3 2020."  Moreover,

> "Third Party app data shows that installs of 21 Blitz, Solitaire Cube, and Blackout Bingo al declined -52%, -40%, and -20%, respectively, in Q4 2020. As of March 3, 2021, those games were on track to continue their declines in Q1 2021.
>
> Based on a careful reading of SKLZ's prospectuses, we estimate that revenue from Solitaire Cube and 21 Blitz, the top two games from Tether studios, shrank -5.9% in Q3 2020.
>
> \*       \*       \*

167.    The Wolfpack Report stated that Skillz's platform could not handle developer's needs regarding synchronous play:

> Our conversations with former employees suggested that large studios are unwilling to touch Skillz's platform, both because the Skillz platform is not robust enough to adequately handle their needs with synchronous play and international matchmaking. One former Skillz employee we spoke to made the following statement regarding Skillz's reputation in the gaming industry:
>
> *"In the gaming industry, Skillz does not have good brand recognition. Most of the players in the industry consider them a joke."*

168.    On this news Skillz's plummeted by 10.9% to close at $24.45.  This resulting decline in market capitalization was approximately $762 million.

169.    On April 19, 2021, the Eagle Eye issued a report concluding that Skillz is "recognizing revenue from 'virtual' money it gave its customers to spend although no real cash is generated in the process."  The Eagle Eye Report places emphasis on the fact that sales and marking includes "limited-time Bonus Cash."

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                                    CASE NO: 3:21-cv-03450

170.    The Eagle Eye Report calculated cash revenue noting that Skillz's revenue recognition policy mispresents the financial condition of the business and concluded that true cash revenue based on net deposits (*i.e.,* cash deposits less withdrawal) – which had declined in the first half of 2020 -- is less than one-half of what management portrays to investors.

171.    Following the publication of the Eagle Eye Report, shares of Skillz plummeted by 6.61% to close at $12.55 on April 19, 2021, losing approximately $254 million in investor value.

172.    On May 4, 2021, less than two months after releasing the Company's 2020 annual financial statements, Skillz issued a press release filed on Form 8-K, conceding that is financial statements improperly classified warrants issued in connection with its December 2020 SPAC merger as equity rather than as a liability.  The May 4 press release stated in part:

> On April 29, 2021, the Audit Committee of the Board of Directors of the Company concluded that **the Company's consolidated financial statements for the year ended December 31, 2020 should no longer be relied upon due to changes required to reclassify the Warrants as liabilities and record non-cash fair value adjustments into earnings to align with the guidance set forth in the Statement.**  Similarly, the related press releases, Report of Independent Registered Public Accounting Firm on the consolidated financial statements as of December 31, 2020 and for the year then ended, and the stockholder communications, investor presentations or other communications describing the relevant portions of the Company's consolidated financial statements for the year ended December 31, 2020 should no longer be relied upon.  The Company is preparing an amendment (the "Amended Form 10-K") to its Annual Report on Form 10-K for the year ended December 31, 2020 filed with the SEC on March 12, 2021 reflecting this reclassification of the Warrants as liabilities and recognition of related non-cash fair value adjustments into earnings.

173.    In the accompanying Q1 2021 Form 10-Q, filed May 5, 2021, the Company explained the basis for classifying the warrants as a liability, as follows:

> **Note 2. Summary of Significant Accounting Policies**
>
> The Company evaluated the Public and Private Common Stock Warrants under ASC 815-40, *Derivatives and Hedging—Contracts in Entity's Own Equity*, ("ASC 815-40"), and concluded that they do not meet the criteria to be classified in stockholders' equity. Specifically, the exercise of the Public and Private Common Stock Warrants may be settled in cash upon the occurrence of a tender offer or exchange that involves 50%

44

or more of our Class A stockholders. As there are two classes of common stock, not all of the stockholders need to participate in such tender offer or exchange to trigger the potential cash settlement and the Company does not control the occurrence of such an event, the Company concluded that the Public Warrants and Private Warrants do not meet the conditions to be classified in equity. Since the Public and Private Common Stock Warrants meet the definition of a derivative under ASC 815, the Company recorded these warrants as liabilities on the balance sheet at fair value, with subsequent changes in their respective fair values recognized in the consolidated statement of operations at each reporting date. Because the Public Warrants were publicly traded and thus had an observable market price in an active market, they were valued based on their trading price as of each reporting date.

