1   LATHAM & WATKINS LLP
    Matthew Rawlinson (Cal. Bar No. 231890)
2   Daniel R. Gherardi (Cal. Bar No. 317771)
    *matt.rawlinson@lw.com*
3   *daniel.gherardi@lw.com*
    140 Scott Drive
4   Menlo Park, CA 94025-1008
    Telephone: +1.650.328.4600
5
    Melanie M. Blunschi (Cal. Bar No. 234264)
6   *melanie.blunschi@lw.com*
    505 Montgomery Street, Suite 2000
7   San Francisco, CA 94111
    Telephone: +1.415.391.0600
8
    *Attorneys for Defendants Skillz Inc., Andrew*
9   *Paradise, Casey Chafkin, Miriam Aguirre,*
    *Scott Henry, Harry Sloan, Jerry*
10  *Bruckheimer, Christopher Gaffney,*
    *Vandana Mehta-Krantz, and Kent E.*
11  *Wakeford*

12
                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14
                        SAN FRANCISCO DIVISION
15

16  THOMAS JEDRZEJCZYK, SONNY CHUNG,          Case No.: 3:21-cv-03450-RS
    KEVIN TINKELMAN, and DAVID LEWIS,
17  individually, and on behalf of all others similarly   **SKILLZ DEFENDANTS' NOTICE**
    situated,                                             **OF MOTION AND MOTION TO**
18                                                        **DISMISS LEAD PLAINTIFFS'**
                    Plaintiffs,                           **CLASS ACTION AMENDED**
19                                                        **CONSOLIDATED COMPLAINT**
    v.                                                    **FOR VIOLATIONS OF FEDERAL**
20                                                        **SECURITIES LAWS**
    SKILLZ INC., f/k/a FLYING EAGLE
21  ACQUISITION CORP., ANDREW PARADISE,       Hearing: April 21, 2022
    CASEY CHAFKIN, MIRIAM AGUIRRE, SCOTT      Time: 1:30 p.m.
22  HENRY, HARRY SLOAN, JERRY                 Location: Courtroom 3 – 17th Floor
    BRUCKHEIMER, CHRISTOPHER GAFFNEY,         Judge: Hon. Richard Seeborg
23  VANDANA MEHTA-KRANTZ, KENT E.
    WAKEFORD, CITIGROUP GLOBAL MARKETS,
24  INC., GOLDMAN SACHS & CO. LLC, JEFFERIES
    LLC, UBS SECURITIES LLC, WEDBUSH
25  SECURITIES INC., WELLS FARGO SECURITIES,
    LLC, CANACCORD GENUITY LLC, STIFEL,
26  NICOLAUS & COMPANY, INC.,

27                  Defendants.

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

SKILLZ DEFS.' MOT. TO DISMISS
3:21-CV-03450-RS

1

# TABLE OF CONTENTS

2

3   I.      INTRODUCTION ................................................................................................ 2

4   II.     BACKGROUND .................................................................................................. 3

5           A.      The Skillz Defendants ............................................................................. 3

6           B.      The Short Reports .................................................................................... 4

7           C.      Skillz's Continued Growth ...................................................................... 5

8   III.    LEGAL STANDARD ......................................................................................... 6

9   IV.     ARGUMENT ....................................................................................................... 6

10          A.      Plaintiffs Do Not Allege A Material Misrepresentation Or
                    Omission Of Fact .................................................................................... 6
11

12                 1.      Skillz Did Not Misrepresent User Engagement or Revenue
                           From Games .................................................................................. 7

13                 2.      Skillz's Statements About "Expectations" For Future
                           Expansion Into India Are Neither Actionable Nor False .......... 9
14

15                 3.      Skillz Did Not Misstate Its Synchronous Play Capabilities.... 11

16                 4.      Skillz Did Not Misrepresent Its Paid User Engagement......... 11

17                 5.      Skillz Presented Its Financial Results Appropriately.............. 13

18                 6.      Skillz Did Not Misrepresent SPAC-Related Warrants .......... 16

19          B.      Plaintiffs Do Not Adequately Plead Scienter......................................... 17

20          C.      Plaintiffs Do Not Adequately Plead Loss Causation ............................ 22

21                 1.      The Short Reports Are Not Corrective Disclosures................. 22

22                 2.      None Of The Cited Disclosures "Corrects" Any Challenged
                           Statement................................................................................... 24

23          D.      The Securities Act Claims Fail For Lack Of Standing ......................... 25

24          E.      Any Control Person Claim Fails Along With The Other Claims ......... 25

25  V.      CONCLUSION................................................................................................... 25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)........................................................................16

*In re AnaptysBio, Inc.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)......................................................................20

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ...............................................................................6

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
2016 WL 2937483 (N.D. Cal. May 20, 2016).....................................................................22

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................................16

*Brody v. Transitional Hosps., Corp.*,
280 F.3d 997 (9th Cir. 2002) ...............................................................................................14

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .............................................................................................25

*In re Cirrus Logic Sec. Litig.*,
946 F. Supp. 1446 (N.D. Cal. 1996) ....................................................................................17

*In re Cisco Sys. Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)......................................................................18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...............................................................................................10

*In re Cloudera, Inc.*,
2021 WL 2115303 (N.D. Cal. May 25, 2021) ..............................................................7, 20

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...............................................................................12

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .....................................................................18

*In re Dropbox Sec. Litig.*,
2020 WL 6161502 (N.D. Cal. Oct. 21, 2020).......................................................................14

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) .............................................................................................22

*In re Harmonic, Inc. Sec. Litig.*,
2006 WL 3591148 (N.D. Cal. Dec. 11, 2006)..................................................................25

*Hessong v. Pinterest, Inc.*,
2021 WL 4339193 (N.D. Cal. Sept. 23, 2021) .............................................................12, 14

*Hong v. Extreme Networks*,
2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ...................................................................9

*In re Intrexon Corp. Sec. Litig.*,
2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ..........................................................11, 22, 23

*Ironworkers Local 580-Joint Funds v. Linn Energy, LLC*,
29 F. Supp. 3d 400 (S.D.N.Y. 2014)................................................................................14

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
2021 WL 5626377 (4th Cir. Dec. 1, 2021) .....................................................................17

*Kipling v. Flex, Ltd.*,
2020 WL 7261314 (N.D. Cal. Dec. 10, 2020)..................................................................8

*Lechner v. Infusystem Holdings, Inc.*,
2017 WL 11593803 (C.D. Cal. Dec. 15, 2017) ...............................................................24

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ...........................................................................................24

*Lopes v. Fitbit, Inc.*,
2020 WL 1465932 (N.D. Cal. Mar. 23, 2020)..................................................................11

*In re Lyft Inc. Sec. Litig.*,
484 F. Supp. 3d 758 (N.D. Cal. 2020) .............................................................................13

*Manger v. LeapFrog Ents., Inc.*,
252 F. Supp. 3d 837 (N.D. Cal. 2017) .............................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)............................................................................................................14

*Mazzaferro v. Aruba Networks, Inc.*,
2014 WL 12680773 (N.D. Cal. Aug. 1, 2014) .................................................................11

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...........................................................................17, 18, 21

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .................................................................................22, 23

*Mulquin v. Nektar Therapeutics*,
510 F. Supp. 3d 854 (N.D. Cal. 2020) ...............................................................10, 22, 24

*In re N. Am. Acceptance Corp. Sec. Cases*,
    513 F. Supp. 608 (N.D. Ga. 1981) ........................................................................16

*In re Nektar Therapeutics*,
    2020 WL 3962004 (N.D. Cal. July 13, 2020) ..........................................................6

*In re Nimble Storage, Inc.*,
    2016 WL 7209826 (N.D. Cal. Dec. 9, 2016) ..........................................................12

*In re NVIDIA Corp. Sec. Litig.*,
    768 F. 3d 1046 (9th Cir. 2014) ...............................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ................................................................................................10

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ....................................................................................6

*Paciga v. Invuity Inc.*,
    2019 WL 3779694 (N.D. Cal. Aug. 12, 2019) .......................................................19

*Pearlstein v. BlackBerry Ltd.*,
    93 F. Supp. 3d 233 (S.D.N.Y. 2015) ......................................................................17

*Percoco v. Deckers Outdoor Corp.*,
    2013 WL 3584370 (D. Del. July 8, 2013) ..............................................................21

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) ....................................................................25

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ..................................................................21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ...................................................................12, 13, 18

*In re Ramp Networks, Inc. Sec.*,
    201 F. Supp. 2d 1051 (N.D. Cal. 2002) ............................................................16, 17

*Reinschmidt v. Zillow, Inc.*,
    2014 WL 5343668, at *6 (W.D. Wash. Oct. 20, 2014) ..........................................15

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ..................................................................................7

