AMY S. PARK (S.B. #208204)
apark@omm.com
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, California 94025-7019
Telephone:   +1 650 473 2600
Fax:         +1 650 473 2601

JONATHAN ROSENBERG (*pro hac vice*)
WILLIAM J. SUSHON (*pro hac vice*)
jrosenberg@omm.com
wsushon@omm.com
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036-6524
Telephone:   +1 212 326 2000
Fax:         +1 212 326 2061

*Attorneys for the Underwriters*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THOMAS JEDRZEJCZYK, SONNY CHUNG, KEVIN TINKELMAN, AND DAVID LEWIS, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SKILLZ INC., f/k/a FLYING EAGLE ACQUISITION CORP., ANDREW PARADISE, CASEY CHAFKIN, MIRIAM AGUIRRE, SCOTT HENRY, HARRY SLOAN, JERRY BRUCKHEIMER, CHRISTOPHER GAFFNEY, VANDANA MEHTA-KRANTZ, KENT E. WAKEFORD, CITIGROUP GLOBAL MARKETS, INC., GOLDMAN SACHS & CO. LLC, JEFFERIES LLC, UBS SECURITIES LLC, WEDBUSH SECURITIES INC., WELLS FARGO SECURITIES, LLC, CANACCORD GENUITY LLC, STIFEL, NICOLAUS & COMPANY, INC.,<br><br>Defendants. | Case No. 3:21-cv-03450-RS<br><br>**UNDERWRITERS' NOTICE OF MOTION TO DISMISS AMENDED CONSOLIDATED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[Proposed Order Filed Concurrently]**<br><br>Date:        April 21, 2022<br>Time:        1:30 PM<br>Judge:       Hon. Richard Seeborg<br>Courtroom:   3, 17th Floor |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................... 3

BACKGROUND ............................................................................................................................ 6

ARGUMENT .................................................................................................................................. 6

    I.    PLAINTIFF TINKELMAN HAS NO STANDING TO ASSERT A SECURITIES ACT CLAIM BASED ON THE SPO. ........................................... 6

    II.    THE ACC DOES NOT PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT IN THE SPO MATERIALS. ................................ 9

        A.    The ACC Alleges that the "Truth" Concerning Skillz's User Engagement and Platform Was Disclosed to Investors Before the SPO. ........................................................................................................... 9

            1.    The Wolfpack Report Stated that Downloads of Skillz's Top Games Had Declined During the Second Half of 2020. .................. 9

            2.    The Wolfpack Report Also Noted that Skillz's Platform Was Not Yet Capable of Hosting Synchronous Play. .................... 11

        B.    The ACC Fails to Plead that the Revenues Skillz Reported in the SPO Materials Were False or Misleading. ............................................... 12

    III.    THE FINANCIAL STATEMENTS' TREATMENT OF WARRANTS AS EQUITY WAS NOT MISLEADING ................................................................... 13

CONCLUSION ............................................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amtrust Fin. Servs., Inc. Sec. Litig.*,
  No. 17-CV-01545-LAK, 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ..................................13

*In re Apple Comput. Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989)..............................................................................................10

*Barnes v. Orofsky*,
  373 F.2d 269 (2d Cir. 1967)....................................................................................................7

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013).............................................................................................6, 7

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)................................................................................................13

*In re Cloudera, Inc. Sec. Litig.*,
  No. 19-CV-03221-LHK, 2021 WL 2115303 (N.D. Cal. May 25, 2021) ..............................12

*In re Convergent Tech. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991).........................................................................................10, 11

*Griffin v. PaineWebber, Inc.*,
  No. 99 Civ. 2292(VM), 2001 WL 740764 (S.D.N.Y. June 29, 2001)....................................8

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995)................................................................................................................7

*In re Harmonic, Inc., Sec. Litig.*,
  No. C 00-2287 PJH, 2006 WL 3591148 (N.D. Cal. Dec. 11, 2006) ......................................8

*Hemmer Grp. v. Sw. Water Co.*,
  663 F. App'x 496 (9th Cir. 2016) ...........................................................................................6

*Hunt v. Bloom Energy Corp.*,
  No. 19-cv-02935-HSG, 2021 WL 4461171 (N.D. Cal. Sept. 29, 2021)..........................13, 14

*In re Levi Strauss & Co. Sec. Litig.*,
  527 F. Supp. 2d 965 (N.D. Cal. 2007) ...................................................................................7

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) .................................................................................12

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  No. 10-cv-0302 MRP, 2011 WL 4389689 (C.D. Cal. May 5, 2011).......................................9

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re North American Acceptance Corp. Securities Cases*,
  513 F. Supp. 608 (N.D. Ga. 1981) ...................................................................................... 15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ............................................................................................................ 13, 14