174. Additionally, Skillz announced the resignation of its CFO after only 8 months in his position. Skillz also issued a press release disclosing its preliminary financial results for the First Quarter ending March 31, 2021, which attached a Stockholder Letter, dated the same day, from Paradise (the "Stockholder Letter"). In the Stockholder Letter, Paradise conceded that Skillz's synchronous game playing was still being tested. Specifically, Skillz disclosed:

> We currently have a handful of developers actively testing synchronous content on our platform, and the initial results are already promising.

175. The May 4, 2021 revelations contradicted Skillz's prior statements concerning its financial reporting and operations, including that its internal disclosure controls were effective (they were not), and that it offered synchronous play on the Skillz platform.

176. Following the release of this new information, Skillz shares plummeted by 8.72% to close at $15.48 on May 5, 2021. Skillz shares lost in excess of $350 million in market value.

177. On May 13, 2021, Skillz filed its Amended 10-K Annual Report disclosing that the effect of the restatement on its 2020 financial statements, in part, as follows:

> The cumulative effect of the change in the accounting treatment of the warrants and the resulting restatement and revision of our consolidated financial statements resulted in $178 million of common stock warrant liabilities, an 11% increase in our accumulated deficit of approximately $23 million and a 34% decrease in additional paid-in capital of approximately $155 million as of December 31, 2020.[55]

---

[55] May 13, 2021 Form 10-K/A at 3 (Background of Restatement).

45

1
2

## ADDITIONAL ALLEGATIONS REGARDING
## THE EXCHANGE ACT DEFENDANTS' SCIENTER

3
4
5
6
7
8
9
10
11
12

178.    As alleged herein, the Exchange Act Defendants acted with scienter because they (i) knew or recklessly disregarded  that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated in the issuance or dissemination of such statements or documents in primary violation of the federal securities laws.  As detailed herein, Skillz and the Officer Defendants, who are the Company's most senior executives, by virtue of their receipt of information reflecting the true facts regarding Skillz, their control over, and/or receipt and/or modification of Skillz's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Skillz, participated in the fraudulent scheme alleged herein.

13
14
15
16
17
18
19
20

179.    The Officer Defendants, because of their positions with Skillz, made and/or controlled the contents of the Company's public statements during the Class Period.  The Officer Defendants were provided with or had access to the information alleged herein to be false and/or misleading prior to their issuance and had the ability and opportunity to provide accurate information or cause inaccurate information to be corrected.  Because of their positions and access to material non-public information, and their participation in making and/or authorizing virtually all of the misstatements at issue, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed, which made their positive representations materially false and misleading.

21
22
23
24
25
26

180.    Defendant Paradise has acknowledged that "I regularly have the opportunity to share our vision, performance, and outlook," with institutional investors.  Moreover, Paradise affirmatively communicated with Company stockholders through web-based financial reporting sites such as Seeking Alpha.  Paradise stated that the purpose of the Blog was to provide "broad context" directly to Skillz shareholders. Paradise also disseminated a Stockholder Letter on a quarterly basis to Company shareholders and participated in quarterly earnings calls that were accessible to all public investors.

27

28

181.    Skillz's senior management, including the Officer Defendants, were personally involved in all aspects of Skillz's platform.  Skillz gaming platform was its primary, if not sole, driver of Company revenues, and senior management was intimately involved in crafting and monitoring its platform.  For example, CW#1 confirmed that key metrics such as game downloads and installations, the number of paying users and amount of entry fees paid by paying users in game competitions were tracked on a real time basis and available to Skillz management through the Tableau Dashboard.