*Rieckborn v. Jeffries LLC*,
    81 F. Supp. 3d 902 (N.D. Cal. 2015) ......................................................................17

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ...............................................................................6, 25

*Rok v. Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ...................................................................18

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ........................................................................9, 10, 21

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2003) ........................................................................6

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..............................................................12

*In re Solarcity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) ...........................................................13, 14

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) .........................................................................8

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) .........................................................................6

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..............................................................25

*Turner v. MagicJack Vocaltec, Ltd.*,
   2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) ...........................................................14

*Veal v. Lendingclub Corp.*,
   2020 WL 3128909 (N.D. Cal. June 12, 2020) .................................................18, 21

*In re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ...................................................6, 25

*Wochos v. Tesla*,
   2019 WL 1332395 (N.D. Cal. Mar. 25, 2019) ......................................................15

*Wochos v. Tesla*,
   985 F.3d 1180 (9th Cir. 2021) ....................................................................9, 10, 23

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) ..............................................................12

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .....................................................................8, 22, 23

## REGULATIONS

17 C.F.R. § 242.200 ..........................................................................................5

1

**OTHER AUTHORITIES**

XI Nat'l L. Rev. 348 (Oct. 29, 2021), available at https://www.natlawreview.com/article/will-
spac-restatements-trigger-shareholder-litigation .................................................................16

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2  **PLEASE TAKE NOTICE** that on April 21, 2022, at 1:30 p.m., or as soon thereafter as

3  the matter may be heard, in the United States District Court for the Northern District of California,

4  located at 450 Golden Gate Avenue, San Francisco, California, Defendants Skillz Inc. ("Skillz" or

5  the "Company"), Andrew Paradise, Casey Chafkin, Miriam Aguirre, Scott Henry, Harry Sloan,

6  Jerry Bruckheimer, Christopher Gaffney, Vandana Mehta-Krantz, and Kent E. Wakeford (with

7  Skillz, the "Skillz Defendants"), will move to dismiss the Class Action Amended Consolidated

8  Complaint for Violations of Federal Securities Laws ("Amended Complaint" or "AC") (Dkt. 76),

9  filed by Plaintiffs Thomas Jedrzejczyk, Sonny Chung, Kevin Tinkelman, and David Lewis.

10  The Skillz Defendants move pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6)

11  and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). All of Plaintiffs' claims

12  under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11

13  and 12(a)(2) of the Securities Act of 1933 (the "Securities Act") fail because Plaintiffs do not

14  allege particularized facts establishing any false or misleading statements or omissions, and

15  Plaintiffs' Exchange Act claims also fail because Plaintiffs have not pleaded with particularly that

16  any defendant acted with scienter or loss causation. The Securities Act claims additionally fail

17  because the only plaintiff to allege them (Plaintiff Tinkelman) lacks standing to sue. And finally,

18  lacking any predicate violation, Plaintiffs' claims under Section 20 of the Exchange Act and

19  Section 15 of the Securities Act must also be dismissed.

20  **ISSUES TO BE DECIDED**

21  1.      Whether Plaintiffs' claim under Section 10(b) of the Exchange Act should be

22  dismissed for failure to plead with particularity a false statement of fact, scienter or loss causation.

23  2.      Whether Plaintiff Tinkelman's claims under Sections 11 and 12(a)(2) of the

24  Securities Act should be dismissed for failure to plead with particularity a false statement of fact

25  or adequately allege standing.

26  3.      Whether Plaintiffs' claims under Section 20(a) of the Exchange Act and Section 15

27  of the Securities Act should be dismissed for failure to plead a predicate violation.

28

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is not the typical securities fraud action that arises after a company announces bad news and its stock price declines. Despite the gloomy picture Plaintiffs try to paint, they acknowledge that Skillz—a small mobile gaming technology start-up that went public in December 2020—consistently expanded its revenues, user base, game offerings, and strategic partnerships throughout the time period described in the Amended Complaint. In fact, Skillz's revenues for 2021 through the filing of that complaint are nearly double those of the same period last year—jumping from $160 million to $275 million.

This case was triggered not by any revelation of fraud (or even of genuinely new information) but rather by two "short reports," written by investors with financial interests in driving down Skillz's stock price. Wolfpack and Eagle Eye both held short positions in Skillz's stock, meaning they stood to profit if Skillz's stock price went down and would lose money if the price was up. In March and April 2021, they published reports that spun Skillz's disclosures of game downloads and user engagement in a negative light and questioned the strength of its platform. Unfortunately, this has become an increasingly common practice—short sellers issue dramatic but unsubstantiated "reports" with vague negative claims, depressing the stock price (to their benefit), and triggering shareholder lawsuits. And that is just what happened here: after each short report, Skillz's share price temporarily declined, and even though it quickly recovered, this lawsuit followed. But courts have repeatedly concluded that securities fraud claims based on self-interested short reports issued with a financial incentive to depress the Company's stock price are not sufficient under the rigorous standards of the PSLRA and should be dismissed.

Plaintiffs' Amended Complaint does not state a claim under either the Exchange Act or the Securities Act. Plaintiffs (1) have not identified an actionable misstatement, (2) have not pleaded any facts, much less the required strong inference, indicating that any Skillz Defendant acted with an intent to deceive investors, and (3) have not explained how any Plaintiff's alleged losses were caused by the revelation of some wrongfully concealed information. In addition, Plaintiff

1   Tinkelman—the only Plaintiff purporting to bring Securities Act claims—does not adequately
2   allege standing to assert any claim under that Act. The Amended Complaint should be dismissed.

3        **No False Statement**. The Amended Complaint challenges a laundry list of statements,
4   covering everything from game downloads to revenues to international expansion aspirations—
5   but Plaintiffs have not pleaded facts establishing that any challenged statement was false at the
6   time it was made or identified any information that Skillz was required to disclose earlier but
7   didn't. The statements were all factually true at the time they were made or are non-actionable
8   forward-looking projections. Without a false statement of fact or wrongful omission, all of
9   Plaintiffs' claims fail.

10       **No Scienter**. Plaintiffs' Exchange Act claims fail for the additional, independent reason
11  that they plead no basis to infer that any defendant acted with an intent to deceive, manipulate or
12  defraud—much less a "strong inference" that is "at least as compelling" as any competing
13  inference, as required by the PSLRA. Plaintiffs do not allege facts showing that any defendant was
14  *even aware* of any information contradicting any challenged statement at the time it was made,
15  much less acted with an intent to defraud.

16       **No Loss Causation**. Plaintiffs also cannot sustain an Exchange Act claim because they
17  have not adequately pleaded losses caused by the revelation of a fraud to the market. Their loss
18  causation allegations are based entirely on the short reports and Skillz's limited restatement of data
19  about warrants in response to new interpretations by regulators. Neither revealed any new facts,
20  let alone a fraud; instead, the short reports spouted negative speculation to advance their authors'
21  ends by pushing Skillz's stock price down, and the restatement updated prior truthful accounting
22  disclosures to conform to new SEC guidance (a routine consequence of revising standards that
23  prompted updates from hundreds of other companies too, without triggering hundreds of lawsuits).

24       The Skillz Defendants respectfully request dismissal of the Amended Complaint.

25  **II.   BACKGROUND**

26       **A.   The Skillz Defendants**

27       Founded in 2012, Skillz's mission is to make electronic sports accessible to everyone via
28  a "mobile gaming platform that allows individuals to play video games in contests against each

other, using their smartphone or tablet." AC ¶ 3. Two types of contests are available on Skillz's gaming platform: "paid" contests, where users deposit real money for a chance to win cash prizes by playing against other users, and "practice" contests, where users play games for free. *Id.*. Skillz generates revenue by collecting a percentage of the total entry fees deposited in paid contests. AC ¶ 5. Skillz grows its business both by attracting more users to download Skillz-integrated games generally as well as to enter into paid competitions. AC ¶¶ 79-80. In the future, Skillz anticipates that it will be able to introduce advertising and other offerings so that it can earn revenues from all users, not just paid competitions. Ex. A (10/13/2020 SEC Correspondence), at 9.

On December 16, 2020, Skillz went public by merging with Flying Eagle Acquisition Corporation (the "Merger"). On March 18, 2021, Skillz launched a secondary underwritten public offering pursuant to a registration statement on SEC Form S-1 (the "March 2021 Offering").

The initial complaint in this lawsuit alleged Exchange Act claims against Skillz, along with its CEO Andrew Paradise, former CFO Scott Henry, Chief Revenue Officer Casey Chafkin, former Chief Technology Officer Miriam Aguirre, and one director, Harry Sloan. The Amended Complaint adds additional challenged statements to the Exchange Act claims, tacks on Securities Act claims based on a subset of the statements challenged under the Exchange Act, and names other members of Skillz's Board of Directors—Jerry Bruckheimer, Christopher Gaffney, Vandana Mehta-Krantz, and Kent E. Wakeford (the "New Defendants"). The only claims alleged against the New Defendants are Securities Act claims based on the challenged statements in the March 2021 Offering materials.