*Pinter v. Dahl*,
  486 U.S. 622 (1988) ............................................................................................................ 8

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................................................. 6

*Primo v. Pac. Biosciences of Cal., Inc.*,
  940 F. Supp. 2d 1105 (N.D. Cal. 2013) ............................................................................... 9

*Rieckborn v. Jefferies LLC*,
  81 F. Supp. 3d 902 (N.D. Cal. 2015) ................................................................................... 3

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ............................................................................................... 9

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................................... 6, 7

*In re UBS AG Sec. Litig.*,
  No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ........................... 8

*In re Violin Memory Sec. Litig.*,
  No. 13-cv-05486 YGR, 2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ............................... 8

*Welgus v. TriNet Grp., Inc.*,
  No. 15-cv-03625-BLF, 2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ................................... 6, 7, 8, 10

**NOTICE OF MOTION AND ISSUES TO BE DECIDED**
**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on Thursday, April 21, 2022, at 1:30 PM or as soon thereafter as the matter may be heard at the U.S. District Court, Northern District of California (San Francisco), 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Citigroup Global Markets, Inc., Goldman Sachs & Co. LLC, Jefferies LLC, RBC Capital Markets, LLC, UBS Securities LLC, Wedbush Securities Inc., Wells Fargo Securities, LLC, Canaccord Genuity LLC, and Stifel, Nicolaus & Company, Inc. will, and hereby do, move the Court for an order dismissing the Amended Consolidated Complaint without leave to amend, under Federal Rule of Civil Procedure 12(b)(6).

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Jonathan Rosenberg, Esq., and exhibits thereto, the Request for Judicial Notice filed with these documents, the arguments of counsel, all pleadings and papers on file in this action, and such other further written and oral argument as may be presented to the Court at a hearing on this Motion or before the Court's decision.

**ISSUES TO BE DECIDED**

Whether the claims against the Underwriter Defendants, brought under Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), should be dismissed because the Amended Consolidated Complaint:

1. has failed to plead Plaintiffs' standing to pursue a Section 11 or 12 claim in the context of Skillz's secondary public offering; and

2. lacks adequate allegations of actionable misstatements or omissions in Skillz's offering materials for its secondary public offering.

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Underwriters[1] hereby join in the Skillz Defendants' Motion to Dismiss and Sections IV.A.1, IV.A.3, IV.A.4, IV.A.6, and IV.D of their Memorandum of Points and Authorities in support of that motion. The Underwriters respectfully submit this separate memorandum to address arguments concerning ACC Counts III and IV under Sections 11 and 12 of the Securities Act, the only claims against the Underwriters.

**PRELIMINARY STATEMENT**

Plaintiffs' only claims against the Underwriters are under Sections 11 and 12 of the Securities Act, which are limited to misleading statements in registration statements and prospectuses for securities offerings. *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 925 (N.D. Cal. 2015) (Section 11 applies to registration statements and "sibling" Section 12 applies to prospectuses). Here, the only Skillz securities offering involving the Underwriters is the SPO, and so any alleged misleading statements outside of the SPO registration statement and prospectus—including statements regarding Skillz's expansion into India (*see* ACC ¶¶ 119–24), monthly average users (or "MAUs") (*see id.* ¶¶135–56), and paying users' average monthly revenues (*see id.*)—cannot provide a basis for a Securities Act claim against the Underwriters.

- The challenged statements regarding Skillz's expansion into India were made during an earnings call on March 12, 2021 (*see id.* ¶ 120), and in a blog post by Skillz CEO Andrew Paradise on April 8, 2021 (*see id.* ¶121).

---

[1] As used in this memorandum, (i) "Underwriters" means defendants Citigroup Global Markets, Inc., Goldman Sachs & Co. LLC, Jefferies LLC, RBC Capital Markets, LLC, UBS Securities LLC, Wedbush Securities Inc., Wells Fargo Securities, LLC, Canaccord Genuity LLC, and Stifel, Nicolaus & Company, Inc.; (ii) "Skillz Defendants" means defendants Skillz Inc., Andrew Paradise, Casey Chafkin, Miriam Aguirre, Scott Henry, Harry Sloan, Jerry Bruckheimer, Christopher Gaffney, Vandana Mehta-Kranz, and Kent E. Wakeford; (iii) "ACC" means the Amended Consolidated Complaint in this action, cited as "ACC ¶ __"; (iv) "SPO" means the March 18, 2021, secondary public offering of Skillz, Inc. common stock; (v) "GAAP" means Generally Accepted Accounting Principles; (vi) "SPAC" means special purpose acquisition company; (vii) "Rosenberg Declaration" means the Declaration of Jonathan Rosenberg, Esq. in Support of the Underwriters' Motion to Dismiss, submitted herewith (cited herein as "Rosenberg Decl. ¶ __"); and (viii) "Blunschi Declaration" means the Declaration of Melanie M. Blunschi in Support of Skillz Defendants' Motion to Dismiss (cited herein as "Blunschi Decl. ¶__."). Unless otherwise specified, all emphasis is added and all quotations and citations are omitted.