182.    On March 12, 2021 Skillz, filed its 2020 Form 10-K.  The Form 10-K was signed by all of the Individual Defendants except Aguirre. Appended as Exhibits 31.1 and 32.1 to the 2020 Form 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendant Paradise certified that "the [2020 Form 10-K] does not contain any untrue statements of a material fact  or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "the information included in the [2020 Form 10-K] fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]" in compliance with Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934. Defendant Henry signed Exhibit 32.2 and certified that the "[2020 Form 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

A.    **Defendants' Statements and Disclosures Contradicting Their Prior Disclosures Are A Strong Indicator of Scienter**

183.    The Exchange Act Defendants' public statement and disclosures effectively conceding the falsity of their prior disclosures are strongly indicative of their scienter.  For example, in the Merger Proxy Statement, they touted Skillz's platform capabilities with respect to synchronous game play for its users.  Specifically, the Exchange Act Defendants stated that they "offer[ed] a wide range of contests for the users.  We enable game genres that can be played: (i) asynchronously; (ii) turn-based synchronously; or (iii) synchronously." The Exchange Act Defendants reiterated the same statements in the March 2021

47

Registration Statement and March 2021 Prospectus and Skillz's 2020 Form 10-K.  Yet, within six weeks after the March 2021 Offering, in which the Defendants Paradise, Chafkin and Aguirre pocketed large profits from the sale of their Skillz shares at more than $23 per share, Defendants acknowledged that Skillz did not have the capability for "synchronous play," with Paradise conceding in Skillz's May 4, 2021 Letter to Stockholders that synchronous play was only in the "testing phase."

184.    Skillz also refuted its own public statements when responding to the SEC.  On October 6, 2020, Skillz received a comment letter from the SEC asking the Company to "specifically tell us whether [Paying MAU] is a metric used to manage your business and if not, explain why."  In response to the comment letter, Skillz misrepresented to the SEC that *"Paying MAU is not a primary metric that we use to manage our business as our primary focus is on growing the total user traffic on our platform."*

185.    The Exchange Act Defendants directly contradicted the representation in Skillz's response to the SEC and disclosures in the Merger Proxy Statement and February 2021 Registration that MAU was primarily driving increased revenues.  Beginning with the release of Q4 2020 results, Defendants Paradise, Chafkin and Henry admitted to investors that "Paying MAU" was a primary metric that Skillz used to gauge revenues, not MAU.  They also made clear that "for now, we're focused on growing our Paying MAU."  *See* ¶¶ 94-95, *supra*.

186.    Former employees have confirmed the falsity of the Exchange Act Defendants' MAU disclosures.  CW#1 stated that during her employment at Skillz, "we did not even pay attention to MAU [Monthly Average Users]" metric. CW#1 explained that "all of a sudden when [Skillz] went public, they realized Wall Street cared about MAUs." *See* ¶ 149, *supra*.

187.    Moreover, the Exchange Act Defendants' disclosures following the merger directly contradicted the Company's statements attributing higher revenues to increased MAU in the Merger Proxy Statement and the February 2021 Registration Statement.  The Exchange Act Defendants also contradicted their misleading disclosures that reported only average revenues based on the MAU metric.  Yet, just over a month after filing the February 2021 Registration Statement, the Exchange Act

48

Defendants reversed their position.  In the March 2021 Registration Statement, which contained updated Q4 2020 results, they represented, contrary to their prior statements, that Paying MAU was the primarily driver of 2020 revenues.  Further, for the first time they so identified ARPPU (which is derived from paying MAU) as a key metric and revealed that ARPPU had declined year-over-year from 2019.

188.   Similarly, the Exchange Act Defendants' contradiction of their representations attesting to the accuracy of the 2020 financial statements and the adequacy of their financial disclosure controls supports a strong inference of scienter.

189.   The Defendants knew that the platform also had certain technical limitations that would have slowed Skillz ability to expand to international markets.  Nevertheless, the Defendants touted it plans to expand the platform to India in 2021 in an April 8, 2021 press release ("we're on track to launch in India later this year.")  *Supra,* at ¶ 121.  In stark contradiction, CW#1 made clear that the expansion to India would take approximately two years and anyone involved with planning the India expansion knew there was no way that they would launch in 2021.  *Supra,* at ¶ 122.

190.   Throughout the Class Period, Defendants also repeatedly touted that its platform ***was capable of synchronous play***, a key feature in competitive gaming.  Yet not until May 4, 2021 did the Defendants finally disclose that its platform's synchronous gaming capabilities were only in the development and testing phase.  *Supra*, at ¶ 174.

191.   Moreover, the reversal of their public statements and disclosures within a short time frame strongly supports a strong inference that the Exchange Act Defendants knew or recklessly disregarded that their representations concerning the Company's operations and financial results were materially false and misleading.