### B.   The Short Reports

On March 8, 2021, Wolfpack published a report questioning Skillz's projections of future revenue. AC ¶ 17; *see also* Ex. B (the "Wolfpack Report") at 1. The Wolfpack Report claimed that third-party app data showed downloads of three games developed on the Skillz platform were declining at certain points in time. AC ¶¶ 17, 166; Ex. B (Wolfpack Report) at 1. The Wolfpack Report also alleged that Skillz's platform cannot "adequately handle" synchronous play and matchmaking for "large studios." AC ¶ 167; *see also* Ex. B (Wolfpack Report) at 10. On April 19, 2021, Eagle Eye published a report claiming that Skillz was recognizing revenue from incentives

1   it had given players to participate in games developed on the Skillz platform. AC ¶ 169; Ex. C (the
2   "Eagle Eye Report") at 1.

3       Both Wolfpack and Eagle Eye admitted to holding short positions in Skillz stock ***at the***
4   ***time of their reports***, meaning that they had borrowed Skillz shares and sold them at market price,
5   betting that Skillz's stock price would decline so that they could purchase the same number of
6   Skillz shares they borrowed at a lower price before they needed to return the borrowed shares. *See*
7   17 C.F.R. § 242.200 (defining "short sale"); Ex. B (Wolfpack Report) at 1; Ex. C (Eagle Eye
8   Report) at 1. In other words, both Wolfpack and Eagle Eye had an incentive to cause Skillz's stock
9   price to decline before they were due to cover their shorts.

10      On the day of the Wolfpack Report, Skillz's stock price declined by 10.9% from $27.45
11  the day prior to close at $24.45, AC ¶ 19, but completely recovered just three days later, closing at
12  $27.78 on March 11, 2021. Ex. D (Yahoo! Finance). On the day of the Eagle Eye Report, Skillz's
13  stock price declined 6.61%, from $15.11 the day prior to $14.11, AC ¶ 20, but more than recovered
14  just two days later to close at $16.76 on April 21, 2021. Ex. D (Yahoo! Finance).

15      **C.    Skillz's Continued Growth**

16      Setting aside the short reports' self-interested spin, Skillz has demonstrated strong growth
17  in its revenues, user base, and paying user base, including after the short reports. *Id.* ¶ 77 (citing
18  Ex. E (11/30/20 Form S-4/A) at 170, 180); *see also* Ex. F (2020 Form 10-K) at 39; Ex. G (Q3 2021
19  press release). Between 2019 and 2020, Skillz achieved 92% growth in revenue; a 62.5% increase
20  in Monthly Active Users ("MAUs"), who are users "who entered into a paid or free contest hosted
21  on Skillz's platform at least once in a month"; and 50% growth in "paying MAU[s]," who are
22  users "who entered into a paid contest hosted on Skillz's platform at least once in a month." Ex. F
23  (2020 Form 10-K) at 27, 40, 43. In the first quarter after the Merger, Skillz achieved "record-
24  breaking first quarter results," "21 consecutive months of revenue growth," and a "Paying to
25  Playing MAU ratio" that was eight times higher than the industry average. Ex. H (Q1 2021 Press
26  Release). Shortly after Plaintiffs filed the Amended Complaint, Skillz announced 70% revenue
27  growth and 47% growth in paying-MAUs for the third quarter of 2021 compared to the same
28  period in 2020. Ex. G (Q3 2021 Press Release).

1    III.    LEGAL STANDARD

2           To state a claim under Section 10(b) of the Exchange Act, plaintiffs must plead a material

3    misrepresentation or omission of fact, scienter, and loss causation. *See In re Rigel Pharm., Inc.*

4    *Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *In re Nektar Therapeutics*, 2020 WL 3962004, at

5    *9 (N.D. Cal. July 13, 2020). To survive a motion to dismiss, the claims must meet the exacting

6    pleading standards of Rule 9(b) and the PSLRA, which "appl[y] to all elements of a securities

7    fraud action." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

8           To state a claim under Section 11 or Section 12(a)(2) of the Securities Act, plaintiffs must

9    allege that a registration statement either "contained an untrue statement of material fact or omitted

10   to state a material fact... necessary to make the statements therein not misleading." 15 U.S.C.

11   § 77k(a). Where claims arising under the Securities Act "sound in fraud" and are alleged in

12   connection with a "unified course of fraudulent conduct," they must meet the heightened pleading

13   requirements of Rule 9(b) by setting forth "what is false or misleading about a statement, and why

14   it is false."[1] *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996); *Rubke v. Capitol*

15   *Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2003). "A typical example of th[e] situation [where a

16   plaintiff alleges a unified course of fraudulent conduct] is where a plaintiff alleges that the same

17   course of conduct constitutes both securities fraud under Section 10 as well as a violation of

18   Section 11." *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014).

19   IV.    ARGUMENT

20          A.      **Plaintiffs Do Not Allege A Material Misrepresentation Or Omission Of Fact**

21          In search of a misrepresentation, Plaintiffs challenge a scattershot selection of Skillz's

22   public statements regarding (1) growth in app downloads; (2) expansion to India; (3) synchronous

23   game play; (4) levels of paid user engagement; (5) user-based revenue metrics; and (6) treatment

24

25   _____

26   [1] The Securities Act and Exchange Act claims here are inextricably intertwined. Plaintiff
     Tinkelman (the only Securities Act plaintiff) challenges the exact same statements under the
     Securities Act as Plaintiffs do under the Exchange Act, and he makes no real effort to disclaim a
27   fraud theory. *See* AC ¶¶ 220, 222, 236-37, 248, 252. In light of this "obvious overlap," the
     Securities Act claims are grounded in fraud. *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp.
28   2d 1052, 1068 (N.D. Cal. 2010) (applying Rule 9(b) to Securities Act claims).

of warrants.[2] AC ¶¶ 108-64. Plaintiffs do not explain what is false or misleading about any of the challenged statements, much less allege particularized facts indicating that they were false when made. This failure dooms all of their claims. *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (Section 10(b)); *In re Cloudera, Inc.*, 2021 WL 2115303, at *20 (N.D. Cal. May 25, 2021) (Sections 11 and 12(a)(2)).

1.    Skillz Did Not Misrepresent User Engagement or Revenue From Games

Premised on the allegation that downloads of three of Skillz's games were declining, Plaintiffs assert that Defendants were misleadingly "bullish" when they described user engagement and revenue from games. AC ¶¶ 108-18. But this argument fails for three reasons.

*First*, Plaintiffs unreasonably extrapolate the meaning of the challenged statements. In the statements Plaintiffs cite, Skillz (a) discussed its positive outlook on user engagement, AC ¶ 112, and (b) explained that while the most downloaded games "rotate over time"—that is, older games at some point decline in download rates—those same older games continue to grow in terms of revenue they bring in. AC ¶¶ 109, 116. Skillz did not state that downloads of specific games were increasing. To the contrary, it recognized the opposite: that the most downloaded games are constantly changing.

*Second*, there is a complete mismatch between the statements Plaintiffs cite (about user engagement and game revenues) and their basis for alleging those statements are false (decreases in free downloads for three games). Plaintiffs make no effort to explain how purported decreases in download rates of three specific games has any bearing on overall "stronger engagement" for users who by definition have already downloaded games. AC ¶ 112. User engagement involves more than downloading (which normally only occurs once), and includes post-download activities such as "match[ing] comparable players" within game contests and "creat[ing] larger tournaments," both of which happen *after* downloads. Nor do Plaintiffs explain how alleged declines in new downloads undermines Skillz's statements about the current value derived from certain games.

---

[2] The statements in Sections IV.A.2 (regarding future expansion to India) and IV.A.5 (regarding financial results) do not appear in the March 2021 Offering materials. As such, they are not the subject of Securities Act claims and are not alleged as to the New Defendants.