- 3 -                                    UNDERWRITER DEFS' MOT. TO DISMISS
                                         NO. 3:21-CV-03450-RS

- Third- and fourth-quarter 2020 financial results attributing revenue growth to higher MAUs, while allegedly failing to disclose declining revenue per user, were shared in a press release on November 18, 2020, in the merger proxy statement dated September 8, 2020, and a draft registration statement dated February 9, 2021 (*see id.* ¶¶ 135–38.)—but not in the SPO offering materials from March 2021.

The ACC also fails to state Securities Act claims against the Underwriters for the allegedly misleading statements in the SPO offering materials. As a threshold matter, no plaintiff has Section 11 or 12 standing to sue the Underwriters. But the ACC also fails to state a claim as to the three allegedly misleading SPO statements or omissions: (i) failing to disclose declining downloads and alleged platform shortcomings; (ii) misrepresenting Skillz's reported revenues; and (iii) erroneously accounting for certain warrants as equity, rather than debt.

*Section 11 Standing.* Section 11 standing requires plaintiffs to allege that they can trace their shares to the offering at issue. Only one plaintiff, Tinkelman, even attempts to plead standing; but courts consistently reject conclusory statements such as his—that he purchased Skillz shares "in or pursuant to" the SPO—as inadequate in the context of a secondary public offering. Here, the SPO shares joined millions of other identical Skillz shares already in the market, making it impossible to discern which were part of the SPO. Even Tinkelman stock purchases on the SPO date at the SPO price (ACC Ex. A) do not plausibly plead purchases of stock that were part of the SPO, as opposed to the preexisting public float trading that day.

*Section 12(a)(2) Standing*. The ACC likewise fails to plead any plaintiff's standing to bring a Section 12(a)(2) claim. Pleading Section 12(a)(2) standing requires allegations that (i) plaintiffs purchased securities in the challenged offering; and (ii) the defendant passed title to them or actively participated in negotiations leading to the purchase. The ACC alleges neither. It fails to plead the first element because it pleads no facts plausibly showing that any plaintiff purchased in the SPO. And it fails to plead the second element because it makes only inadequate conclusory allegations that the Underwriters "solicited and sold" Skillz stock to "Lead Plaintiffs and other members of the Class." (ACC ¶ 62(e).)

*Declining Downloads and Platform Shortcomings*. The ACC alleges that the March 2021 SPO materials failed to disclose (i) declines in downloads for Skillz's top games in the latter half

of 2020, and (ii) the inability of the Skillz platform to host synchronous gaming. As the Skillz Defendants explain, the ACC fails to plead how these alleged omissions rendered anything in the SPO materials misleading and, further, the SPO statements that the ACC does identify are too vague to be actionable. (*See* Skillz Defs. Mem. 7–8, 10–12.) But these omissions cannot give rise to a Securities Act claim for another reason: there is no liability under the securities laws for misstatements or omissions in SEC filings when the "truth" about those statements had already been publicly disclosed. The ACC itself alleges that information about Skillz's declining downloads and platform shortcomings was published in a Wolfpack Research short-seller report on March 8, 2021, eleven days before the SPO; this disclosure, the ACC alleges, immediately caused Skillz's stock price to drop materially. (ACC ¶ 168.) Under settled Ninth Circuit law, this pre-SPO disclosure to the market negates plaintiffs' ability to plead that the SPO offering materials were misleading.

*Cash Revenues*. The ACC makes passing reference to another short-seller report from anonymous Twitter user "Eagle Eye," which alleges that Skillz's cash revenues were only 19% to 40% of its reported revenues. But as the Skillz Defendants show, the ACC does not explain how this rendered any statement in the SPO materials false or misleading, and with good reason: the SPO materials had already disclosed that cash revenues were less than booked revenues. (*See* Skillz Defs. Mem. 12 n.7.) The cash revenue allegations should therefore be dismissed for failure to plead falsity.