**B.    Paradise Refused to Answer Analysts Questions Concerning the Decline in Downloads of Games on Skillz**

192.   Throughout the Class Period Skillz had repeatedly touted the substantial growth of its top games, even after being displaced as the number one title. However, Defendants knew that, since at least June 2020, the downloads of its top games were significantly slowing down.   Rather than

49

acknowledge this negative trend, Defendants chose to conceal it from shareholders and the market and engage in misdirection.

193.     During the March 12 Earnings Call, Defendant Paradise was specifically asked by Michael Graham of Canaccord Genuity, Inc. to discuss the third-party report that "download activity might be slowing down a little bit in some of those key games":

> Q. I wanted to start off with a question just about game concentration and revenue concentration. Through your own disclosures, we know that you have a lot of concentration of revenue and a few games. I think that's been by design, just sort of marketing around those games to grow the ecosystem there, but I just wonder if you can comment on your philosophy there, in general, and then I believe there was a third-party report out there, suggesting that download activity might be slowing down a little bit in some of those key games, and I just wonder if you could maybe talk about what you're seeing there, and how that's shaping the business going forward?

193.     However, Paradise evaded directly answering the question, instead diverting the discussion to another unrelated metric "GMV" that had nothing to do with whether downloads were declining or not.  Paradise's failure to acknowledge the downturn in downloads—admittedly a key component of the Company's success that was readily available to the Officer Defendants on the Tableau Dashboard—furthered his misleading agenda that only emphasized the Company's positive trends while excluding material adverse facts that would have enabled investors to engage in a more realistic and balanced assessment of the Company's   financial performance and prospect.

### C.     Proprietary Platform Is Its Only Core Operation

194.     Skillz's proprietary platform is at the heart of its business model.  Skillz identified the platform as its principal core strength:

> **Deep Technology Moat:**  We have invested extensively in developing our proprietary platform, resulting in many significant inventions and a broad portfolio of 58 granted or pending patents worldwide. We currently analyze 1.5 billion data points per day which we use to enhance our data-driven algorithms, continuously fortifying our position as a leading competitive mobile gaming platform.

> **Strong Network Effects:**  Compelling competitive content on our platform attracts users, and increases the size of our audience, which, in turn, attracts more developers

50

to create new interactive experiences using our platform, producing a powerful network effect.[56]

195.    According to Skillz its "proprietary platform revolutionizes and democratizes the mobile gaming industry and allows us to deliver gaming experiences that our player community trusts and loves and "levels the playing field" for every developer."[57]

196.    Skillz touted the uniqueness and benefits of its platform.  Skillz stated that "[t]he scales and engagement of our consumer and developer communities drive brands to join our platform, which offers a highly differentiated competitive mobile gaming experience.  Our platform creates a mutually beneficial environment where the player experience is enriched by the brands and the brands activate their audiences through interactive content."[58]

197.    Since the platform was a core aspect of Skillz's business operations, the Officer Defendants tracked and monitored every possible key metric from its platform on a real time basis, including the average daily time a user spent on the platform, the number of games that users play, the total number of tournaments hosted on its platform and the number of users who paid to enter those tournaments, the number of MAUs and Paying MAUs, that and the numbers of games downloaded by Skillz's users, and the "marketing payback period" (the number of days it takes Skillz to earn back its customer acquisition costs.)  Many, if not all, of these metrics were available and easily accessible to all the Officer Defendants on Skillz's Tableau Dashboard.

198.    Given their involvement in the Company's core operations, and the fact that the Exchange Act Defendants routinely publicly discussed the leading metrics *inter alia,* in the Company' SEC filings, investor presentations and earnings calls, supports a strong inference of knowledge that their

---

[56] March 2021 Registration Statement at 3 (emphasis in original).
[57] *Id.* at 1.
[58] *Id.*

public statements misrepresented or omitted material information about the key metrics. Accordingly, it would be absurd for the Exchange Act Defendants to be unaware of the status of Skillz's user base and the trends that impact the Company's business operations.

### D. Defendants Personally Profited By Selling Their Skillz Stock At Inflated Prices While in Possession of Material Non-Public

199.    The Officer Defendants and Defendant Wakeford were highly motivated to personally profit from the sale of Skillz common stock in the March Offering at inflated prices because they knew or recklessly disregarded that Skillz financial statements were overstated and that its business operations were unsustainable. The following day after the March Offering, the price of Skillz's shares declined by 14.35% to below $20. Further, less than one month later, the price of Skillz's shares had declined by nearly one-half or $11 per share.