*Third*, even assuming that the challenged statements referred to game download rates (again, they do not), Plaintiffs' purported support for their falsity argument is inadequate. Plaintiffs rely on the Wolfpack Report for the claim that downloads of certain games had decreased. AC ¶ 110; Ex. B (Wolfpack Report). On top of its admitted bias, the Wolfpack Report is unsupported: it cites to the Company's Form S-4 as its source for download declines, but the S-4 does not mention user downloads of any games, and refers only to revenues generated from certain popular games. Ex. B (Wolfpack Report) at 3 (citing Ex. I (11/17/20 Form S-4/A) at 57). And while the Wolfpack Report states those "declines" were "on track to continue" in Q1 2021, its only support for such conclusion is unspecified "Third party app data." Ex. B (Wolfpack Report) at 3. The Court need not accept such conclusory and unsupported allegations. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Plaintiffs' sole confidential witness's allegations do not "confirm" the Wolfpack Report or otherwise provide a basis to plead falsity. AC ¶ 111. First, the confidential witness ("CW") is not described with sufficient particularity for the Court to accept the allegations as true. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009) (requiring that CWs be "described with sufficient particularity to establish their reliability and personal knowledge"). Here, the CW is described in one instance as a member of the "Revenue Department" who held an undefined "management role" and participated in unknown "Leadership events," and in another instance as a member of Skillz's "marketing department." AC ¶¶ 103, 149. The CW apparently only worked at the Company for a few months and left in March 2021. *Id.* ¶¶ 103, 128; *Zucco*, 552 F.3d at 996. Second, even if the CW's allegations had foundation, they are still not relevant to the challenged statements: the CW allegedly stated that downloads of two games were declining and that games "were not doing well," AC ¶¶ 110-12, but, again, Plaintiffs have not (and cannot) connected free user download rates to growth in gross revenue of games or user engagement after download. *See Kipling v. Flex, Ltd.*, 2020 WL 7261314, at *10 (N.D. Cal. Dec. 10, 2020) (rejecting claims based on CWs without particularized allegations establishing CWs' personal knowledge).

Because Plaintiffs fail to allege adequate facts demonstrating the falsity of the Skillz Defendants' statements about user engagement and revenue generated from games on the Skillz

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

1    platform were false, they cannot state a claim based on the statements in Paragraphs 108-118. *See,*

2    *e.g.*, *Hong v. Extreme Networks*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017) (rejecting

3    falsity allegations where "the reasons Plaintiffs offer[ed] as to why the statements [we]re false or

4    misleading b[o]re no connection to the substance of the statements themselves").

2.    Skillz's Statements About "Expectations" For Future Expansion Into India
       Are Neither Actionable Nor False

7    Plaintiffs' claim that the Company misled investors when Mr. Paradise stated that Skillz

8    "expect[s]" or is "on track" to launch its platform in India "later this year [2021]," AC ¶¶ 120-21,

9    fares no better. Challenged only under the Exchange Act, this is a non-actionable forward-looking

10   statement of opinion, and Plaintiffs do not allege that Mr. Paradise subjectively disbelieved the

11   statement or set forth any particularized facts indicating that it was objectively false when made.

12   *First*, the challenged statements expressly reflect the Company's expectations for the

13   future. Both Skillz's call to discuss quarterly earnings and the challenged blog post include a

14   warning that some of management's comments "will be forward-looking statements within the

15   meaning of the federal securities laws. Forward-looking statements, which are usually identified

16   by the use of words such as will, *expect*, should, and other similar phrases are subject to numerous

17   risks and uncertainties that could cause actual results to differ materially from what we expect."

18   Ex. J (Q4 2020 Earnings Call Transcript) at 4 (emphasis added); *see also* Ex. K (Blog Post) at 4.[3]

19   Both because of this meaningful cautionary language, and because Plaintiffs do not allege with

20   particularity that the challenged statement was made with "actual knowledge... that the statement

21   was false or misleading," the PSLRA protects the forward-looking challenged statements. *Ronconi*

22   *v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001); *see also Wochos v. Tesla*, 985 F.3d 1180, 1194 (9th

23   Cir. 2021) (emphasis in original) (affirming dismissal where plaintiffs "failed to plead that

24   Defendants *knew* their [] goal was *impossible* to achieve"). There is no such allegation of actual

25   knowledge of falsity here, and the statements about future expansion in India are not actionable.

26   _____

27   [3] Skillz also warned investors that its ability to attract "players in international markets" will be
     "subject to the particular challenges of supporting a rapidly growing business in an environment

28   of multiple languages, cultures, customs, legal systems, alternative dispute systems, regulatory
     systems and commercial infrastructures." *See, e.g.*, Ex. E (11/30/20 S-4/A) at 74.

1    *Second*, even if the challenged statements were not protected by the PSLRA safe harbor,

2    they are Mr. Paradise's opinions as to the Company's planned expansion timeline. Plaintiffs

3    therefore must—but do not—allege particularized facts showing *both* that he did not believe the

4    opinion *and* that it was objectively wrong at the time. *See Omnicare, Inc. v. Laborers Dist. Council*

5    *Const. Indus. Pension Fund*, 575 U.S. 175, 183-85 (2015); *see also City of Dearborn Heights Act*

6    *345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017). Plaintiffs do

7    neither. There is no allegation that the Company did not plan to launch in India in 2021. *See*

8    *Ronconi*, 253 F.3d at 430 (rejecting challenged statement regarding company's anticipated growth

9    where plaintiffs made no allegation that defendants "actually knew" the growth would not be

10   achieved). And Plaintiffs offer no facts indicating that, as of March or April 2021, Skillz and Mr.

11   Paradise did not have a basis to believe expansion into India by the end of 2021 was possible—

12   and in fact, the CW acknowledged it was possible.[4] *See* AC ¶ 123.

13       Even putting all of that aside, Plaintiffs' October 2021 allegation that Skillz was wrong to

14   *expect* in early 2021 to launch in India by the end of 2021 ignores that there was still time for the

15   Company to execute on its goal. It is particularly specious for Plaintiffs to rely on the CW's alleged

16   statements here, given the CW left Skillz in March 2021, well before the stated expansion target-

17   date. AC ¶¶ 122-23. And even the CW does not claim that launching in India by the end of 2021

18   was impossible—merely that Skillz would have to acquire additional resources to make it happen,

19   hardly an impossibility in a newly public, growing company. AC ¶ 123. In any event, one CW's

20   opinion, unaccompanied by any allegation that those who made the challenged statement shared

21   those views, is not enough to plead falsity. *See Wochos*, 985 F.3d at 1194 (rejecting allegations of

22   two employees' views that Tesla's production goal was "impossible" when unaccompanied by any

23   allegation that defendants "ever accepted those employees' views"); *Mulquin v. Nektar*

24   *Therapeutics*, 510 F. Supp. 3d 854, 866 (N.D. Cal. 2020) (rejecting falsity allegations based on the

25   CW's unsupported statements of purported "disagreement" with defendants).

26

27
─────────────
28   [4] Plaintiffs again try to invoke the Wolfpack Report, claiming that it revealed that Skillz's platform
     did not support "scaling the business internationally," but Wolfpack makes no mention of that
     topic. *Compare* AC ¶ 165 *with* Ex. B (Wolfpack Report).

1        3.    Skillz Did Not Misstate Its Synchronous Play Capabilities

2        Plaintiffs' challenge to statements regarding Skillz's enablement of synchronous game play

3    appears to confuse the service Skillz provides and the games that third parties develop. AC ¶¶ 125-

4    29. The Company stated that Skillz "enable[s] game genres that can be played: (i) asynchronously;

5    (ii) turn-based synchronously; or (iii) synchronously." AC ¶¶ 125-27. Plaintiffs allege that the

6    Company did not enable synchronous game play because the Company stated in a shareholder

7    letter for the first fiscal quarter of 2021 that game developers were testing synchronous game play

8    technology. AC ¶ 174; Ex. L (Q1 2021 Shareholder Letter) at 1. In other words, some third-party

9    app developers were developing *their own* synchronous games—which they would not have been

10   able to do if Skillz had not already enabled that functionality.[5] *See Mazzaferro v. Aruba Networks,*

11   *Inc.*, 2014 WL 12680773, at *1 (N.D. Cal. Aug. 1, 2014) (granting dismissal on falsity grounds

12   where plaintiffs' claims were "not so inconsistent with the challenged statements as to support an

13   inference that they were false").[6]

14       4.    Skillz Did Not Misrepresent Its Paid User Engagement

15       The basis for Plaintiffs' challenge to statements about Skillz's platform growth and its

16   effect on overall user engagement is difficult to decipher. AC ¶¶ 131-33. This is not surprising, as

17   Skillz's broad comments about user experience and its "vibrant and growing ecosystem" are non-

18   actionable puffery, too generic and aspirational to constitute a false statement of fact. Plaintiffs

19   nevertheless appear to claim the statements were misleading because Plaintiffs assert (without any

---

[5] Plaintiffs rely on the CW to assert that synchronous game play was "brand new" and that Skillz was still working out "bugs." But working through bugs on a new feature is a far cry from not having the feature at all. *See Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *6 (N.D. Cal. Mar. 23, 2020) (dismissing claims that statements about product features were false due to bugs or defects because the fact that "a new program has kinks does not make a positive statement about the program false"). And Plaintiffs do not allege how the CW would have known the technical capabilities of the Skillz platform during the CW's few months in an unspecified role or roles in the revenue or marketing groups. *See In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *4 n.3 (N.D. Cal. Feb. 24, 2017) (rejecting reliance on CW allegation that defendant's technology "never worked" where there were "no facts to suggest CW1's personal knowledge of the technology or the reliability of her opinion").