*Reclassification of Warrants*. The ACC attacks Skillz's accounting judgment to classify certain warrants as equity, rather than debt. But that accounting judgment qualifies as a statement of opinion as to which the ACC fails to plead either subjective disbelief or objective falsity (*i.e.*, that the statement lacked a reasonable basis). And Skillz's accounting judgment was not misleading even if were not an opinion; Skillz's accounting was consistent with prevailing accounting guidance at the time of the SPO. Thus, Securities Act claims regarding the warrant classifications should also be dismissed.

**BACKGROUND**

The Underwriters adopt and incorporate by reference the Skillz Defendants' factual background. (*See* Skillz Defs. Mem. 3–5.) The Underwriters' sole role in the events alleged in the ACC was to underwrite Skillz's March 2021 SPO. While the ACC makes conclusory allegations concerning the Underwriters' participation in drafting the allegedly misleading SPO materials and sale of securities into the market generally (*see* ACC ¶¶ 61–62), Plaintiffs do not allege any particular Underwriter's involvement in negotiating or closing any Lead Plaintiff's purchase of Skillz stock in the SPO.

**ARGUMENT**

**I.   PLAINTIFF TINKELMAN HAS NO STANDING TO ASSERT A SECURITIES ACT CLAIM BASED ON THE SPO.**

*Section 11*. Pleading standing under Section 11 requires plaintiffs to allege facts plausibly showing that they "'purchased shares in the offering made under the misleading registration statement,' or purchased shares in the aftermarket 'provided they can trace their shares back to the relevant offering.'" *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 378 (N.D. Cal. 2020) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013)). Tinkelman, the only plaintiff who even attempts to plead Section 11 standing, alleges only that he "purchased the Company's stock in and traceable to" the SPO. (ACC ¶ 31.) Courts routinely find such conclusory pleading inadequate in the secondary offering context. *See, e.g.*, *Century Aluminum*, 729 F.3d at 1108 (requiring factual specificity when pleading traceability to secondary offering); *Welgus v. TriNet Grp., Inc.*, No. 15-cv-03625-BLF, 2017 WL 167708, at *15 (N.D. Cal. Jan. 17, 2017) (holding allegations stock was purchased "pursuant to and traceable to the Second Offering Registration Statement" insufficient to plead Section 11 standing); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016) (finding allegation that plaintiff purchased stock "pursuant and/or traceable to the Registration Statement" for secondary offering insufficient to plead Section 11 standing).

As the Ninth Circuit explained in *Century Aluminum*, plaintiffs who purchase shares after a secondary offering simply cannot tell whether their shares can be traced to any particular

1    offering. 729 F.3d at 1107; *see also Hemmer Grp. v. Sw. Water Co.*, 663 F. App'x 496, 498 (9th
2    Cir. 2016) (finding shares purchased from "fungible mass" not traceable to registration
3    statement). This is because "'most trading is done through brokers who neither know nor care
4    whether they are getting newly registered or old shares,' and 'many brokerage houses do not
5    identify specific shares with particular accounts but instead treat the account as having an
6    undivided interest in the house's position.'" *Century Aluminum*, 729 F.3d at 1106 (quoting
7    *Barnes v. Orofsky*, 373 F.2d 269, 271–72 (2d Cir. 1967)).

8        Tinkelman's certification that he purchased Skillz stock on the SPO date and at the SPO
9    price (ACC Ex. A) cannot bridge this gap. While these alleged facts make it *possible* that
10   Tinkelman purchased the shares in the SPO, an "obvious alternative explanation" exists: "they
11   could instead have come from the pool of previously issued shares." *Magnachip*, 167 F. Supp. 3d
12   at 1055 (quoting *Century Aluminum*, 729 F.3d at 1107–08). Tinkelman's allegations are "merely
13   consistent with [an] assertion that [his] shares were traceable to the secondary offering," which
14   does not plead plausibility, as Rule 8 requires. *See id.* (finding certification of stock purchases on
15   secondary offering day and price insufficient and "merely consistent with" purchases traceable to
16   secondary offering); *see also Century Aluminum*, 729 F.3d at 1107–08 (holding that allegations
17   plaintiff purchased shares on secondary offering date shows only possibility that tracing
18   requirement could be satisfied, not required plausible basis).

19       *Section 12(a)(2)*. Pleading standing under Section 12(a)(2) requires allegations that a
20   plaintiff purchased securities (i) in the public offering, and (ii) directly from, or as a result of
21   being solicited by, the defendants (the "privity" requirement). *See Gustafson v. Alloyd Co.*, 513
22   U.S. 561, 578 (1995) (limiting Section 12 claims to purchasers in offering). The ACC fails to
23   plead either element.