200.    Defendants Paradise, Chafkin, Aguirre and Wakefored personally profited by selling a large percentage of their Skillz shares and collectively received net proceeds of $242.5 million at inflated prices. Defendants' insider trading while in the possession of material non-public information is further evidence of scienter, since it shows that Defendants were aware that Skillz bullish outlook was unsustainable and built upon material false statements and omissions.

201.    In total, Defendants received net proceeds of $242.5 million, as follows:[59]

| Defendant | Total Shares Sold on March 22, 2021 | Total Net Percentage of Their Skillz Holdings | Total Net Proceeds |
|---|---|---|---|
| Andrew Paradise | 8.4 million | 12.24% | $196.1 million |
| Casey Chafkin | 1.7 million | 13.49% | $39 million |
| Miriam Aguirre | 274,825 | 11.49% | $6.41 million |
| Kent Wakeford | 42,465 | 2.5% | $991,133 |
| **Total:** | | | **$242.5 million** |

---

[59]  *See* March 2021 Prospectus, at 88-94.

1    **E.     CFO Resignation**

2    202.    The resignation of Defendant Henry as CFO announced on May 4, 2021, as more realistic

3    details about Skillz's financial status and its highly touted prospects were revealed, strengthens the

4    inference of the Exchange Act Defendants' scienter.

5
     **APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD**
6    **ON THE MARKET DOCTRINE**

7    (As to the Exchange Act Violations)

8    203.    The market for Skillz shares were open, well-developed, and efficient at all relevant times.

9    As a result of the materially false and/or misleading statement and/or failures to disclose, Skillz's shares

10   traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class

11   purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of

12   Skillz shares and market information relating to Skillz and have been damaged thereby.

13   204.    The artificial inflation of Skillz's shares were caused by material misrepresentations

14   and/or omissions made prior to and throughout the Class Period, as particularized in this Complaint.

15   As described herein, from the announcement of the Merger Agreement in September 2020 through May

16   4, 2021, the close of the Class Period, Defendants made or caused to be made a series of materially false

17   and/or misleading statements about Skillz's business, prospects, and operations.   These material

18   misstatements and/or omissions created an unrealistically positive assessment of Skillz's financials and

19   its business, operations, and prospects, thus causing the price of the Company's shares to be artificially

20   inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

21   Defendants' materially false and/or misleading statements resulted in Plaintiffs and other members of

22   the Class purchasing Skillz shares at such artificially inflated prices, and each of them has been damaged

23   as a result.

24   205.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-

25   the-market doctrine in that:

26

27                                             53

- Skillz shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- The Company filed periodic public reports during the Class Period and participated in the submission of SEC filings in advance of the December 2020 merger;

- Skillz regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Skillz's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

206.    Based on the foregoing, the market for Skillz securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

207.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated UTE Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## LOSS CAUSATION
(As to the Exchange Act Violations)

208.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

209.    During the Class Period, Plaintiffs and the Class purchased Skillz's shares at artificially inflated prices and were damaged thereby.  The price of Skillz shares significantly declined when the

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                CASE NO: 3:21-cv-03450

misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

210.    For example, on the day of the Wolfpack Report was released, shares of Skillz's plummeted by 10.9% to close at $24.45.  This disclosure represented approximately $762 million in market value.

211.    As a result of the information published in the Eagle Eye Report, shares of Skillz plummeted by 6.61% to close at $12.55 on April 19, 2021, losing approximately $254 million in market value.

212.    On May 4, 2021, Skillz made several adverse disclosures described herein, which resulted in an 8.72% decline on May 5, 2021 As a result, the shares lost another $350 million in market value.

## NO SAFE HARBOR

213.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ material from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Skillz and Individual Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to Defendants' positions with Skillz, and access to Skillz's material information that was unavailable to the public, Defendants knew

that the adverse facts described herein were not disclosed to and were being concealed from investors. Defendants are liable for the false statements and omissions alleged herein.