[6] Plaintiffs also purport to challenge statements in the March 2021 Offering materials that were allegedly "corrected" in the Wolfpack Report. *See, e.g.*, AC ¶ 127 (alleging that statements related to synchronous game play were also in the March 2021 Offering materials). But the Wolfpack Report was issued *before* the March 2021 Offering materials, and as such, Plaintiffs' falsity arguments as to the statements in those materials fail.

stated basis) that the statements were not true for the one percent of Skillz users who spend more than $500 or $1000 on the Skillz platform. AC ¶ 133. Plaintiffs do not claim that Skillz actually made any statements that were specific to that group.

*First*, Skillz's statements about a "stickier, more engaging, and continuously improving" user experience and a "vibrant and growing ecosystem" are non-actionable puffery. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("Statements of mere corporate puffery, vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."); *In re Nimble Storage, Inc.*, 2016 WL 7209826, at *10 n.16 (N.D. Cal. Dec. 9, 2016) (statements concerning "growing . . . base" and "vibrant" demand inactionably vague). Courts have also considered statements referring to "continuing improvements" as non-actionable optimism. *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (citing *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005)); *see also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141-42 (N.D. Cal. 2017) (rejecting statements that the company was making its "algorithms better and driving continuous improvements in engagement" as non-actionable puffery).

*Second*, Plaintiffs offer no basis other than their own say-so for the conclusion that Skillz's general references to "users" applied universally to every single user or every possible slice of its user base. Skillz did not limit its references to "users" in the challenged statement to any particular spending level, and it is an unreasonable inference that general statements about "users" were necessarily intended to describe only the use patterns of the minority of users who spend $500 or more on the Skillz platform, rather than the entire overarching user base. *See Hessong v. Pinterest, Inc.*, 2021 WL 4339193, at *6 (N.D. Cal. Sept. 23, 2021) (rejecting falsity allegations where "there are no facts alleged showing why the lukewarm and generalized growth statements about users" could be false concerning unrelated "growth rate or ARPU"). Plaintiffs do not challenge what Skillz actually said—*i.e.*, that Skillz's number of users was consistently increasing, and that user

1    experiences were improving—or point to any corrective disclosure regarding the 1% of users that

2    they cherry-pick for their challenge

3              5.    Skillz Presented Its Financial Results Appropriately

4         Plaintiffs argue that Skillz (a) should have disclosed particular revenue submetrics earlier

5    than it did, and the failure to do so somehow violated SEC disclosure rules; and (b) should have

6    been more clear that its revenues only came from paying users.[7] AC ¶¶ 135-51. These challenges

7    are pleaded under the Exchange Act only. None holds water.

8              a.    Skillz Was Not Required To Report Plaintiffs' Preferred Submetrics

9         *First*, Plaintiffs challenge the Company's financial statements as misleading because the

10   Company has expanded the number of submetrics it discloses in recent periods, for example, by

11   including in its most recent filings breakdowns of paying users and Skillz's average revenue per

12   paying user ("ARPPU"). AC ¶¶ 141-51. Plaintiffs argue that the failure to include these specific

13   figures in prior periods rendered revenue numbers misleading.

14        But it is well settled that companies are not prohibited from changing what particular

15   submetrics of revenue they disclose, and indeed, courts recognize that there are "many potential

16   reasons" why a company might change its reporting of revenue metrics that "have no relation to

17   the prior falsity of [those] metric[s]." *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1002

18   (N.D. Cal. 2017); *see also In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 773 (N.D. Cal. 2020)

19   (dismissing securities action based on changes in types of reported metrics because there is "no

20   basis for imposing a duty to include the same metrics in subsequent financial statements"). This

21   makes sense: as the Ninth Circuit acknowledges, "[n]o matter how detailed and accurate disclosure

22   statements are, there are likely to be additional details that could have been disclosed but were

23   not." *Intuitive Surgical*, 759 F.3d at 1061. For that reason, there is no "rule of completeness for

24   
25   [7] Plaintiffs allege in passing that Skillz overstated its revenue from "bonus cash" (that is, user incentives that can only be used to enter into future paid contests, *see* Ex. F (2020 Form 10-K), at 41), and that the Eagle Eye Report purportedly "revealed" that Skillz misrepresented revenues by

26   including "bonus cash." *See, e.g.*, AC ¶¶ 2, 160-70. Plaintiffs do not, however, actually challenge any Skillz statement of revenue. The reason for that is simple: Skillz explained that promotions

27   like "bonus cash" are recognized either as a reduction of revenues or a sales and marketing expense, either way being appropriately factored into the Company's audited revenues. Ex. F

28   (2020 Form 10-K), at 50.

1   securities disclosures." *In re Dropbox Sec. Litig.*,, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21,

2   2020) (concluding that factually accurate annual report was not misleading where it did not include

3   particular negative details). Notably, though Plaintiffs want more, they do not (and cannot) allege

4   that the metrics that they were provided failed to comply with GAAP.[8] *See Turner v. MagicJack*

5   *Vocaltec, Ltd.*, 2014 WL 406917, at *9 (S.D.N.Y. Feb. 3, 2014) (dismissing claims on falsity

6   grounds where auditors opined the financial statements were prepared in accordance with GAAP

7   and stood by their conclusion).

8       Skillz was not under any duty to disclose any specific submetric of revenue. *See Brody v.*

9   *Transitional Hosps., Corp.*, 280 F.3d 997, 1006 n.8 (9th Cir. 2002) ("[i]f a company reports that

10  its sales have risen from one year to the next, that statement is not misleading even though it does

11  not include a detailed breakdown of the company's region by region or month by month sales.").

12  That is, companies are only required to disclose "known trends or uncertainties" that the company

13  "expects will have a material favorable or unfavorable impact on net sales or revenues or income

14  from continuing operations." *In re NVIDIA Corp. Sec. Litig.*, 768 F. 3d 1046, 1054 n.8 (9th Cir.

15  2014). Plaintiffs have not alleged the existence of any adverse trend, much less one that would

16  have an impact that a reasonable investor would have viewed as "significantly alter[ing] the 'total

17  mix' of information made available," which would be required to state a securities claim.[9] *Matrixx*

18  *Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011); *see also Hessong*, 2021 WL 4339193, at *7

19  (dismissing securities fraud action where plaintiff alleged "no facts... supporting the existence of

20  negative 'trends'" in domestic MAUs or ARPU at the time the challenged statements were made).

21      Plaintiffs try to suggest these metrics are important because they were a harbinger of a

22  _____

23  [8] These well-settled rules also defeat Plaintiffs' fallback claim that the Skillz Defendants violated
    SEC disclosure rules. AC ¶¶ 152-56. Plaintiffs challenge the Company's representation to the SEC

24  of the primary metrics it used to manage its business in October 2020—which the SEC did *not*
    challenge—based solely on the subsequent disclosure of different key metrics. But changes in

25  metric reporting "does not show that the previous reporting . . . was false or misleading." *Solarcity*,
    274 F. Supp. 3d at 1002; *see also Ironworkers Local 580-Joint Funds v. Linn Energy, LLC*, 29 F.

26  Supp. 3d 400, 426 (S.D.N.Y. 2014) ("Plaintiff's effort to transform that business decision [to
    change the way it calculated certain metrics] into some sort of admission that statements made in

27  prior reporting periods were false and materially misleading is entirely misguided.").

28  [9] ARPPU may have declined in certain portions of 2020, but it increased in the first quarter of
    2021, so any declines were not a trend. *See* Ex. L (Q1 2021 Shareholder Letter).

future financial collapse. *See* AC ¶ 151. Not only are there no allegations supporting this suggestion, it is also demonstrably untrue. Plaintiffs cite metrics from the second half of 2020, AC ¶ 135, but as of the date of the Amended Complaint, and contrary to Plaintiffs' suggestion, Skillz's revenues had continued to increase. *See, e.g.*, Ex. G (Q3 2021 Press Release). Put simply, Plaintiffs' doomsday association of a particular submetric with the crumbling of Skillz's financial results has no basis and is also inconsistent with reality.

*Reinschmidt v. Zillow, Inc.* is instructive. In *Zillow*, plaintiffs alleged that defendants had a duty to disclose "essentially flat" ARPU to "counter-balance the positive statements Zillow made" about the growth of its business. 2014 WL 5343668, at *6 (W.D. Wash. Oct. 20, 2014). The court rejected plaintiffs' falsity allegations both because they did not "identify any affirmative statement made by Defendants that ARPU had increased" and because it was "entirely possible" that increased revenues, but decreased ARPU, was a result of selling cheaper subscriptions. *Id.* at *5-7. The same is true here. Plaintiffs do not identify a single statement that ARPPU was increasing in 2020. And it is certainly not surprising that Skillz could continue to grow revenue by increasing the number of paying users (which were increasing in number throughout this period) even if paying users generated slightly less revenue (on average) than when that group was smaller.