24       To plead the first element, plaintiffs must allege that they purchased shares "by means of a
25   prospectus," which, as the Supreme Court ruled in *Gustafson*, limits Section 12's application to
26   purchases in a public offering, as opposed to the post-offering secondary market. *Id.* at 577.
27   Thus, unlike Section 11, even stock purchases "traceable to" a particular offering cannot provide
28   Section 12 standing, as such purchases necessarily occur in the secondary market. *See Welgus*,

2017 WL 6466264, at *26 (distinguishing between secondary-market purchases "traceable to," and purchases in, offering). Because no lead plaintiff adequately alleges a purchase in the SPO, the Section 12(a)(2) claim must be dismissed. *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007) ("[B]ased on *Gustafson*, § 12 is limited to transactions purchased pursuant to a public offering and, therefore, does not extend to *any* after market transactions.").

As to the second element, privity, plaintiffs must allege either that a defendant (i) actually "pass[ed] title to" the Skillz "securities in question" to the plaintiff, or (ii) "'enagage[d] in solicitation' of the securities sales for financial gain." *In re Harmonic, Inc., Sec. Litig.*, No. C 00-2287 PJH, 2006 WL 3591148, at *9 (N.D. Cal. Dec. 11, 2006) (quoting *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)). Plaintiffs cannot satisfy this requirement with their conclusory allegation that the Underwriters "solicited and sold Skillz common stock from the March 2021 Offering to Lead Plaintiffs and other members of the Class." (ACC ¶ 62(e).) This is insufficient. *See In re Violin Memory Sec. Litig.*, No. 13-cv-05486 YGR, 2014 WL 5525946, at *19 (N.D. Cal. Oct. 31, 2014) (dismissing Section 12(a)(2) claim for lack of standing where complaint included "conclusory statement" that plaintiff "bought common stock directly" from underwriter); *Welgus*, 2017 WL 167708 at *19 n.9 (rejecting Section 12(a)(2) standing allegations that were "conclusory and not specific to any of the defendants"). Nor is it sufficient that the Underwriters allegedly participated in drafting the SPO prospectus or engaged in SPO marketing efforts generally. (ACC ¶¶ 241, 251–54). *See Violin Memory*, 2014 WL 5525946, at *18; *Harmonic*, 2006 WL 3591148, at *9 (pleading defendant was statutory seller requires allegations that defendant "did more than simply urge another person to purchase a security"); *see also In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *26–27 (S.D.N.Y. Sept. 28, 2012) (dismissing Section 12(a)(2) claim where plaintiff failed to allege purchase directly from underwriter or that any underwriter "specifically and successfully solicited its purchases"); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292(VM), 2001 WL 740764, at * 2 (S.D.N.Y. June 29, 2001) (dismissing Section 12(a)(2) claim against underwriter where plaintiff did not allege purchase from underwriter or that underwriter was directly involved in soliciting plaintiffs). Instead, "underwriters are not sellers within the meaning of Section 12 unless they actively participate in the negotiations with

the plaintiff/purchaser." *Violin Memory*, 2014 WL 5525946, at *18. Here, aside from a conclusory allegation, the ACC "contains no allegations that the Underwriters actively solicited any Plaintiff." *Id.* at *19.

Because Plaintiff Tinkelman lacks Section 11 and 12 standing, the claims against the Underwriters should be dismissed.

## II.   THE ACC DOES NOT PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT IN THE SPO MATERIALS.

The fundamental element of both a Section 11 and Section 12 claim is that the offering materials contained materially false or misleading statements. *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1122 (N.D. Cal. 2013) (dismissing Section 11 claim where plaintiffs failed to plead misrepresentations or omissions in offering materials); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-0302 MRP, 2011 WL 4389689, at *8 (C.D. Cal. May 5, 2011) (prospectus must contain material misstatement or omission for liability under Section 12). As shown below and in the Skillz Defendants' motion (*See* Skillz Defs. Mem. 7–8, 10–12, 15-17.), the ACC fails to plead facts contradicting challenged statements concerning Skillz's user engagement and platform capabilities, and the ACC alleges in any event that the market was aware of the "truth" concerning the statements before the SPO. And the challenge to Skillz's accounting in the SPO materials for certain warrants likewise fails, because those accounting decisions are opinions that the ACC fails to plead were subjectively disbelieved or objectively unreasonable, and that were correct under the prevailing accounting standards when made.

### A.   The ACC Alleges that the "Truth" Concerning Skillz's User Engagement and Platform Was Disclosed to Investors Before the SPO.