## PLAINTIFFS' CLASS ALLEGATIONS

214. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased publicly traded Skillz securities on the NYSE during the Class Period, and all persons who purchased or acquired Skillz common stock in the March 2021 Offering, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Skillz and its subsidiaries, members of the Individual Officer Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

215. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Skillz securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

216. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

217. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interest antagonistic to or in conflict with those of the Class.

218. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act and/or the Securities Act was violated by Defendants' acts as alleged herein;

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                CASE NO: 3:21-cv-03450

- whether statements made by Defendants to the investing public prior to and throughout the Class Period, including in the Merger Proxy Statement, March Registration Statement and the March 2021 Prospectus, misrepresented material facts about the financial condition and business of the Company;

- whether Defendants' public statements to the investing public prior to and throughout the Class Period, including in the Merger Proxy Statement, March Registration Statement and the March 2021 Prospectus, omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants omitted material facts in the MDA discussion of their financial statements in violation of SEC disclosure rules;

- whether the Defendants caused the Company to supply or disseminate materially false and misleading information prior to and throughout the Class Period, including the Merger Proxy Statement, March Registration Statement and the March 2021 Prospectus;

- whether the Exchange Act Defendants acted with the requisite level of intent, if any, in supplying false information or issuing false SEC filings;

- whether the prices of Skillz securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

219.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**Against the Company and Officer Defendants**

220.    Plaintiffs repeat and reallege each and every allegation contained above as it fully set forth herein.

221.    This Count is asserted against the Exchange Act Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

222.    During the Class Period, the Exchange Act Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

223.    The Exchange Act Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- Employed devices, schemes, and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchased of Skillz securities during the Class Period.

224.    The Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or

1  dissemination of such statements or documents as primary violations of the securities laws.  These

2  Defendants by virtue of their receipt of information reflecting the true facts of the Company, their

3  control over, and/or receipt and/or modification of Skillz's allegedly materially misleading statements,

4  and/or their associations with the Company which made them privy to confidential proprietary

5  information concerning the Company, participated in the fraudulent scheme alleged herein.

6      225.    The Officer Defendants, who are or were the senior officers and/or directors of the

7  Company, had actual knowledge of the material omissions and/or the falsity of the material statements

8  set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the

9  alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true

10  facts in the statements made by them or other Skillz personnel to members of the investing public,

11  including Plaintiffs and the Class.

12      226.    As a result of the foregoing, the market price of Skillz securities was artificially inflated

13  throughout the Class Period.  In ignorance of the falsity of the Exchange Act Defendants' statements,

14  Plaintiffs and the other members of the Class relied on the statements described above and/or the

15  integrity of the market price of Skillz securities during the Class Period in purchasing Skillz securities at

16  prices that were artificially inflated as a result of Defendants' false and misleading statements.

17      227.    Had Plaintiffs and the other members of the Class been aware that the market price of

18  Skillz's securities had been artificially and falsely inflated by Defendants' misleading statements and by

19  the material adverse information which Defendants did not disclose, they would not have purchased

20  Skillz's securities at the artificially inflated prices that they did, or at all.

21      228.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the

22  Class have suffered damages in an amount to be established at trial.

23      229.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and

24  Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class

25  for substantial damages which they suffered in connection with their purchase of Skillz's securities during

26  the Class Period.

27

28  CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Officer Defendants**

230.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as it fully set forth herein.

231.    Prior to and throughout the Class Period, the Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Skillz's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business operations and presentation of its financial condition.

232.    As officers of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Skillz's business, financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

233.    Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings that contained material information that Skillz supplied and/or disseminated in the marketplace prior to the merger and throughout the Class Period concerning the Company's business and results of operations. Prior to the merger and throughout the Class Period, the Officer Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Officer Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Skillz securities.

234.    By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

235.    As detailed herein, the Securities Act claims are based on the fact that the March 2021 Registration Statement and Prospectus contained untrue statements of material fact and omitted material facts about the Company's business operations and financial results. In summary, the March 2021 Registration and Prospectus contained materially false and misleading statements about several key aspects of Skillz business operations, and future prospects of, the Company, including: (1) misrepresenting that Skillz was experiencing increased growth as a result of the expansion of its userbase when, in reality, it generated all of its revenue from a small fraction of paying users; (2) overstating Skillz technical capabilities, claiming that the platform was capable of hosting synchronous game play—i.e., where users could compete against each other in real-time—when that functionality was still in development, and had not been publicly released; (3) misrepresenting Skillz expansion into international markets, claiming in 2021 that Skillz would launch in India before the end of the year, when its own market analysis showed that this was at least 2 years on the horizon; (4) misrepresenting that the 2020 financial statements were accurate when they understated liabilities by $140 million and failed to disclose material weaknesses in the Company's financial disclosure controls; and (5) overinflating Skillz's revenue by treating "Bonus Cash"—credits issued by Skillz that functioned like dollars and could be used within the Skillz platform to offset the cost of entering paid contests—as though they were cash deposits.