Plaintiffs do not—and cannot—allege that Skillz's reported revenues were inaccurate, nor that those revenues even decreased throughout the putative class period. Plaintiffs' claims amount to nothing more than a hindsight desire for additional submetrics of revenue at an earlier date, and that is not sufficient to support any of their claims.

<p style="text-align:center">b. <u>Skillz's Revenue Disclosures Were Not Misleading</u></p>

Plaintiffs' argument that Skillz's disclosures were misleading because they attributed revenue increases to MAUs rather than specifically saying "paying" MAUs is just not plausible. *Wochos v. Tesla*, 2019 WL 1332395, at *6 n.2 (N.D. Cal. Mar. 25, 2019). The Company made very clear—and Plaintiffs admit—that at this stage, Skillz was generating revenues exclusively from paying users. *See* Ex. M (2020 Form 10-K/A) at 42; Ex. I (11/17/20 Form S-4/A) at 182; AC ¶ 5. The Company also disclosed that only 10% of its MAUs enter into paid contests. Ex. I (11/17/20 Form S-4/A) at 168. And Plaintiffs acknowledge that Skillz stated that increased revenue

1   was driven by the acquisition of "new *paying* users." AC ¶¶ 137-38 (emphasis added). A

2   reasonable investor could not have been misled as to the source of Skillz's increased revenues by

3   Skillz not using the word "paying" more often in its financial statements.

4               6.      Skillz Did Not Misrepresent SPAC-Related Warrants

5               On April 12, 2021, the SEC issued, for the first time, a release regarding its views of how

6   SPAC warrants should be classified as liabilities rather than equities under GAAP. *See* Ex. N

7   (5/4/21 Form 8-K). This statement differed from how the vast majority of SPACs had accounted

8   for such warrants.[10] Following the release, the Company (and virtually every other SPAC) decided

9   to conform its 2020 annual financial statements to the SEC's views set forth in its April 2021

10  statement. *Id*. That does not amount to a false statement, particularly where the original financial

11  statements conformed to generally accepted industry standards at the time. *See In re Bristol-Myers*

12  *Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004) ("Restatement of financial results...

13  without corresponding fraudulent intent, [is] not sufficient to state a securities fraud claim."); *In*

14  *re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1066 (N.D. Cal. 2002) (rejecting falsity

15  allegations related to restatement caused by "changed circumstances"); *In re N. Am. Acceptance*

16  *Corp. Sec. Cases*, 513 F. Supp. 608, 636 (N.D. Ga. 1981) (rejecting securities fraud claims based

17  on restatement due to changed accounting guidance because original financial statements were

18  "consistent with generally accepted auditing standards at the time [they] were issued").

19              Even putting aside that the new SEC position impacted hundreds of similarly situated

20  companies (without triggering an onslaught of enforcement actions or securities lawsuits),

21  Plaintiffs do not come close to pleading falsity with respect to the warrants. Plaintiffs do not allege

22  that the Company's accounting decisions were wrong at the time of the original financial

23  statements. And in any event, courts have repeatedly confirmed that GAAP accounting judgments

24  are statements of opinion. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at

25  *12-13 (S.D.N.Y. Sept. 9, 2019) (holding that where financial statements "reflect a result achieved

26  by applying judgments to objective historical facts," they "reflect[] an opinion"); *see also*

27

28  [10] *See, e.g.*, "Will SPAC Restatements Trigger Shareholder Litigation?", XI Nat'l L. Rev. 348 (Oct. 29, 2021), available at https://www.natlawreview.com/article/will-spac-restatements-trigger-shareholder-litigation.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SILICON VALLEY

SKILLZ DEFS.' MOT. TO DISMISS
3:21-CV-03450-RS

1    *Rieckborn v. Jeffries LLC*, 81 F. Supp. 3d 902, 921-22 (N.D. Cal. 2015) (assessing financial

2    statements resulting from accounting judgments as opinion statements); *Pearlstein v. BlackBerry*

3    *Ltd.*, 93 F. Supp. 3d 233, 243 (S.D.N.Y. 2015) (assessing "subjective accounting choices" as

4    opinions); *cf. In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1457 (N.D. Cal. 1996) ("GAAP is

5    not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range

6    of reasonable treatments, leaving the choice among alternatives to management.").

7           As discussed above, pleading the falsity of such opinion statements, requires particularized

8    allegations showing *both* that the opinion was objectively wrong *and* that a defendant did not

9    believe that opinion at the time or had no basis whatsoever to believe it. *See supra* Section IV.A.2.

10   Plaintiffs do not plead any facts explaining why classifying warrants as equities *before* the SEC

11   statement was objectively or subjectively false. Plaintiffs do not allege that, when Skillz published

12   the original financial statements, its accounting judgments were objectively unreasonable or that

13   any Defendant did not believe them. To the contrary, Skillz's independent auditor (like the auditors

14   of hundreds of other SPACs) signed off on the financial statements, which included the warrant

15   treatment decision *and* its internal controls over financial reporting. *See* Ex. F (2020 Form 10-K)

16   at 54. The SEC never directly questioned those financial statements (aside from generally stating

17   its new position) or pursued any enforcement afterward. And Skillz explained that the SEC's views

18   "were not consistent with our historical interpretations of the specific provisions within our warrant

19   agreements and our application of [the relevant accounting standards]." Ex. M (2020 Form 10-

20   K/A) at 73. Plaintiffs' attempt to generate a "false statement" out of a decision to conform to new

21   SEC interpretations is baseless. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 2021 WL 5626377,

22   at *4 (4th Cir. Dec. 1, 2021); *Ramp*, 201 F. Supp. 2d at 1066 (rejecting falsity allegations as fraud

23   by hindsight where restatement did not render challenged statements false when made).

24          **B.      Plaintiffs Do Not Adequately Plead Scienter**

25          Even if Plaintiffs had identified a false or misleading statement (and they have not), their

26   Exchange Act claims independently fail because they have not established a "strong inference" of

27   an "intent to deceive, manipulate, or defraud." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,

28   540 F.3d 1049, 1061 (9th Cir. 2008). To survive a motion to dismiss, Plaintiffs' factual allegations

of scienter must be "more than merely plausible or reasonable," and they must give rise to an inference of scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 1066. This requires facts strongly implying a defendant's "contemporaneous knowledge that [a] statement was false when made." *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *9 (N.D. Cal. Mar. 29, 2013).

To be clear, Plaintiffs do not even assert—much less allege particularized facts—that any speaker made any challenged statement knowing that it was false or otherwise unsupported. Instead, they resort to a litany of half-baked assertions that, whether considered individually or together, remain far less compelling than the inference that the Skillz Defendants did not believe they were misleading the market. *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) (granting dismissal on scienter grounds where independently insufficient scienter allegations remained insufficient when considered collectively, *i.e.*, "zero plus zero (plus zero plus zero plus zero) cannot equal one").

**Access to Unspecified Information**. Plaintiffs broadly allege that Skillz and the Officer Defendants received "material non-public information" that "reflect[ed] the true facts regarding Skillz." AC ¶¶ 178-79. But Plaintiffs do not specify what information was received, when it was received, or how it bears on any of the challenged statements, as they must to plead scienter with particularity. *See, e.g.*, *Veal v. Lendingclub Corp.*, 2020 WL 3128909, at *14 (N.D. Cal. June 12, 2020). At most, Plaintiffs refer to their CW's assertion that certain metrics were "*available* to Skillz management through the Tableau Dashboard." AC ¶ 181 (emphasis added). But mere access to hypothetically contradictory information is not enough, and Plaintiffs do not allege that any Skillz Defendant ever accessed the Tableau Dashboard much less concluded it undermined their public statements.[11] *See Intuitive Surgical*, 759 F.3d at 1063 ("Mere access to reports... is insufficient to establish a strong inference of scienter.").

**"Contradictory" Statements**. Plaintiffs next allege that the Skillz Defendants made contradictory statements supposedly "conceding the falsity" of certain challenged statements and

---

[11] For individuals other than Ms. Aguirre, Plaintiffs also cite certifications under the Sarbanes-Oxley Act ("SOX"). AC ¶ 182. It is well-settled that SOX certifications do not support an inference of scienter. *See, e.g.*, *Rok v. Identiv, Inc.*, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4, 2017).

therefore "indicative of their scienter." AC ¶ 183. But none of the cited statements are actually contradictory, much less do they demonstrate that any challenged statement was knowingly false when made. *See, e.g.*, *Paciga v. Invuity Inc.*, 2019 WL 3779694, at *6 (N.D. Cal. Aug. 12, 2019) (requiring plaintiffs to allege particularized information known by defendants that contradicted their statements at the time they were made).