#### 1.   *The Wolfpack Report Stated that Downloads of Skillz's Top Games Had Declined During the Second Half of 2020.*

The ACC alleges that various statements in the SPO materials concerning "user engagement" were misleading because they should have disclosed a "decline in [Skillz's] downloads during the second half of 2020." (ACC ¶ 114.) As the Skillz Defendants show, a claim based on this omission fails for two reasons:

- Nothing in the challenged statements was rendered misleading by the omission of information about downloads during the second half of 2020 (*See* Skillz Mem. at 7–8, 22–23.)  This is both because of a mismatch between the alleged omission and the Wolfpack Report's statements (as the Skillz Defendants argue), and because the Wolfpack Report admittedly repackaged public information.  Thus, for the same reason the Wolfpack Report is not a corrective disclosure (as the Skillz Defendants show), it also fails to supply a basis for pleading falsity—it offered only a negative spin on information obtained from publicly available sources.  (*Id.*)  *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 881 (9th Cir. 2012) (concluding complaint failed to plead falsity where subsequent disclosure "was not inconsistent" with challenged statement); *Welgus*, 2017 WL 6466264, at *9 (N.D. Cal. Dec. 18, 2017) (complaint fails to plead falsity where allegations "do not actually contradict" challenged statement).

- The challenged statements concerning user engagement are simply too vague to be actionable.  (*See* Skillz Mem. 11–12.)

But even if the Wolfpack report somehow revealed new material information about Skillz and the challenged statements were sufficiently concrete to be actionable, the Wolfpack Report's public, pre-SPO disclosure would defeat any claim that the SPO materials were misleading.  The ACC acknowledges that, on March 8, 2021, eleven days before the SPO, Wolfpack Research publicly noted the second-half 2020 decline in Skillz downloads:

- "We found that the three games responsible for 88% of SKILZ's revenues in the first 9 months of 2020 had all peaked by Q3 2020."

- "Third Party app data shows that installs of 21 Blitz, Solitaire Cube, and Blackout Bingo all declined -52%, -40%, and -20%, respectively in Q4 2020.  As of March 3, 2021, those games were on track to continue their declines in Q1 2021."

- "[W]e estimate that revenue from Solitaire Cube and 21 Blitz, the top two games from Tether Studios, shrank -5.9% in Q3 2020."

(ACC ¶ 166 (quoting Wolfpack Report).)  (*See also* Blunschi Decl. Ex. C.)  Thus, the ACC alleges that (i) by March 8, 2021, investors were aware that "installations of the three games responsible for 88% of Skillz's revenues (21 Blitz, Solitaire Cube, and Blackout Bingo) all declined substantially" (*id.* ¶ 165); and (ii) this was immediately reflected in Skillz's stock price, which declined 10.9% that day (*see id.* ¶168).

The Wolfpack Report's pre-SPO statements defeat any claim that the SPO materials were misleading based on omissions about the allegedly declining downloads.  *In re Convergent Tech.*

*Sec. Litig.*, 948 F.2d 507, 513, 517 (9th Cir. 1991) (dismissing Section 11 claim because alleged omission in prospectus "is materially misleading only if the information has not already entered the market"); *see also In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) (noting material omission may be excused where other sources had disclosed omitted information to market). As the Ninth Circuit has explained, "[i]f the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's price and the market will not be misled." *Convergent Tech.*, 948 F.2d at 513, 517. Given the ACC's allegations that Skillz's stock was listed and traded on an efficient market (*see* ACC ¶¶ 203, 205) and that the market "promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the securities" (*id.* ¶ 206), the ACC establishes that the alleged omitted information was not, in fact, misleading. *See Convergent Tech.*, 948 F.2d at 513, 517.

### 2. The Wolfpack Report Also Noted that Skillz's Platform Was Not Yet Capable of Hosting Synchronous Play.

The pre-SPO Wolfpack Report also included statements about the Skillz's platform's synchronous play capabilities, negating another theory in the ACC. As discussed above and in the Skillz Defendants' brief, the Wolfpack Report does not supply a basis for pleading falsity because it merely repeated public information. *See* pp. 9–10, *supra*. While this alone negates the synchronous play allegations, those allegations also fail because the ACC itself alleges that the Wolfpack Report supposedly revealed the true state of the Skillz platform's synchronous play capabilities.

The ACC alleges that the SPO materials were misleading because they should have disclosed that Skillz could not host and "was nowhere close to launching" synchronous games on its platform. (ACC ¶ 128.) As the ACC concedes, however, the Wolfpack Report had already disclosed this information eleven days before the SPO: "Our conversations with former employees suggested that large studios are unwilling to touch Skillz's platform, both because the Skillz platform is not robust enough to adequately handle their needs with synchronous play and international matchmaking." (*Id.* ¶ 167 (quoting Wolfpack Report, emphasis added).) Under

1  controlling Ninth Circuit authority, this allegation, too, must be dismissed.  *See Convergent Tech.*,
2  948 F.2d at 513, 517.