### COUNT III
**Violations of Section 11 of the Securities Act**
**Against All Defendants Except Aguirre**

236.    Plaintiff Tinkelman realleges every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

237.    This Count is based on Defendants' statutory liability for untrue and materially misleading statements or omissions in the March 2021 Registration Statement. This Count does not sound in fraud,

1   and any allegations of knowing or reckless misrepresentations or omissions in March 2021 Registration

2   Statement are excluded from this Count, except that any challenged statements of opinion or belief are

3   alleged to have been materially untrue statements of opinion or belief when made at the time of the

4   March 2021 Offering.

5        238.   Plaintiffs assert this Count pursuant to §11 of the Securities Act, 15 U.S.C. § 77k, on

6   behalf of all members of the Class who purchased or otherwise acquired the common stock sold pursuant

7   or traceable to the March 2021 Offering, and who were damaged thereby, against the above-referenced

8   Securities Act Defendants.

9        239.   As alleged above, the March 2021 Registration Statement contained untrue statements

10  and omissions of material fact concerning, among other things, Skillz business model, growth strategy,

11  and its projected financial results.

12       240.   As an issuer of the registered securities, Skillz is strictly liable for the untrue statements

13  of material fact and material omissions alleged in this Count.

14       241.   The Individual Defendants (except Defendant Aguirre) were executive officers, directors

15  and/or major shareholders, and e signatories to the March 2021 Registration Statement.  The Underwriter

16  Defendants served as underwriters for the March 2021 Offering.

17       242.   None of the other Defendants named in this Count made a reasonable investigation or

18  possessed reasonable grounds for the belief that the statements contained in March 2021 Registration

19  Statement were accurate and complete in all material respects.  Had they exercised reasonable care, they

20  would have known of the material misstatements and omissions alleged in this Count.

21       243.   At the time of their purchases of Skillz common stock, Plaintiff and Class members did

22  not know, nor in the exercise of reasonable diligence could they have known, that the March 2021

23  Registration Statement contained untrue statements of material fact and omitted to state material facts

24  required to be stated or necessary to make the statements identified above not misleading when they

25  purchased or acquired the registered securities.  As a direct and proximate result of the acts and omissions

26  of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial

62

damage in connection with its purchase of Skillz common stock sold through and/or traceable to the March 2021 Offering.

244. This claim is brought within one year of discovery of the untrue statements and omissions in the March 2021 Registration Statement and within three years of the effective date of March 2021 Offering.

245. By reason of the foregoing, the Defendants named in this Count are liable under §11 of the Securities Act to Plaintiffs and members of the Class who purchased or otherwise acquired the securities sold pursuant or traceable to the March 2021 Registration Statement.

**COUNT IV**
**Violation of Section 12(a)(2) of the Securities Act**
**Against Skillz and the Underwriter Defendants**

246. Plaintiff Tinkelman repeats and realleges each and every allegation contained above as if fully set forth herein.

247. This claim is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of all persons who purchased or otherwise acquired Skillz common stock in the March 2021 Offering against Skillz and the Underwriter Defendants.

248. This Count is not based on and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent. Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

249. On March 19, 2021, Plaintiff Tinkelman purchased 100 shares in the March 2021 Offering, at a price of $24.00 per share.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                                  CASE NO: 3:21-cv-03450

250. Section 12(a)(2) gives rise to liability as to "[a]ny person who … offers or sells a security … by means of a prospectus or oral communication, which includes an untrue statement of material fact, or omits to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading …" 15 U.S.C. §77l(a)(2).

251. By means of the defective March 2021 Registration Statement and Prospectus, Skillz and the Underwriter Defendants promoted and sold shares for their own benefit and the benefit of their associates. The Underwriter Defendants additionally solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase Skillz common stock in the March 2021 Offering.