*First*, Plaintiffs argue that statements that the Company "enable[s] game genres that can be played... synchronously" were contradicted by a later statement that developers were "actively testing synchronous content on our platform." *See* AC ¶ 183; Ex. L (Q1 2021 Shareholder Letter) at 1. Developers' testing of synchronous games on Skillz's platform *confirms* the accuracy of the Company's statements. Skillz does not create games. It provides a platform for games developed by others. Skillz enables synchronous play, but it is dependent on developers to create, test, and deploy synchronous game play on their apps through the Skillz platform. These two statements do not contradict each other, much less amount to a strong inference of scienter.

*Second*, Plaintiffs claim that the statement accompanying certain financial results in 2021 that paying-MAUs was a primary metric used to gauge *revenues* and attributing revenues to paying-MAUs somehow demonstrates scienter as it relates to the October 2020 statement that paying-MAUs was not a primary metric used to manage the business "as our primary focus is on growing the total user traffic on our platform." AC ¶¶ 184-85, 187. According to Plaintiffs' CW, "when [Skillz] went public, they realized Wall Street cared about MAUs." AC ¶ 186. Putting aside the incongruity of Plaintiffs' allegations and that the Company has consistently disclosed its MAUs, the Company has always been clear that paying users are what currently drive its revenues. *See, e.g.*, Ex. E (11/30/20 Form S-4/A) at 181. Indeed, in the same SEC correspondence that Plaintiffs allege was misleading, Skillz disclosed the precise number of paying-MAUs for the six months ended June 30, 2020, as well as for 2019 and 2018. Ex. A (10/13/20 SEC Correspondence). Skillz then explained that, at that time, its focus was "on growing total user traffic... based on the expectation that, *over time*, we will be able to monetize all users as the content on our platform evolves and we add new forms of monetization such as advertising." *Id.* (emphasis added). Plaintiffs offer no "contemporaneous facts that would establish a contradiction between the alleged

materially misleading statements and reality." *In re Cloudera*, 2021 WL 2115303, at *11. Paying-MAUs has always been disclosed as the sole source of *revenue*. The purportedly inconsistent statement in October 2020 referred to the metric the Company was then focused on in terms of growing its business (MAUs), which it explained arose from the goal of monetizing every user on the Skillz platform at some point in the future. Again, those two statements are not at odds with each other and do not demonstrate scienter.

*Third*, Plaintiffs claim that Defendants knew the Skillz platform had "certain technical limitations that would have slowed Skillz['s] ability to expand to international markets." AC ¶ 189. Plaintiffs make no effort to explain what "technical limitations" existed. And even their CW's allegations (albeit limited to when she left the Company in March 2021) that the Company needed additional support to be able to launch in India in 2021 inherently recognizes that such a launch was possible. *Id.* Plaintiffs allege no fact indicating that any Defendant did not believe that the Company could launch in 2021 at the time the challenged statements were made.

**"Refusal" to Answer Question**. Plaintiffs next argue that Mr. Paradise's scienter is apparent from his "refus[al]" to answer a question regarding "slowing" downloads for certain games. AC ¶¶ 192-93. But as noted above in discussing how Mr. Paradise's response was not a false statement, *see supra* Section IV.A.I, Mr. Paradise answered the question: the analyst asked how perceived decreased downloads was "shaping the business going forward," AC ¶ 115, and Mr. Paradise explained that the Company's "previous number on[e] titles, [] actually all continued to grow in [Gross Marketplace Volume (or, in other words, revenue)], even after being displaced from their position." *Id.* That is not surprising: users normally only download an app once but then continue to use it indefinitely, meaning that app downloads may decrease (so that the app may no longer be the most downloaded game on the platform) even as the app continues to grow in the total amount of entry fees paid by users for that game's contests. *See* Ex. E (11/30/20 Form S-4/A) at 3. Again, Plaintiffs have not identified any fact that would render this exchange inaccurate, much less a strong inference of scienter. *See In re AnaptysBio, Inc.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021) (rejecting "evasive" answers to analyst questions as basis for scienter).

**Core Operations**. Plaintiffs next allege that the Skillz Defendants must have known about

1    the Company's "user base and the trends that impact the Company's business" because the Skillz

2    platform is its "core operation." AC ¶¶ 194-98. But Plaintiffs fail to meet the significant threshold

3    for relying on this theory to raise a compelling inference of scienter. *See Percoco v. Deckers*

4    *Outdoor Corp.*, 2013 WL 3584370, at *5 (D. Del. July 8, 2013) ("Only in rare instances can core

5    operations alone allow inferences of scienter."). What is missing from Plaintiffs' pleading is how

6    knowledge of Skillz's business metrics in general has any bearing on their claims. Plaintiffs allege

7    Skillz Defendants had access to "every possible key metric," AC ¶ 197, but do not explain how

8    any of those metrics undermined the challenged statements—especially when Plaintiffs do not

9    dispute that nearly all of those metrics were positive, such as steadily increasing revenues or paying

10   MAUs. Without tying any supposedly known metric to the falsity of a challenged statement,

11   Plaintiffs' core operations theory fails. *See Manger v. LeapFrog Ents., Inc.*, 252 F. Supp. 3d 837,

12   847 (N.D. Cal. 2017) (rejecting core operations theory of scienter where what has been "missing

13   from the beginning are facts that the [metrics purportedly known by defendants] meant that the

14   [challenged] statements . . . were false or misleading"); *Veal*, 423 F. Supp. 3d at 816 (rejecting

15   scienter claim based on knowledge of "day-to-day workings of the company's business" absent

16   allegations of "specific information conveyed to management and related to the fraud").

17        **Stock Sales**. Plaintiffs also urge the Court to draw an inference of scienter based on stock

18   sales by four Skillz Defendants in the March 2021 Offering. AC ¶¶ 199-201. Plaintiffs do not,

19   however, allege that any of those stock sales were "unusual" or "suspicious" in any way. *See In re*

20   *Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104 (N.D. Cal. 2006). Indeed, the Amended Complaint

21   lacks any allegation of any individual's stock sale history. Moreover, the four insiders sold as little

22   as 2.5% and no more than 13.49% of their Skillz holdings in the offering. AC ¶ 201. And Plaintiffs

23   do not allege that any of the five other Skillz Defendants sold *any* shares. Sales of a small portion

24   of sellers' holdings by only a few defendants has been rejected as a basis for inferring scienter. *See*

25   *Metzler*, 540 F.3d at 1067 (noting that "[w]e typically require larger sales amounts—and

26   corroborative sales by other defendants—to allow insider trading to support scienter" where one

27   defendant made no sales and another 37% of his holdings); *see also Ronconi*, 253 F.3d at 435

28   (insider selling 17% of holdings insufficient to plead a compelling inference of scienter).

1   **CFO Retirement**. Plaintiffs also refer to Mr. Henry's "resign[ing]" as Skillz's chief

2   financial officer as somehow being indicative of scienter. AC ¶ 202. But Mr. Henry *retired* from

3   his role as planned after assisting in taking Skillz public. *See* Ex. O (5/5/21 Form 8-K). "[T]he bare

4   fact of [Mr. Henry's] retirement cannot support [Plaintiffs'] allegations of scienter." *Zucco*, 552

5   F.3d at 1002; *see also Intrexon*, 2017 WL 732952, at *6 (executive's resignation did not support

6   inference of scienter absent allegations of "suspicious circumstances" accompanying resignation).

7   **C.      Plaintiffs Do Not Adequately Plead Loss Causation**

8       Plaintiffs' Exchange Act claims also fail on the independent ground that Plaintiffs have not

9   pleaded loss causation, which requires a showing that "the revelation of [the alleged]

10  misrepresentation or omission was a substantial factor in causing a decline in the security's price."

11  *Mulquin*, 510 F. Supp. 3d at 870. Typically, this requires allegations "that the defendant revealed

12  the truth through 'corrective disclosures' which caused the company's stock price to drop and

13  investors to lose money." *Id.* But there was no such revelation here: Plaintiffs have not pleaded

14  any corrective disclosures that caused their alleged losses.

15          1.      The Short Reports Are Not Corrective Disclosures

16      Plaintiffs' primary theory of loss causation fails at the threshold because it is based on self-

17  interested short reports that do not "reveal" any "truth" to the market. *See, e.g.*, AC ¶¶ 210-11.