### B.     The ACC Fails to Plead that the Revenues Skillz Reported in the SPO Materials Were False or Misleading.

The ACC also touts an anonymous Twitter post by "Eagle Eye Research" stating that Skillz's reported revenues were inflated by "recognizing revenue from 'virtual' money it gave its customers to spend although no real cash is generated in the process."  (ACC ¶ 169.)  Eagle Eye allegedly reported that Skillz's "true cash revenue" was "less than one-half of what management portray[ed] to investors."  (*Id.* ¶ 170; *see also id.* ¶20.)  But this allegation fails to plead falsity, because the ACC does not plead how Eagle Eye's accusations rendered anything in the SPO materials misleading.  *See In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 773 (N.D. Cal. 2020) (dismissing Section 11 claim because complaint did "not point to any statements in the Registration Statement as materially false or misleading"); *see also In re Cloudera, Inc. Sec. Litig.*, No. 19-CV-03221-LHK, 2021 WL 2115303, at *13 (N.D. Cal. May 25, 2021) (dismissing securities claim for failure to plead falsity).  The ACC's failure to tie this alleged omission to any SPO disclosure is unsurprising because the SPO materials disclosed that Skillz's reported revenues included amounts for substantial non-cash revenue.  (*See* Skillz Mem. at 12–13 n.7.)

This is clear from the notes to the SPO's financial statements.  Those notes state that "promotions and incentives," which include "bonus cash," were booked in two ways.  For promotions and incentives that were deemed "consideration payable to a customer," Skillz booked these as a "reduction in revenue . . . when revenue is recognized," *i.e.*, when the bonus cash was used for a transaction.  (Rosenberg Decl. Ex. 1 at F-9 (Form S-1), Ex. 2 at F-9 (Form 424B4 Prospectus).)  For promotions and incentives that Skillz adjudged "sales and marketing expense[s]," the company recorded those expenses "when the related cost is incurred," again, when the bonus cash was actually used.  (*Id.*)  Thus, the SPO materials disclosed to investors that, for end-user transactions involving bonus cash, Skillz booked the entire transaction value as revenue (even the portion covered by the "bonus cash") and then offset that revenue with an entry either for "reduction in revenue" or "sales and marketing expense" to arrive at the appropriate

amount of net revenue for the transaction. (*See id.*) This is why Eagle Eye had to acknowledge that its cash revenue calculations were based on "disclosures made in SEC correspondence," the SPO registration statement, and Skillz's 2020 10-K. (Blunschi Decl. Ex. D at 1.)

### III. THE FINANCIAL STATEMENTS' TREATMENT OF WARRANTS AS EQUITY WAS NOT MISLEADING

The ACC fares no better in alleging that the SPO materials materially misled investors by incorporating Skillz's 2020 financial statements, which classified certain warrants as equity. (*See* ACC ¶¶ 158–59, 161–64.) This claim should be dismissed for two reasons.

First, as the Skillz Defendants show (*see* Skillz Defs. Mem. 15–17), the ACC fails to plead facts showing that Skillz did not subjectively believe its opinion to classify the warrants as equity, or that the opinion did not have a reasonable basis. The federal securities laws consider accounting decisions—like classifying warrants as equity or debt, which involve judgment calls under ASC 815-40—statements of opinion. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613–14 (9th Cir. 2017) (treating goodwill accounting determinations as opinion statements); *Hunt v. Bloom Energy Corp.*, No. 19-cv-02935-HSG, 2021 WL 4461171, at *3–13 (N.D. Cal. Sept. 29, 2021) (applying opinion statements standard announced in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015), to accounting determinations of total revenue, net loss, and net loss per share); *In re Amtrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-01545-LAK, 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 9, 2019) ("[I]f determining the relevant provision of GAAP to apply in a certain area of accounting or with respect to a certain transaction involve[s] a subjective evaluation, then any data resulting from that application of GAAP [is] a statement of opinion."). The accounting standard at issue here is no different. ASC 815-40-25-7 generally prohibits an issuer from accounting for warrants as equity if warrant holders could require a net cash settlement, "except in those limited circumstances in which holders of the underlying shares also would receive cash." ASC 815-40-25-7. The guidance further explains that equity classification is not precluded "if the net cash settlement requirement can only be triggered in circumstances in which *the* holders of the shares underlying the [warrant] also would receive cash." ASC 815-40-25-

8.  This guidance is ambiguous as to whether equity classification is allowed where (i) *all* holders of the underlying shares receive cash (as ASC 815-40-25-8 suggests in stating that "*the* holders of the shares" must receive cash), or (ii) only *some* holders of those shares would receive cash (as ASC 815-40-25-7 and 815-40-55-3 suggest by using "holders of the shares" without a definite article). This, in turn, required issuers to exercise judgment in applying this exception where, as here, only some stockholders would receive cash.