252. The March 2021 Registration Statement and Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts., as detailed above. Skillz and the Underwriter Defendants owed Plaintiff and members of the Class who purchased shares pursuant to the March 2021 Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the March 2021 Registration Statement and Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Skillz and the Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained and incorporated by reference in the March 2021 Registration Statement at the time of the March 2021 Offering were true and without omissions of any material facts and were not misleading. Accordingly, Skillz and the Underwriter Defendants are liable to Lead Plaintiff Tinkelman and the other members of the Class who purchased Skillz shares in the March 2021 Offering.

253.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the March 2021 Registration Statement and Prospectus at the time Plaintiff purchased common stock issued in the March 2021 Offering

254.    By reason of the conduct alleged herein, Skillz and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff Tinkelman and members of the Class who purchased shares pursuant to the March 2021 Prospectus sustained substantial damages in connection with their purchases of those shares.  Plaintiff Tinkelman and other members of the Class who hold the shares issued pursuant to the March 2021 Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby elect to rescind and tender their shares to Skillz and the Underwriter Defendants.  Class members who have sold their shares are entitled to rescissory damages.

255.    This claim is brought within three years from the time that the shares upon which this claim is brought were sold to the public, and within one year from the time when Plaintiff Tinkelman and Class members discovered or reasonably could have discovered the facts upon which this claim is based.

**COUNT V**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

256.    Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

257.    This count is asserted against the Individual Defendants based upon Section 15 of the Securities Act.

258.    This Count is not based on and does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting

this claim under the Securities Act, Plaintiff does not allege that the Individual Defendants acted with scienter or fraudulent intent.  Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

259.    The Individual Defendants, by virtue of his, her or its control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Skillz within the meaning of Section 15 of the Securities Act.  Skillz and the Officer Defendants had the power and influence and exercised the same to cause Skillz to engage in the acts described herein.

260.    The Individual Defendants at all relevant times participated in the operation and management of Skillz, and conducted and participated, directly and indirectly, in the conduct of Skillz's business affairs.  As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Skillz's financial condition and results of operations.  Because of their positions of control and authority Individual Defendants were able to, and did, control the issuance of the March 2021 Registration Statement and Prospectus, which contained materially false and misleading statements and omissions, as detailed herein.

261.    The Individual Defendants' control, ownership and positions made them privy to and provided them with knowledge of the material facts misrepresented and/or concealed from Plaintiff and the Class.  The Individual Defendants did not make reasonable investigation or possess reasonable grounds for the belief that the statements contained in the March 2021 Offering were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

262.     By reason of the aforementioned conduct, each of the Individual Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiff and the other members of the Class who purchased or acquired shares pursuant to the March 2021 Offering to the same extent as Skillz who committed the violations of Section 11 complained of herein.  As a direct and proximate result of these violations, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of shares pursuant to the March 2021 Offering.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding rescission or rescissionary measure of damages;

(d)     awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including attorney's fees and expert expenses; and

(e)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED.**

Plaintiff hereby demands a trial by jury.

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                                    CASE NO: 3:21-cv-03450

Dated:  October 8, 2021

**LOWEY DANNENBERG, P.C.**

By:___*Scott Vincent Papp*_____
Christian Levis (admitted *pro hac vice*)
David C. Harrison (admitted *pro hac vice*)
Andrea Farah (admitted *pro hac vice*)
Scott Vincent Papp (admitted *pro hac vice*)
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel: 914-997-0500
Email:  clevis@lowey.com
Email: dharrison@lowey.com
Email:  afarah@lowey.com
Email:  spapp@lowey.com

*Counsel for Lead Plaintiffs*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (139304)
Danielle Smith (291237)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
danielles@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (*Pro Hac Vice forthcoming*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiff Lewis*

**SCHUBER JONCKHEER & KOLBE LLP**
Willem F. Jonckheer
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Tel: (415) 788-4220
Email: wjonckheer@sjk.law

*Liaison Counsel for Plaintiffs*

68

1

2

## **CERTIFICATE OF SERVICE**

I, Scott V. Papp, Esq., hereby certify that on October 8, 2021, I authorized a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


*/s/    Scott Vincent Papp*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450