18      Beyond the fact that Courts routinely reject self-interested short seller reports as "corrective

19  disclosures,"[12] the short reports here did not "correct" anything. The Wolfpack Report makes

20  various negative predictions about Skillz, two of which Plaintiffs latch onto: that certain game

21  _____

22  [12] *See Mulquin*, 510 F. Supp. 3d at 873  (rejecting loss causation theory based on report by short seller "who had a financial interest in driving [the company's] stock price down and who disclaimed any representation, express or implied, as to the accuracy, timeliness, or completeness

23  of any such information or with regard to the results obtained from its use"); *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1208 (9th Cir. 2020) (affirming dismissal where loss causation

24  relied on short seller's analysis that "did not require any expertise or specialized skills beyond what a typical market participant would possess" and "included the disclaimer that the author

25  makes no representation as to the accuracy or completeness of the information"); *Intrexon*, 2017 WL 732952, at *7 (granting dismissal on loss causation grounds where loss causation was based

26  on short report ); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 2937483, at *5 (N.D. Cal. May 20, 2016) (same, noting that short seller report that "contain[ed] merely the opinions of the

27  author [which] cannot be categorically labeled as 'the truth'"); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (a short seller's "opinion, standing alone, cannot reveal[] to the market the

28  falsity of a company's prior factual representations").

downloads were decreasing and that Skillz's platform purportedly did not "support synchronous game play." AC ¶ 165. But according to Wolfpack itself, its "opinions" were based on information "obtained from public sources"—meaning it was not revealing concealed information.[13] Ex. B (Wolfpack Report) at 15; *see also id.* at 2. This negative spin on public information is precisely what courts reject as the basis of loss causation. *See Meyer*, 710 F.3d at 1199 ("If every analyst or short-seller's opinion... could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure. That cannot be—nor is it—the law.").[14] And, in any event, none of the challenged statements has anything to do with the three games whose downloads Wolfpack claimed were declining, *see supra* Section IV.A.1, and Plaintiffs elsewhere admit that Skillz supported synchronous play, *see supra* Section IV.A.3 & AC ¶ 174.

Plaintiffs' reliance on the Eagle Eye Report published on Twitter is even weaker. AC ¶¶ 169-171. Like the Wolfpack Report, the Eagle Eye Report states it is based on a review of Skillz's "publicly available financial information" and cites only to the Company's public filings, Wikipedia, and public news articles related to the market in general or unrelated companies. *See* Ex. C (Eagle Eye Report). Repackaging public information in a negative way is not a corrective disclosure. *See Intrexon*, 2017 WL 732952, at *7.

Notably, the short reports were followed by only temporary stock drops. AC ¶¶ 168, 171. Four days after the Wolfpack Report, Skillz's share price exceeded the closing share price on the day before the March 8 report. *See* Ex. D (Yahoo! Finance). And Skillz's share price likewise recovered just two days after the Eagle Eye Report. *Id.* These quick recoveries after modest price declines "refute[] the inference that the alleged concealment of this particular fact caused any material drop in the stock price." *See, e.g.*, *Wochos*, 985 F.3d at 1198.

---

[13] The Wolfpack Report refers to statements from former employees, but none of those statements bears on any of the challenged statements. *See id.* at 15 (discussing purported former employees' sentiments about Mr. Paradise). And in any event, the unidentified former employees do not meet the threshold of reliability required of confidential witnesses. *See Zucco*, 552 F.3d at 995.

[14] In addition, the Wolfpack Report was published before the final registration statement and prospectus for the March 2021 Offering—so it could not have corrected any price inflation based on alleged misstatements in the March 2021 Offering documents.

2.   None Of The Cited Disclosures "Corrects" Any Challenged Statement

As a fallback to their insufficient short-seller-based loss causation theories, Plaintiffs pivot to a series of unrelated disclosures on May 4, 2021, as allegedly revealing some unknown fraud. AC ¶¶ 172-76. First, Plaintiffs point to the Company's incorporation of new SEC interpretations of the treatment of SPAC-related warrants into its 2020 annual financial statements. AC ¶¶ 172-73. But again, the SEC issued new statements on the treatment of warrants, which were otherwise subject to GAAP and ASC rules that required subjective management estimates and opinions. Skillz's decision to revise its existing financial statements to conform them to the new interpretation from the SEC does not amount to the revelation of some fraudulent accounting practices, and the May 4, 2021 restatement therefore cannot form the basis of loss causation. *See Lechner v. Infusystem Holdings, Inc.*, 2017 WL 11593803, at *2, *9 (C.D. Cal. Dec. 15, 2017) (rejecting loss causation theory where "there was nothing" in the company's financial restatement "indicating fraud—only that an error occurred resulting in overstated revenues"); *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (affirming dismissal based on failure to allege that a "revelation of fraudulent activity" caused the stock price decline).

Plaintiffs also allege that Skillz's May 4, 2021 stockholder letter noted that third party app developers were "actively testing synchronous content." AC ¶ 174. This statement does not reveal the falsity of any challenged statement. *See supra* Section IV.A.3. To the contrary, it confirms that app creators were utilizing the Skillz platform to develop synchronous game play.[15]

Notably, Plaintiffs do not allege any corrective disclosure that relates in any way to their challenged statements regarding expansion into India, paid user engagement, and/or paying-MAUs or ARPPU. Any alleged stock price decline purportedly caused by the short reports or the May 4, 2021 disclosures thus could not have revealed any supposed fraud related to those topics.

In sum, while Skillz's stock price may have temporarily fallen on certain dates, the disclosures on those dates do not reveal the "truth" of any false statement, and thus do not amount to corrective disclosures sufficient to plead loss causation. *Mulquin*, 510 F. Supp. 3d at 870.

---

[15] Plaintiffs also reference Mr. Henry's retirement but do not tie it to any challenged statement or explain what fraud it supposedly revealed, so it has no bearing on loss causation. *See* AC ¶ 174.

1      **D.      The Securities Act Claims Fail For Lack Of Standing**

2             The Securities Act claims also fail because the only Plaintiff to assert such claims—

3      Plaintiff Tinkelman—has not adequately alleged facts tracing his purchase of shares to the

4      Company's secondary offering. AC ¶¶ 236-62. To plead Securities Act standing, plaintiffs "must

5      either have 'purchased shares in the offering made under the misleading registration statement,' or

6      purchased shares in the aftermarket 'provided they can trace their shares back to the relevant

7      offering.'" *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 378 (N.D. Cal. 2020) (quoting *In re*

8      *Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)). This is a particularly high

9      bar where "there are multiple registration statements, in which case the plaintiff must prove that

10     the purchased shares were issued under the allegedly false or misleading one, 'rather than some

11     other registration statement.'" *Id.* Courts routinely reject the "conclusory allegation" that a plaintiff

12     "purchased [shares] directly traceable" to the offering, and that is all Plaintiff Tinkelman has pled

13     here. Compare *Century Aluminum*, 729 F.3d at 1107 *with* AC ¶ 31 (alleging Plaintiff Tinkelman

14     "purchased the Company's common stock in and traceable to Skillz's March 2021 Offering").

15     Allegations that a plaintiff purchased shares on the day of a secondary offering at the same offering

16     price are "merely consistent with" being "traceable to the secondary offering" and are insufficient.

17     *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016).

18     Plaintiff Tinkelman's failure to plead Securities Act standing is fatal to those claims.[16]

19     **E.      Any Control Person Claim Fails Along With The Other Claims**

20            Because Plaintiffs do not state a primary violation of the securities laws, their "control

21     person" claims under Sections 15 or 20(a) necessarily fail. *See Rigel*, 697 F.3d at 886

22     ("Section 20(a) and section 15 both require underlying primary violations of the securities laws.").

23     **V.     CONCLUSION**

24            For the reasons stated above, the Amended Complaint should be dismissed.

25

26     [16] Plaintiff Tinkelman also lacks standing for his Section 12(a)(2) claim against Skillz because he has not alleged that the Company "pass[ed] title to" Skillz stock to him, nor "engage[d] in solicitation of [the] securities sales for financial gain." *In re Harmonic, Inc. Sec. Litig.*, 2006 WL

27     3591148, at *9 (N.D. Cal. Dec. 11, 2006). Plaintiff Tinkelman's conclusory assertion that Skillz "promoted and sold shares for [its] own benefit" is insufficient. See *Violin Memory,* 2014 WL

28     5525946, at *19 (dismissing Section 12(a)(2) claim for lack of standing where complaint included "conclusory statement" that plaintiff "bought common stock... directly" from underwriter).

Dated: December 23, 2021

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/Matthew Rawlison
Matthew Rawlinson

*Attorneys for Defendants Skillz Inc., Andrew Paradise, Casey Chafkin, Miriam Aguirre, Scott Henry, Harry Sloan, Jerry Bruckheimer, Christopher Gaffney, Vandana Mehta-Krantz, and Kent E. Wakeford*