The Supreme Court has held that statements of opinion are not considered false or misleading "just because external facts show the opinion to be incorrect." *Omnicare,* 575 U.S. at 188. Instead, a plaintiff challenging an opinion must plead facts (i) showing that the belief was not honestly held, *id.* at 185, or (ii) "about the inquiry the issuer did or did not conduct or the knowledge it did or did not have whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context," *id.* at 194. The ACC pleads neither theory.

As to subjective falsity, the ACC alleges simply that "Skillz and its representatives . . . knew or recklessly disregarded" that the warrants should have been treated as debt. This conclusory allegation is not enough. *Bloom Energy Corp.*, 2021 WL 4461171 at *5–6 (conclusory knowledge allegations insufficient under *Omnicare*). And the ACC likewise fails to plead that Skillz's accounting decision lacked a reasonable basis. The guidance in both ASC 815-40-25-7 and 815-40-55-3 suggested that equity classification was permitted if at least *some* (but not necessarily all) Skillz stockholders would receive cash in a transaction permitting warrant-holders to demand a net cash settlement. Based on this guidance, Skillz—together with hundreds of other SPACs and their accountants—concluded that its warrants should be treated as equity in March 2021, when the company released its 10-K for the year ending December 31, 2020. (Blunschi Decl. Ex. F.)  It was only after the SPO that the SEC announced in a statement entitled, "Staff Statement on Accounting and Reporting Considerations for Warrants issued by Special Purpose Acquisition Companies," that warrants redeemable for cash must be treated as debt unless *all* shares underlying the warrants would be redeemed for cash. (Rosenberg Decl. Ex. 4 (Grant Thornton, Snapshot:  SEC Staff Addresses Warrants Issued by SPACs, (April 13,

- 14 -

UNDERWRITER DEFS' MOT. TO DISMISS
NO. 3:21-CV-03450-RS

1    2021).) That post-SPO guidance does not render Skillz's earlier accounting judgment objectively
2    unreasonable.

3        Even if the warrant-classification judgment were not viewed as an opinion statement, the
4    claim should still be dismissed because classifying the warrants as equity was not misleading.
5    Rather, that accounting treatment was an accurate statement when the SPO occurred. Financial
6    statements cannot be considered misleading under the securities laws where a subsequent change
7    in accounting guidance requires a restatement. For example, in *In re North American Acceptance*
8    *Corp. Securities Cases*, 513 F. Supp. 608, 636 (N.D. Ga. 1981), plaintiffs sued an auditing firm
9    alleging that it had a duty to revise its certification of financial statements that had appeared in a
10   prospectus. Even though, like here, the financial statements were subsequently restated due to an
11   intervening change in accounting guidance, the court concluded that the auditor's opinion in the
12   prospectus need not be revised because it "was consistent with generally accepted auditing
13   standards *at the time it was issued*." *Id.* (emphasis added). Similarly here, when Skillz treated its
14   warrants as equity (and not debt), it had followed the accepted accounting practices prevailing at
15   the time of the SPO. In fact, 85% of SPACs reportedly restated their financials based on the
16   SEC's April 2021 change in guidance. (Rosenberg Decl. Ex. 5 (Nicola M. White, Pervasive
17   SPAC Accounting Error Prompts Mass Restatements, BLOOMBERG TAX (July 26, 2021).)

**CONCLUSION**

No plaintiff has pleaded standing to bring either a Section 11 or 12 claim. Plaintiff Tinkelman, the only plaintiff who tries, cannot trace his shares to the SPO, as Section 11 requires, and did not buy his shares in the SPO from a statutory seller, as Section 12 requires. But even if Tinkelman had Section 11 or 12 standing, the ACC fails to plead that the Registration Statement or Prospectus contained a materially misleading statement or omission. The ACC should therefore be dismissed with prejudice as to the Underwriters.

Dated: December 23, 2021

Respectfully submitted,

By: /s/ Amy S. Park
AMY S. PARK
apark@omm.com
O'Melveny & Myers LLP
2765 Sand Hill Road
Menlo Park, California 94025-7019
Telephone: +1 650 473 2600
Fax: +1 650 473 2601

JONATHAN ROSENBERG (*pro hac vice*)
WILLIAM J. SUSHON (*pro hac vice*)
jrosenberg@omm.com
wsushon@omm.com
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036-6524
Telephone: +1 212 326 2000
Fax: +1 212 326 2061

*Attorneys for the Underwriters*