**LOWEY DANNENBERG, P.C.**
Christian Levis
David C. Harrison
Andrea Farah
Scott Vincent Papp
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Email:  clevis@lowey.com
Email:  dharrison@lowey.com
Email:  afarah@lowey.com
Email:  spapp@lowey.com
*Lead Counsel for Lead Plaintiffs and the Class*

**SCHUBERT JONCKHEER & KOLBE LLP**
Willem F. Jonckheer
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Tel: (415) 788-4220
Email:  wjonckheer@sjk.law
*Liaison Counsel for Plaintiffs*

[Additional counsel appears on signature page]

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS JEDRZEJCZYK, SONNY CHUNG, KEVIN TINKELMAN, AND DAVID LEWIS, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SKILLZ INC., f/k/a FLYING EAGLE ACQUISITION CORP., ANDREW PARADISE, CASEY CHAFKIN, MIRIAM AGUIRRE, and SCOTT HENRY,<br><br>Defendants. | No. 3:21-cv-03450-RS<br><br>**SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**(DEMAND FOR JURY TRIAL)** |

# TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................................. 1

JURISDICTION AND VENUE ............................................................................................ 4

SUBSTANTIVE ALLEGATIONS ........................................................................................ 7

    A.    Skillz's Business ................................................................................................... 7

    B.    Skillz's Financial Model Was Driven by Paying Users ................................. 9

    C.    Defendants' Materially False and Misleading Statements and Omissions ............................. 13

        1.    Declining Downloads of Top Games ................................................ 14

        2.    Defendants Concealed That Average Revenues By Paying Users Had Declined and Misattributed Increasing Revenue to MAU Rather Than Paying Users ................................. 19

        3.    Overstated Technical Capabilities — Synchronous Play .............................. 24

        4.    Skillz Failed to Disclose the Risks Presented by Its Dependency on Bonus Cash to Boost User Engagement ................................. 28

ADDITIONAL ALLEGATIONS REGARDING .............................................................. 36

THE INDIVIDUAL DEFENDANTS' SCIENTER ........................................................ 36

    A.    Defendants' Statements and Disclosures Contradicting Their Prior Disclosures Are a Strong Indicator of Scienter ................................. 38

    B.    Defendants Promoted the Irrelevant MAU Metric to Assuage Analysts and Then Reversed Course And Engaged In Damage Control ................................. 39

    C.    Paradise Refused to Answer Analysts' Questions Concerning the Decline in Downloads of Games on Skillz ................................. 44

    D.    Defendants Knowingly Failed to Disclose Net Cash Deposits Needed to Assess Skillz's Bonus Cash-Fueled End User Incentive Program ................................. 45

    E.    The Proprietary Platform Is Its Only Core Operation ................................. 47

    F.    Defendants Personally Profited By Selling Their Skillz Stock At Inflated Prices While in Possession of Material Non-Public Information ................................. 49

APPLICABILITY OF PRESUMPTION OF RELIANCE ................................................ 49

FRAUD ON THE MARKET DOCTRINE ...................................................................... 49

LOSS CAUSATION ............................................................................................................ 51

NO SAFE HARBOR .......................................................................................................... 54

PLAINTIFFS' CLASS ALLEGATIONS ............................................................................ 55

COUNT I ............................................................................................................................. 56

i

COUNT II ................................................................................................................................. 59

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                              CASE NO: 3:21-cv-03450

Plaintiffs Thomas Jedrzejczyk, Sonny Chung, Kevin Tinkelman, and David Lewis (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, hereby bring this Second Amended Consolidated Complaint (SAC)[1] for Violation of Federal Securities Law ("Complaint") against the Defendants identified herein, based upon, *inter alia*, personal knowledge as to the Plaintiffs and the Plaintiffs' own acts, and upon information and belief as to all other matters, based on the investigation conducted by and under the supervision of Plaintiffs' counsel, which included a review of the Skillz, Inc.'s ("Skillz" or the "Company") public documents filed with the United States Securities and Exchange Commission ("SEC"), conference call transcripts, presentations and press releases published by and regarding the Company, analysts' reports, interviews with former Company employees, and other readily obtainable information. Plaintiffs' counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and the other Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Skillz common stock between December 16, 2020 and May 4, 2021, inclusive (the "Class Period") seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10B-5, against Skillz and certain of the Company's senior officers and directors.

---

[1] Plaintiffs file this SAC in accordance with the Court's July 5, 2022 order. ECF No. 131. In support of Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act, the SAC adds new allegations regarding additional false and misleading statements by Defendants about the Company's synchronous game play capabilities (¶¶ 85–98), decline in download rate (¶¶ 49–65), and use of Bonus Cash (¶¶ 99–117). It also removes the claims against the Underwriter Defendants and the Director Defendants under Section 11 and Section 12 of the Securities Act, the claim arising from the restatement of warrants, and the Exchange Act claims arising from statements about the Company's expansion to India.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

2.     Skillz provides a mobile gaming platform that allows individuals to play video games in contests against each other, using their smartphone or tablet. The Company represents that its success depends on convincing gamers to download and install games that they will play competitively on the platform in contests where they pay an entry fee for a chance to win real money.

3.     During the months preceding and after the Company's going public merger (the "Merger") with a special purpose acquisition company ("SPAC") called Flying Eagle Acquisition Corporation ("FEAC"), Defendants gave misleading presentations of Skillz's financial condition and technological features, while failing to disclose current adverse facts that would have significantly altered investors' assessments of the Company's paying user engagement, revenue prospects, the sustainability of its business model, and associated risks.

4.     Specifically, Defendants made false and misleading statements and failed to disclose material facts that:

   a.   the rate of growth in games downloaded and installed had plummeted from more than 100% per month in early 2020 to a paltry 2% per month in January 2021, turning negative and declining by 20% per month in February 2021;

   b.   Average Revenue Per Paying User ("ARPPU"), a key metric tracked by Defendants internally (but not disclosed to investors), that measures paying user engagement on Skillz's platform—was in decline, having decreased in 3Q 2020 and 4Q 2020, as well as for full year 2020;

   c.   Defendants hid the known downturn in ARPPU by focusing their discussion and reporting on Monthly Active User ("MAU") numbers—a metric followed by analysts covering online businesses with ad-based financial models—that co-founder and Chief Revenue Officer Casey Chafkin later admitted, "**just isn't a metric that correlates with our business performance,**"[2] because: (i) Skillz did not make

---

[2] Q1 2021 Earnings Call dated May 4, 2021 (the "Q1 2021 Earnings Call") at 5–6.

2

money from ads, and (ii) 85%-90% of Skillz's MAUs played games for free, generating no revenue for the Company;

d. the Company's reporting of increases in the average revenue per user ("ARPU") was materially misleading because it attributed revenue to both paying and non-paying MAUs who played games for free, obscuring the year-over-year decline in average revenue per paying user over the past six months;

e. most of the money users paid to enter contests on Skillz platform, came from "Bonus Cash"—a free, virtual money incentive that Skillz awards to new and existing users to cover contest entry fees. Bonus Cash accounted for a staggering 53% to 71% of Skillz reported GAAP revenues for the 2018, 2019, and 2020 years. During this time, Skillz consistently attributed growth in user engagement to its superior content catalog, ability to match comparable players and host larger tournaments, misleading investors to believe that these features—not Bonus Cash—were driving growth;

f. Skillz's dependence on Bonus Cash to create user engagement was unsustainable and its disclosures regarding this user incentive did not adequately apprise investors of the risk it posed to the business. Although Bonus Cash is billed as a non-redeemable incentive, Skillz's policy of allowing users to withdraw all winnings over their entry fee as real dollars, regardless of whether they are attributable to real money or Bonus Cash, had the effect of converting at least some Bonus Cash into real dollars. As a result, Skillz's heavy spending on Bonus Cash incentives created $3 in liability for every $2 in revenue, an unsustainable strategy that Skillz publicly abandoned just a few months later; and

g. although promoting its ability to host synchronous game play as one of its platform's key features, at best, Skillz's platform could only handle synchronous game playing

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                        CASE NO: 3:21-cv-03450

on the most basic level and lacked the technological capabilities to handle high-quality synchronous games and genres that it told investors would attract more users.

5.      Defendants' misleading statements and omissions enabled Skillz's senior executives to sell $242.5 million worth of stock at an inflated price of $24 per share in the Company's post-Merger public offering of 32,000,000 shares (the "March 2021 Offering"). Defendant Paradise alone reaped $196 million from his sale of 8.4 million shares in the March 2021 Offering.

6.      Following the disclosure of material adverse facts through a series of partial disclosures beginning March 8, 2021, the market price of Skillz stock declined from $27.45 to $15.48, the day after the close of the Class Period on May 4, 2021.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.      This Court has jurisdiction over Skillz and the individual defendants named herein because each defendant has sufficient minimum contacts with the judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Company is also headquartered in this district.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District and the Company is based in this district.

11.     In connection with the acts alleged in this Complaint, Skillz, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

4

**PARTIES**

**Plaintiffs**

12.     Lead Plaintiff Thomas Jedrzejczyk purchased the Company's common stock at artificially inflated prices during the Class Period, as set forth in his Certification, previously filed with the Court, and was damaged thereby.

13.     Lead Plaintiff Sonny Chung purchased the Company's common stock at artificially inflated prices during the Class Period, as set forth in his Certification, previously filed with the Court, and was damaged thereby.

14.     Lead Plaintiff Kevin Tinkelman purchased the Company's common stock at artificially inflated prices during the Class Period, as set forth in his Certification, previously filed with the Court, and was damaged thereby.

15.     Plaintiff David Lewis purchased the Company's common stock at artificially inflated prices during the Class Period, as set forth in his Certification, previously filed with the Court, and was damaged thereby.

**Defendants**

16.     Defendant Skillz is incorporated in Delaware and headquartered in San Francisco, CA 94104. As of March 31, 2021, Skillz had approximately 326 million shares of Class A stock outstanding, and 70 million shares of Class B common stock issued and outstanding.

17.     On September 1, 2020, Skillz executed a merger agreement with FEAC, a SPAC (the "Merger Agreement") formed in January 2020 for the purpose of using pooled funds to acquire an existing business and taking it public. Pursuant to §6.06(a) of the Merger Agreement, Skillz provided material information about its business and financial condition for inclusion in the Merger Proxy Statement. This included Skillz's audited financial statements for 2017 through 2019, as well as unaudited financial statements for the current period in 2020. Skillz warranted under §4.24 that the information it

supplied did not contain an untrue statement of material fact or omit information necessary to make its statements not misleading.

18.     On September 8, 2020, the initial Merger Proxy was filed with the SEC. After a series of amendments, a final prospectus was filed on December 1, 2020. FEAC and Skillz consummated their merger on December 16, 2020. In connection with the completion of the Merger, FEAC was renamed Skillz, Inc.

19.     On December 17, 2020, Skillz shares began trading on the NYSE under the symbol "SKLZ" at an opening price of $17.89. The stock traded as high as $45 during the Class Period, as evidenced by the price chart, *infra,* at ¶ 117.

20.     Defendant Paradise is a co-founder of Skillz and currently serves as the Company's Chief Executive Officer. Paradise holds voting power over 85% of the Company through his holdings of Skillz's Class B stock. Paradise was identified on the cover of the proxy statement and registration statement/prospectus on Form S-4 (the "Merger Proxy"), and approved and/or signed the registration statements[3] for the March 2021 Offering and Skillz's Form 10-K for the fiscal year ended December 31, 2020, filed on March 12, 2021 (the "2020 Form 10-K").

21.     Defendant Casey Chafkin ("Chafkin") is a co-founder of Skillz and currently serves as the Company's Chief Revenue Officer. Chafkin approved and/or signed several of the Company's SEC filings, including the Registration Statements for the March 2021 Offering.

22.     Defendant Henry served as the Company's Chief Financial Officer during the relevant Class Period. Henry approved and/or signed several of the Company's SEC filings during the class period, including the 2020 Form 10-K and the Registration Statements for the March 2021 Offering.

---

[3] The Form S-1 on February 8, 2021 (the "February 2021 Registration Statement.") and effective March 19, 2021 (the "March 2021 Registration Statement")

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

23.    Defendant Miriam Aguirre ("Aguirre") has served as the Company's Chief Technology Officer since November 2013. Aguirre reviewed and approved the Company's SEC filings and public statements during the Class Period.

24.    The defendants referenced in ¶¶ 20–23 are collectively referred to as the "Individual Defendants." The Individual Defendants possessed the authority to control the contents of statements made by Skillz in the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors. The Individual Defendants made the misstatements and omissions alleged herein and were provided with copies of the Company's documents alleged herein to be materially false and misleading prior to, and or shortly after, their issuance and had the ability and opportunity to present their issuance or cause them to be corrected. Due to their participation in the wrongful acts alleged herein, their positions with the Company, and their access to Skillz's material information that was unavailable to the public, the Individual Defendants knew or were deliberately reckless in not disclosing the adverse facts that were concealed from investors. The Individual Defendants are therefore liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### A.    Skillz's Business

25.    Skillz was founded in 2012 as a private company headquartered in San Francisco, California.

26.    The Company produces a Software Development Kit—a set of software tools and programs—that third party game developers can integrate into their own products if they want to utilize Skillz's platform to provide competitive gameplay for their users, who can download games for free through the Apple App Store or other mobile app stores and install them on the individual user's phones and other electronic devices.

27.    Individuals that download games integrated with Skillz platform can use the platform to compete against other players of the same game. This kind of competitive game play is generally referred

to as "esports" (short for electronic sports), which is a subset of the mobile gaming market. Skillz holds itself out as "the world's leading mobile esports platform."[4]

28.     Users can play two types of contests: (i) "paid" contests, where paying users wager real money for a chance to win cash prizes by competing against other users, and (ii) "practice" contests, where non-paying users download and play games for free. Non-paying users comprise the vast bulk (85–90%) of game users on the platform, but generate no revenue for Skillz.

29.     Like these two contest types, Skillz business model involves two steps: (1) user acquisition, and (2) user engagement. User acquisition refers to the process of getting new users to download and play games that integrate with Skillz's platform. This phase of Skillz business, in large part, depends on third party developers. As the Company explained, because Skillz does not develop its own games, "the substantial majority of the users access the games featured on our platform through the direct download on their mobile devices of apps developed by our developer partners."[5] Thus, Skillz ability to acquire new users depends on third party developers manufacturing quality games for its platform that users want to download and play.

30.     User engagement focuses on converting users that download games into paying users by getting them to spend money to enter a paid contest. This is the only activity that has the potential to generate revenue for Skillz. User engagement is also heavily dependent on third party developers making games that users will want to pay to play. Indeed, the Company acknowledges that its "business depends on maintaining a successful platform for third-party developed games that end-users will download and [pay] entry fees to compete for cash… with other end-users."[6]

---

[4] April 8, 2021 Blog Post (by CEO Paradise), attached to the Company's April 8, 2021 Form 8-K (the "April 8, 2021 Blog Post") at 2.
[5] Merger Proxy Statement on Amended Form S-4 dated November 30, 2020 (the "Merger Proxy") at 60.
[6] *Id.* at 57.

31.     As a result, Skillz spends heavily on user acquisition and engagement through its "End User Incentives Program." The primary incentive Skillz's awards is a virtual currency called "Bonus Cash" that acts like free money gamers can use to offset the cost of entering paid contests. Players also acquire Bonus Cash by redeeming "Ticketz," a loyalty incentive given to users every time they play a paid entry contest, for Bonus Cash in Skillz's in-app store.[7]

32.     User engagement is key to generating revenue for Skillz as it only makes money by collecting a percentage (approximately 16–20%) from entry fees wagered in paid contests.[8] Skillz shares that percentage with the third-party game developers that publish games on Skillz platform, who receive half of what Skillz collects from paid contests according to its terms and conditions.[9] Any remaining funds from the contest pool are distributed to the winner.

### B.     Skillz's Financial Model Was Driven by Paying Users

33.     Because Skillz only makes money by taking a commission from paid contests, its revenue is not based on the number of users on its platform. This contrasts with how many websites, apps, and other online businesses generate revenues. For example, many free gaming apps and other types of websites derive the bulk of their revenue from advertising dollars. In this ad-based model, revenue is a function of two key metrics: (1) number of users that accessed the company's website or used their product (*e.g.*, a game), and (2) the frequency of use, or user engagement.

34.     Businesses that utilize this kind of ad-based revenue model typically report these key metrics as "Monthly Active Users," or "MAU," which reflects the gross number of users that accessed the website or app on a monthly basis, and "Average Revenue per User," or "ARPU," which represents the dollar value revenue generated by each MAU (all of which would have seen ads) for a given period, such as a month, by the average number of MAUs.

---

[7] *Id.* at 175.
[8] 2020 Form 10-K, at 42.
[9] https://www.skillz.com/legal/.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

35.     Between September 2020 and release of year-end results in March 2021, Skillz's reporting and Defendants' statements focused on these two metrics—MAU and ARPU—despite the Company not following an ad-based business model. These numbers were misleading because, unlike an ad-driven website or business, where all MAUs generate revenue for the company since they receive ads, 85–90% of MAUs on Skillz's platform did not pay to play games and, as a result, did not generate any revenue. Only the small percentage of MAUs who entered into a paid contest (referred to as "Paying MAU") generated revenue for Skillz.

36.     Skillz's co-founder Chafkin candidly acknowledged during the Company's Q1 2021 earnings call that "**MAU, simply put, just isn't a metric that correlates with our business performance.**"[10] Rather, MAU was a "**vanity metric,**" that is, a large gross number that sounds impressive on the surface, such as Skillz claim that it had 2.7 million total monthly users on the platform in 2020, even though most of them were nonpaying users. While reporting several million MAUs may have appeared impressive to market analysts, Chafkin explained that MAU is better understood as an expense, rather than revenue, since **"the portion of our MAU that are nonpaying users actually cost us money because we provide servers … [and] customer support for them."**[11]

37.     In contrast, Paying MAUs are comprised solely of players who paid entry fees to compete for cash with other users. As Skillz's exclusive source of revenue, Paying MAU was one of the key metrics Skillz management routinely reviewed on a dashboard in Tableau, a business intelligence platform the Company used to track metrics in real time.[12] Unlike MAU, this metric strips out the 85–90% of Skillz end-users that do not spend money on the platform to provide a clear indicator of the rate of engagement

---

[10] Q1 2021 Earnings Call. at 5–6.
[11] *Id.* at 13–14.
[12] *See* 2020 10-K at 27 (noting that Skillz tracks certain "key metrics," including Paying MAUs, using its "internal analytics system").

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                                    CASE NO: 3:21-cv-03450

of paying users, which Skillz referred to internally as ARPPU. Like Paying MAU, Skillz management also tracked ARPPU on a real-time basis in Tableau.[13]

38.    Despite MAUs having no correlation to Skillz's business performance, Skillz misleadingly attributed revenue growth in the 2018, 2019, and 2020 years to an increase in MAUs, stating as follows in both the Merger Proxy Statement and February 2021 Registration Statement:

> <u>Nine Months Ended September 30, 2020 Compared to<br>the Nine Months Ended September 30, 2020</u>
>
> **Revenue**
> Revenue increased by $77.3 million, or 91%, to $162.4 million in the nine months ended September 30, 2020 from $85.1 million in the six months ended September 30, 2019. The increase was **attributable primarily to a 91% increase in MAUs**, driven by sales and marketing investment to acquire new paying users.[14]
>
> Year ended December 31, 2019 Compared to Year ended December 31, 2018
>
> **Revenue**
> Revenue increased by $69.1 million, or 136%, to $119.9 million from $50.8 million in 2018. The increase was **attributable primarily to a 99% increase in MAUs**, driven by sales and marketing investment to acquire new paying users.[15]

39.    Moreover despite the lack of business justification and specific SEC guidance to the contrary, Defendants asserted in response to the SEC's review of the Merger Proxy that "Paying MAU is <u>not</u> a primary metric that we use to manage our business."[16] Defendants took this position in order to fit the Company into a favorable set of metrics based on MAUs that analysis were familiar with from ad-based online businesses and websites, even though they knew those metrics were inapplicable to Skillz's paying user-based revenue model.

---

[13] *Id.*
[14] Merger Proxy at 184; February 2021 Registration Statement at 66.
[15] Merger Proxy at 185; February 2021 Registration Statement at 67.
[16] FEAC Letter to SEC dated October 13, 2020" ("Response Letter"), at 9.

40.     Confidential Witness #1 ("CW#1") who worked in the Revenue Department from mid-2020 to early 2021, confirmed the Company's plan to promote MAU growth. CW#1 held a management role and participated directly in meetings and events with Defendant Paradise and Defendant Chafkin, including weekly revenue meetings which typically spanned several hours. CW#1 stated that before the Merger "we did not even pay attention to MAU." Then, "all of a sudden when [Skillz] went public, they realized Wall Street cared about MAUs, and our numbers were terrible" and then Skillz began to focus on that metric. "It's not something that was being was being paid attention to previously," said CW#1.

41.     CW#1 explained that "[a]fter realizing that Wall Street cared about monthly active users," senior management launched an initiative called the "MAU Burst," which allocated $3.2 million with the goal of hitting 950,000 installations. According to CW#1, the "single focus" of this initiative was to "spend[] a lot of money trying to drive" MAU, particularly in December 2020.

42.     CW#1's department participated directly in the MAU Burst initiative, which the Director of Financial Planning and Analysis ("DFPA") had a leading role in implementing. The DFPA was a senior Company official and member of the Senior Leadership Team, which included the Company's Executive Team and their seconds in command.

43.     As the DFPA explained to CW#1, "senior leadership are [sic] aware we are making a large efficiency tradeoff for MAU. The MAU burst needs to stop on December 31, as it's only useful to get our Q4 MAU number. **It's a lot of spend, but it's worth it to potentially maintain quarter over quarter MAU levels, as it's a measure that Wall Street will look at closely."**

44.     However, as CW#1 explained, whatever users were acquired during the MAU Burst were not "high-quality installs," meaning that many did not actually play any games on Skillz's platform, and certainly did not enter paid contests that would generate revenue for the Company. Furthermore, CW#1 understood from communications with the DFPA that "it doesn't matter [to the DFPA] if they're shitty installs. He just wanted to get installs – 950,000 of them. It didn't matter if they genuinely, actually wanted to play the games."

45.     It is telling, in light of the MAU Burst and the Company's prior focus on MAUs, that Skillz's results for the reporting periods following the Merger no longer publicly asserted that MAU was primarily driving revenues. Instead, it dropped that pretext and reversed position–strenuously emphasizing over the next several months what Defendants knew all along: that Paying MAU (and not MAU) metrics were the most representative of Skillz's business. Defendant Paradise made this clear in a Blog on Seeking Alpha that **"[t]he returns we generate today only come from paying users"** which is **"why payors are our primary target"** and **"for now, we're focused on growing our Paying MAU."**[17] Paradise reiterated in the Company's Earning Call for Q1 2021 that **"Skillz generates nearly all of its revenue from paying players" and "is perhaps the most important metric to our business."**[18]

46.     Defendant Chafkin added that "[f]or a business that generates revenue from consumer payments, **the most relevant KPI (key performance indicator) that everyone should be looking at is Paying M-A-U**. … It wouldn't make sense to evaluate a business like Netflix using site visitors rather than subscribers, and that's really the same way we think about it. …"[19] Chafkin emphasized that since "**MAU, simply put, just isn't a metric that correlates to our business performance,"**[20] and **"[n]o one on my team is optimizing the business for growing MAU"** (although clearly not the case when the DFPA was leading the MAU Burst).**[21]**

C.     **Defendants' Materially False and Misleading Statements and Omissions**

47.     Prior to and throughout the Class Period, Defendants disseminated materially false and misleading statements and omissions that misrepresented Skillz's purported financial condition and prospects and concealed and obscured material facts, that inflated the price of its common stock.

---

[17] April 8, 2021 Blog Post at 2.
[18] Q1 2021 Earnings Call at 5–6.
**[19]** *Id.* at. 5–6.
[20] *Id.*
[21] *Id.* at 13–14.

### 1. Declining Downloads of Top Games

48.     Skillz repeatedly represented that game downloads were an integral component of acquiring new paying users. For example, Defendants stated in the Merger Proxy that its **"business depends on maintaining a successful platform for third-party developed games that users *will download* and pay cash entry fees to compete for cash with other users**."[22]

49.     Defendant Paradise confirmed the correlation between growth in downloads and new paying users. He emphasized that Paying MAU, "**the most important metric to our business," is "a function of both the number of new installs or downloads,"** as well as persuading these users to compete in paying contests, which he referred to as the **"install-to-deposit rate."**[23]

50.     Thus, Defendants led investors to believe that increasing game downloads and installs that put more users in the system, grew the Company's *paying* user base, which translated into higher revenues.

51.     Skillz also boasted that "**paying users today have 10 Skillz games installed" as compared to "3 games installed in 2015,"**[24] without disclosing whether any of these paying users actually paid to play any of those games. This was a material omission as Skillz's paying user base was concentrated almost exclusively to the top games, the vast majority of its revenue coming from the top 3 titles. Most of these downloaded games, other than the top titles, generated little or no revenue.

52.     Defendants also touted the continuing drawing power of its top games representing that Skillz continued to experience growth in its top titles, and claiming that its most popular games were, "not shrinking or disappearing" and even "continue[d] to grow, often quite substantially, after being displaced from the number one position."[25]

---

[22] Merger Proxy at 57.
[23] Q1 2021 Earnings Call at 3; Q1 2021 Stockholder Letter at 1.
[24] September 2 Investor Call at 7.
[25] September 2 Investor Call at 7 (Paradise speaking); *see also* March 2021 Registration Statement at 48 ("In 2020, the number of games that generated over $1 million of annualized GMV has grown 57% from 23 to 36.").

53.     However, Defendants knew or recklessly disregarded that the Company had experienced (and was experiencing) a dramatic and ever-worsening decline in download rate of growth of its top games, that began in the second half of 2020 and turned negative in 2021. On March 8, 2020, Wolfpack Research released a report titled, "SKLZ: It Takes Little Skill to see this SPACtacular Disaster Coming" (the "Wolfpack Report"). The Wolfpack Report was based on an independent investigation which included "conversations with former employees, employees of Skillz's two largest developers, and independent third-party app download data."

54.     The Wolfpack Report found that "the three games responsible for 88% of SKILZ's revenues in the first 9 months of 2020 had all peaked by Q3 2020. Downloads for SKLZ's full lineup of games began to show overall declines in Q1 2021."

55.     More specifically, Skillz's monthly download growth rate imploded from more than doubling the prior year during Q1 2020, to virtually nil by early 2021 and **declined** in February 2021:

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                          CASE NO: 3:21-cv-03450

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22   56.   Given this dramatic reversal, it was materially misleading for Skillz to claim that its

23   top titles "continue to grow, often quite substantially, after being displaced from the number one

24   position." Moreover, contrary to their representation, downloads of top titles were shrinking by as

25   much as 20% in February 2021.

26

27                                                          16

28

57.     Disclosure of the evaporating download growth rate in the top games driving Company revenue was material to investors because it changed investors' assessments of the Company's prospects given that it weakened (and potentially severed) the highly touted link between increasing downloads and new paying users of top games. In other words, as download growth diminished, so did the pool of potential new paying users that could impact revenue growth. This is so even if Skillz ramped up its exorbitant spending to engage existing users.

58.     Although Skillz's SEC filings included a risk disclosure stating that if its top games become "less popular. . . and we are unable to identify and market suitable replacements, our business and prospects could suffer,"[26] this representation was incomplete and itself materially misleading as it failed to disclose that Skillz's top games **had already become** "less popular," as evidenced by the plummeting growth rates for installs in the second half of 2020 and negative growth in early 2021. This adverse trend was highly material to investors given that Skillz promoted the relationship between download growth and new paying users, stating that the number of paying users was a "function of the number of new installs" and the "install-to-deposit" rate.

59.     CW#1 substantially confirmed the Wolfpack Report's findings. CW#1 compiled download data and reviewed the information with Skillz's senior officials as part of regular Sunday evening meetings that Defendant Paradise held every week to go over tasks and targets and to review numbers. According to CW#1, Skillz "cared about" downloads when it came to evaluating games. Anyone in a leadership position would have access to downloads and other metrics on a real-time basis through Tableau, the Company's internal business intelligence platform.

60.     CW#1 reported that data presented at these meetings showed that downloads of 21 Blitz and Solitaire Cube declined "consistently" since June 2020. CW#1 also reported that "top to bottom, they were failing to get more people into the game, failing to keep people in the platform." CW#1, also stated that "the games were not doing well." According to CW#1, "Blackout Bingo was essentially eating

---

[26] Proxy Statement, at 56; March 2021 Registration Statement at 12; 2020 10-K at 13.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

1  up all of the new installs because that's what the audience was seeing first," "but it was to the detriment

2  of the other games. And that's because all of the advertisements were kind of overlapping and showing

3  the same ads to the same audience."

4       61.    Following the release of the Wolfpack Report on March 8, 2021, Skillz's stock plummeted

5  by 10.9% to close at $24.45. The resulting decline in market capitalization was approximately $762

6  million.

7       62.    Notably, analysts did not question the veracity of the third-party app download data

8  reported by Wolfpack. On the contrary, they immediately brought the report to the attention of Skillz's

9  senior management during the Q4 2020 Earning Call held on March 12, 2021 (the "Q4 2020 Earnings

10 Call"). Michael Graham from Canaccord Genuity, Inc. specifically referenced the "third party report"

11 and asked the Company to comment on "what you're seeing" regarding the decline in download growth

12 for key games, and "how that's shaping the business going."

13      63.    Defendants did not specifically contest the accuracy of download data provided by

14 Wolfpack, or the report's conclusion, although they had every opportunity. Nor did they plainly

15 acknowledge to analysts that the install growth rate of top games had collapsed. Rather, Defendant

16 Paradise diverted the discussion to another metric, Gross Market Value, or "GMV," that he claimed was

17 still growing. Paradise responded to Mr. Graham as follows:

18       … I know we're a newly public Company, so people aren't as familiar with how our
19       business mix has always worked. Media businesses always have concentration because
         consumers seek out the best experiences. The most popular content has the biggest
20       audience, but generally, the rising tide lifts all boats. Our previous number on titles,
         they've actually all continued to grow in GMV, even after being displaced from their
21       position.

22

23

24

25

26

27                                          18

28 SECOND AMENDED CONSOLIDATED COMPLAINT
   AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

64.     Paradise's answer was nonresponsive because GMV ("gross merchandise volume") refers specifically to the total entry fees paid by users from cash deposits, Bonus Cash, and retained winnings.[27] Paradise simply ignored the question of whether the new user download rate was declining, and whether the downward trend had an impact on new paying users, or the business going forward. Paradise's failure to acknowledge the downturn in downloads furthered his misleading narrative that emphasized only positive results while excluding adverse facts that would have tempered the one-sided impression of the Company's financial performance, and skewed investors' assessments of the Company' s growth.

**2.     Defendants Concealed That Average Revenues By Paying Users Had Declined and Misattributed Increasing Revenue to MAU Rather Than Paying Users**

65.     Skillz's Merger Proxy and the February 2021 Registration Statement included financial results for the nine months ended September 30, 2020. These disclosures were materially misleading and incomplete in failing to identify revenues generated by paying active users (i.e., ARPPU)—a significant indicator of user engagement—as a key metric that had declined by 8% in Q3 2020 and over 12% during in Q4 2020, as compared to the prior year periods.

66.     Instead, Defendants misleadingly reported only that ARPU had increased 6% for the nine-month period in 2020 and 19% for 2019 over prior year periods. However, the Company's focus on improved ARPU, by itself, was misleading because ARPU simply reflects the Company's revenue divided by the total number of MAUs, of which 85–90% did <u>not</u> generate any revenue for Skillz. Worse, not only did 85–90% of MAUs included in the ARPU calculation not generate revenue, but as Defendants Chafkin explained, "the portion of our MAU that are nonpaying users actually cost us money because we provide servers … [and] customer support for them." None of those costs were accounted

---

[27] As defined in Skillz's financial statements, "GMV represents entry fees that may be paid using cash deposits, prior cash winnings that have not been withdrawn, and end-user incentives." Q1 2021 10-Q.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

for in the ARPU number, which highlighted only the positive information the Company wanted to portray.

67.     For the same reason, the Merger Proxy and February 2021 Registration Statement were also materially misleading in misattributing higher revenues for the nine months and 2020 and the full year 2019 to an "increase in MAUs, driven by sales and marketing investment to acquire new paying users" (*see* ¶ 38, *supra*), when the vast bulk of MAUs played free games that contributed nothing to revenues. Skillz's attribution of revenue growth primarily to MAUs was unjustified. As Defendant Paradise subsequently conceded, Paying MAU "is perhaps the most important metric to our business," as it was paying users, and not MAU, that primarily drove the Company's revenue growth.

68.     Moreover, Defendants knew and had access to metrics that accurately tracked the Company's revenue at the time they made these false and misleading statements. Both the Merger Proxy and February Registration Statement represented that Defendants tracked certain key metrics "by our internal analytic systems based on tracking active user accounts," i.e., Tableau. ARPPU was one such metric internally tracked recognized by Defendants as an accurate expression of user engagement. Yet, despite monitoring ARPPU internally, Defendants failed to mention ARPPU or disclose that metric anywhere in these SEC filings. The Merger Proxy and the February 2021 Registration Statement were materially misleading and incomplete in misattributing revenue growth primarily to higher, mostly non-Paying MAU numbers, while failing to disclose that the average revenue per paying user—a key metric of user engagement and revenue for the Company—was on the decline during the second half of 2020.

69.     Despite failing to identify ARPPU at all in the discussion of financial results for the last nine months of 2020,[28] Defendants suddenly began reporting ARPPU as a key metric in the Company's 2020 annual results, just one month after the filing of the February Registration Statement, which omitted that information. More specifically, Defendants disclosed in the Company's 2020 year end results what

---

[28] The November 18, 2020, release reporting nine months 2020 financial results also reported increases in both MAU and ARPU, without disclosing the ARPPU metric.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                            CASE NO: 3:21-cv-03450

they had known for months, namely, that ARPPU had declined in Q3 2020 and Q4 2020[29] and that any increase in revenues were attributable to paying users, and not MAU. Defendants' failure to disclose the importance of Paying MAU and the downturn in ARPPU rendered their prior, more favorable financial disclosures before the release of Q4 2020 and year-end results materially false and misleading.

70.     Defendants' reporting of results gave the misleading impression that adding users to the Skillz platform was the primary factors driving revenues. However, as Defendant Chafkin candidly conceded, MAU was just a "**vanity metric,**" mostly comprised of nonpaying users, that actually increased Skillz's expenses, rather than revenue. This was so, Chafkin explained, because **"the portion of our MAU that are non-paying users actually cost us money because we provide servers … [and] customer support for them."**[30]

71.     Skillz's complete about face in its reporting of key metrics for the quarter following the Merger, in conjunction with senior management's emphatic rejection of MAU (**"MAU…just isn't a metric that correlates with our business performance")** did not result from changes in the Company's financial or business model, which remained the same throughout 2020. Nor can it be attributable to a different understanding of the SEC requirements regarding the disclosure of key metrics as those requirements also remained the same.

72.     Indeed, in connection with its review of the Merger Proxy, the SEC staff provided specific guidance to consider in assessing the disclosure of Skillz's key metrics.[31] In particular, Release No. 33-10571, cited by the SEC staff, provides "guidance on disclosure of key performance indicators and metrics" in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). The SEC notes in the release that "[f]or each business, there is a limited set of critical variables which presents the pulse of the business." The Commission previously "emphasized that …

---

[29] Skillz Q4 2020 Report.
[30] Q1 2021 Earnings Call at 13–14.
[31] SEC Letter to FEAC dated October 6, 2020 ("SEC Comment Letter") at 6.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                   CASE NO: 3:21-cv-03450

'companies should consider whether disclosure of all **key variables** and other factors **that management uses to manage the business would be material to investors, and therefore required.**[32] The SEC explained that the standard for materiality is the same as that used in determining violations of the federal securities laws: "Information is material is there is a substantial likelihood that a reasonable investor would consider the information important in deciding how to vote or make an investment."[33]

73.     The release also stated that companies should also identify and address those "key variables … that are peculiar to and necessary for an understanding and evaluation of the individual company" such as **"company-specific sales metrics such as same store sales or revenues per subscriber.**"[34] The discussion of such metrics should include "further material information, …necessary in order to make the presentation of the metric, in light of the circumstances under which it is presented, not misleading." The SEC expressly stated that this requirement was intended to apply to several non-GAAP metrics, including "total customers/subscribers" and "average revenue per user," that Skillz admitted to monitoring.[35]

74.     These guidelines required Skillz to disclose ARPPU, and not just MAU or ARPU in the months leading up to and after the Merger. Defendant Chafkin later acknowledged that "[f]or a business [like Skillz] that generates revenue from consumer payments, **the most relevant KPI that everyone should be looking at is Paying M-A-U**," emphasizing that "**[i]t wouldn't make sense to evaluate a business like Netflix using site visitors rather than subscribers**, and that's really the same way we think about it."[36] In contrast, **MAU "is not a contributor to revenue today."** [37]

75.     Given Chafkin's concession, Skillz's failure to (i) disclose the importance of Paying MAU, and (ii) identify and disclose the decline in its ARPPU metric during the months leading to and after the

---

[32] Release 33-10751 at 2 (quoting SEC Rel. No. 33-8350 (Dec. 19, 2003)).
[33] *Id.* at 2 n.5 (citing *TSC Industries, Inc v. Northway, Inc.*, 426 U.S. 438 (1976)).
[34] *Id.* at 3.
[35] *Id.* at 4 n.11.
[36] Q1 2021 Earnings Call at 5–6.
[37] *Id.* at 14.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                        CASE NO: 3:21-cv-03450

Merger were material omissions, and violated SEC rules that required the Company to disclose "all key variables and other factors that that management uses to manage the business [that] would be material to investors, and therefore **required**."

76.     By solely disclosing the increase in MAU and ARPU (which is derived from the MAU population comprised of more than 85–90% non-paying users), without also disclosing the far more significant ARPPU metric, Defendants at best obscured the fact that average revenues generated by paying users were declining during the second half of 2020 and the full year. This misleading disclosure violated SEC Rel. 33-10751 and the federal securities laws.

77.     Additionally, Defendants' risk disclosure stated in part that "[o]ur third-party developers and investors rely on our key metrics as a representation of our performance… . [I]f advertisers, platform partners or investors do not perceive end-user metrics to be accurate representations of the end-user base or end-user engagement, our reputation may be harmed." However, Defendants' risk disclosure was materially incomplete and misleading in failing to identify and disclose ARPPU, a key metric, to investors so they could accurately assess paying user engagement.

78.     There was no business justification for Defendants' myopic focus on the MAU metric prior to year-end 2020. Chafkin's analysis of Skillz's key metrics applied at all relevant times before and after the Merger, as did Defendants' disclosure obligations of key metrics under Release No. 33-10751. CW#1 confirmed that before the Merger "we did not even pay attention to MAU" until "all of a sudden when [Skillz] went public, they realized that Wall Street cared about MAUs," and then Skillz began to focus on that metric."

79.     Defendants knew or recklessly disregarded that reporting high MAUs was intended to position Skillz to Wall Street analysts and investors using familiar metrics that would boost its stock price. The "MAU burst" CW#1 identified as a wasteful initiative focused on driving up MAU numbers before year-end confirms this and helped Skillz achieve that goal. As the DFPA explained to CW#1 "the MAU burst needs to stop on December 31, as it's only useful to get our Q4 MAU number. **It's a lot of spend,**

1  **but it's worth it to potentially maintain quarter over quarter MAU levels, as it's a measure that**

2  **Wall Street will look at closely."**

3      80.    Defendants' inconsistent reporting throughout the Class Period made it difficult for

4  investors to immediately understand the relative contributions and significance of MAU and PAU, even

5  following the March 2021 disclosures that added ARPPU as a key metric in the 4Q 2020 financial results.

6      81.    Indicative of the continuing uncertainty around Skillz's key metrics, and its history of

7  misleading financial reports, Paying MAU and MAU commanded a large part of the discussion during

8  the Q1 2021 Earnings Call on May 4, 2021. For example, in response to the opening question raised by

9  Jason Bazinet, an analyst from Citigroup Global Markets, whether MAU was "the right metric to focus

10  on," Defendant Chafkin acknowledged that Skillz's "**reporting on MAUs when we went public …**

11  **seems to have created more confusion**." In other words, investors were misled by the inaccurate and

12  exaggerated MAU disclosures.

13      82.    Similarly, in response to a question by Drew Crum, an analyst from Stifel Nicholas & Co.,

14  Inc., about "[h]ow important is the monthly active user to the developer community," Chafkin

15  emphasized that developers care about revenues, and that while "MAU may be a '**vanity metric**'" [*i.e.*, a

16  large number], "it's not actually correlated to our business performance, … [but] actually costs us money

17  because we provide servers for them [non-paying users]." "So, we continue to optimize for that metric

18  [paying users] and until we capitalize on the opportunity to monetize our non-paying MAU, we won't

19  focus on growing [MAU]."[38]

20      83.    Following the discussion in the Q1 2021 earnings call, the market finally understood the

21  misleading nature of Defendants' prior disclosures about the relative significance of MAU and paying

22  users before March 10, 2021, and Skillz shares declined by 8.72% on to close at $15.48 on May 5, 2021.

23          **3.  Overstated Technical Capabilities — Synchronous Play**

24

25  ---
[38] *Id.* at 13–14.

26

27

28  SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL            CASE NO: 3:21-cv-03450

84.    Skillz also misled investors by overstating the technical features of its platform and thus, its ability to drive user growth. During the September 2, 2020, Investor Call, Defendant Paradise repeatedly lauded Skillz's platform's capabilities:

Skillz is making fair competition accessible for everyone, everywhere. We do that through 200 different features we built to create a community, and it's a community that loves fair and meaningful competition. These features do everything, ranging from **head-to-head tournaments, to multi-hundred-thousand-player week-long leagues, and exciting live events**.[39]

85.    In line with these statements, Skillz promoted its entry into the market for synchronous game play, an increasingly popular gaming format where users compete against each other in real-time, as opposed to in turn-based games (*e.g.*, like bingo). As Skillz noted in a January 23, 2020 blog post, synchronous gameplay has many advantages that could help attract and maintain a larger paying user base, including that it (1) "creates strong social immediacy and reciprocity, which in turn builds player retention," (2) "works well in games with engaging and immersive design elements, such as strong character development, top-notch graphics, and story-like gameplay," and (3) "integrates successfully with games maintaining a large existing player base that is heavily motivated by competition and social play."[40] Unsurprisingly, many of the most popular and profitable genres in the mobile gaming market—such as racing, first-person shooter, or Battle Royale—require synchronous gameplay.

86.    Synchronous games are historically difficult and expensive to develop for at least three reasons. First, synchronous gaming genres tend to have relatively complex gaming mechanics and higher quality graphics.[41] Second, synchronous games require that participants be able to react to the actions of all other participants in real time. Performance and latency issues must be non-existent, or the player

---

[39] September 2, 2020 Investor Call at 4.
[40] https://www.skillz.com/competitive-multiplayer-mobile-games-synchronous-vs-asynchronous/
[41] In order to play a game, users must download the game first; the size of that download provides some insight into the game's complexity. Apex Legends Mobile, a popular shooter/Battle Royale game produced by Electronic Arts, is a 3.7 GB game—over fourteen times the size of Skillz's most popular game, Blackout Bingo, which is only 259.9 MB. This level of complexity exists regardless of whether the game is played alone by a single player, or synchronously with others.

25

experience will be ruined. Third, the game must constantly maintain a sizable user base; if there are not enough active users, players will be unable to match with other players within an acceptable amount of time. As a result, the top synchronous games tend to be developed by large game studios like Electronic Arts (*see* n.41) or Epic Games, maker of the wildly popular real time battle royale game *Fortnight*, and have tens of millions of players with millions online at any given moment.[42]

87.     In contrast to these premium mobile gaming genres, Skillz's most popular games are simple and produced by small game studios. For example, five of Skillz's ten most popular games (21 Blitz, Solitaire Cube, Spider Solitaire Cube, Cube Cube, and Bubble Cube 2) come from Tether Studios, an independent game developer with less than twenty employees.

88.     Nonetheless, and despite not developing any games itself, Skillz highlighted synchronous game play as a source of growth, representing its platform's capabilities in the Merger Proxy 2020 as follows:

> **Games on Our Platform**
> **We offer a wide range of contests** for the users. We enable game genres that can be played: (i) asynchronously; (ii) turn-based synchronously; or (iii) synchronously. An example of an asynchronous game would be a match-3 puzzle game or bingo game where users play the exact same game at different times and then the scores are compared when both contestants have played to determine the winner. An example of a turn-based synchronous game would be a dominoes game in which users take turns in real-time and the winner is determined when the game ends. An example of a synchronous game would be a real-time strategy game where users are making multiple moves simultaneously and then the winner is determined when the game ends.[43]

89.     The same representations were included in the February 2021 Registration Statement, the 2020 Form 10-K, and the March 2021 Registration Statement.[44]

---

[42] https://www.gamesradar.com/how-many-people-play-fortnite/ (83 million Fortnite users, with 3 million online at any one time)

[43] Merger Proxy at 170.

[44] February 2021 Registration Statement at 56; 2020 Form 10-K at 6; March 2021 Registration Statement at 68.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                        CASE NO: 3:21-cv-03450

90.     Defendant Paradise further promoted the Company's synchronous gaming capabilities during the Q4 2020 investor call on March 12, 2021, stating:

> Over the past year, [one] of the many areas we've continued to invest in is our synchronous gameplay ecosystem. **We're expanding the reach of the platform to enable new gaming genres ranging from real-time strategy, to fighting, to racing, to first-person shooters**. These are incredibly popular genres, and Skillz is uniquely positioned to **deliver the same fidelity, trust, and reliability** that have been the hallmarks of our platform since inception. **Synchronous content will deliver even higher player engagement than we've seen before and will further expand our universe of players, and more importantly, perhaps, payers.**[45]

91.     These statements were false and misleading because they gave the misimpression that synchronous games on the Skillz platform had advanced to the stage where they represented a viable source of growth for the Company when, in fact, synchronous game play was, at best, only in the testing phase and not reliable or capable of being used for serious gameplay. This fact was first partially disclosed to investors in the Wolfpack Report, which first revealed that large game studios—the ones who would have the resources to develop truly synchronous content—would not produce games for Skillz because its platform was not "robust" enough:

> Our conversations with former employees suggested that large studios are unwilling to touch Skillz platform both because **Skillz platform is not robust enough to adequately handle their needs with synchronous play** and international matchmaking. One former Skillz employee we spoke to made the following statement regarding Skillz's reputation in the gaming industry:
>
> "*In the gaming industry, Skillz does not have good brand recognition. Most of the players in the industry consider them a joke*"

92.     Wolfpack's report was subsequently confirmed by CW#1, who stated that synchronous gaming was still "brand new" at the time CW#1 left Skillz in March 2021, and that the Company was in the process of "working out bug defects" by asking all employees to test synchronous games.

93.     Following the release of the Wolfpack Report Skillz's stock declined by almost 11% to close at $24.45 per share.

---

[45] Q4 2020 Earnings Call at 3.

27

94.     On May 4, 2021, Defendant Paradise disclosed additional information regarding the state of synchronous game play in a Stockholder Letter issued in connection with the announcement of Q1 2021 results. In this letter, Defendant Paradise stated for the first time that synchronous game play was still in its early development with only a "handful" of developers testing content on the Company's platform:

> We currently have a handful of developers actively testing synchronous content on our platform, and the initial results **are already promising**.[46]

95.     In fact, synchronous game play was so new and untested, that Defendant Paradise conceded for the first time in response to an analysts' question during the Q1 2021 Earnings Call on May 4, 2021, that the Company did not include any revenue from synchronous games in the financial projections it announced for 2021.[47]

96.     On this news, the market price Skillz's share price declined by 8.72% on to close at $15.48 on May 5, 2021.

97.     Defendant Paradise's statements in the May 4, 2021 Stockholder Letter, and his admission that revenue from synchronous gaming was not even included in the Company's projections for 2021 revealed to investors for the first time that the state of synchronous game play was even worse than partially revealed by the Wolfpack Report in March of that year, and a significant and material way away from delivering "higher player engagement", specifically from paying users, as Paradise has previously represented.[48]

### 4.   Skillz Failed to Disclose the Risks Presented by Its Dependency on Bonus Cash to Boost User Engagement

98.     Skillz also made false and misleading statements during the Class Period about the factors driving "user engagement" a term that, as explained above, the Company used to refer to paying contest

---

[46] Q1 2021 Stockholder Letter at 1.
[47] Q1 2021 Earnings Call at 10.
[48] Q4 2020 Earnings Call at 3.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                          CASE NO: 3:21-cv-03450

entries and thus revenue. For example, Skillz touted the superior technical ability of its platform to match players and breadth of gaming content as the key drivers of user engagement:

99.    Specifically, the Company repeatedly represented in its SEC filings as follows:

**Extraordinary User Engagement.** Skillz has developed a platform for game developers and end-users that has proven engaging and "sticky." Additionally, as its **platform features more content, end-users have played more games**.[49]

\*    \*    \*

**The scale, growth and engagement of users** – As we continue to acquire users, our ability to match comparable players, on both skill level and tournament template, in a fair and timely manner improves. **Better matching leads to stronger engagement** and the ability to create larger tournaments with more profitable take rates. **This creates a sticker, more engaging, and more continuously improving experience for our players, which in turn attracts more players to our platform, creating a positively reinforcing cycle leading to ever-improving gaming experiences.**[50]

100.    These statements were false and misleading because as, discussed herein, Skillz failed to disclose that the "extraordinary user engagement" it touted was driven not by its superior matchmaking ability, or the amount of games on its platform, but rather was attributable to aggressive and uneconomic spending on paid user incentives known as "Bonus Cash."

101.    Bonus Cash "is a promotional incentive that cannot be withdrawn and can only be used by end-users to enter into paid entry fee contests"[51] on the Skillz platform. Skillz awards Bonus Cash to new and existing users as part of its "monetization services," which Skillz claims allows "game developers [to] enhance the player experience by allowing them to compete in head-to-head matches, live tournaments, leagues, and charity tournaments, and increase player retention through referral bonus programs, loyalty perks, on-system achievements, and rewarding them with prizes (including Bonus Cash)."[52]

---

[49] Merger Proxy at 29, 94.
[50] *Id.* at 181; February 2021 Registration Statement at 63; March 2021 Registration Statement at 49; 2020 Form 10-K at 40.
[51] Merger Proxy at 2.
[52] Merger Proxy at 182.

29

102.     Skillz accounts for Bonus Cash awarded through its monetization services in two ways as part of its End User Incentive Program, which Skillz refers to as "Engagement Marketing." First, Bonus Cash awards deemed "payable to a customer"—i.e., a *game developer*[53]—are recognized as a reduction in Company revenue.[54] As an example, this would include initial deposit Bonus Cash, such as a "10+10" offer in which a user receives $10 in Bonus Cash for making an initial deposit of $10 onto the Skillz platform.[55] Second, Bonus Cash awards presented to *existing* Skillz users, such as a "50+100" limited-time offer awarding $50 in Bonus Cash for a $100 deposit would not be considered "payable to a customer" and are treated as a user engagement marketing expense.[56] According to Defendant Paradise, the particular offers a user receives and when is determined by a "machine-learning system [that] looks at a user's historical pattern, instantly analyzes them, and serves up the perfect offer to help [Skillz] optimize monetization."[57]

103.     Although Bonus Cash is virtual money created by Skillz, the Company recognizes Bonus Cash as revenue when users spend it to enter games. As the Merger Proxy states, "Skillz recognizes revenue related to *each game* regardless of how the entry fees are paid" by withholding "16%-20% of the total entry fees when distributing the prize money as a commission."[58] Skillz then shares *part* of the commissions the game developer, however, unlike Skillz, "the game developers' share is calculated *solely* based upon entry fees paid by *net cash deposits* received from end-users, adjusted for certain costs incurred by Skillz to provide monetization services."[59]

---

[53] Skillz regards the developer and not the player as its customer. As Defendant Henry explained on the Company's Q1 2021 Earnings Call: "as I think we all know our customer is the game developer, right, not the end user". Q1 2021 Earnings Call at 7.
[54] Merger Proxy at 191.
[55] Q2 2021 Stockholder Letter at 3.
[56] Merger Proxy at 191.
[57] Q2 2021 Stockholder Letter at 3.
[58] Merger Proxy at 183 (emphasis added)
[59] *Id.*

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                          CASE NO: 3:21-cv-03450

104.    Skillz spent heavily on its End User Incentive Program prior to and throughout the Class Period. For example, the three-months ending March 31, 2021, Skillz spent a total of $36 million—or 43% of Skillz revenue—on "Engagement Marketing" incentives targeted at boosting engagement and retention of existing users. Of that spend, approximately $33 million was attributable to end user incentives treated as a sales and marketing expense, including Bonus Cash.[60] This represented a significant increase from the prior year, as Defendant Paradise explained in a letter to shareholders: Engagement Marketing was "up 110% over the prior year period, **growing slightly faster than revenue**. . . driven by new marketing programs launched in Q3 2020."[61] As explained in Paragraph 102, Skillz's spending on Engagement Marketing, including Bonus Cash, was broken down into incentives treated as a sales and marketing expense and those treated as a revenue reduction. As the chart below shows, Skillz awarded tens-of-millions of dollars of Bonus Cash between 2018 and 2021, even if less than 100% of its total Engagement Marketing spend treated as a sales and marketing expense is considered. The amount also steadily increased year-over-year:

| Time Period | Revenue Reduction Attributable to End-User Incentive Programs | Sales & Marketing Expenses Attributable to End-User Incentive Programs | Total End-User Incentive Programs | Total Revenue | End-User Incentive Programs as a Percentage of Revenue |
|---|---|---|---|---|---|
| Year ending 12/31/18 | $11.6 M | $18.7 M | $30.3 M | $50.8 M | 59.6% |
| Year ending 12/31/19 | $27.7 M | $45.4 M | $73.1 M | $119.9 M | 61.0% |
| Year ending 12/31/20 | $51.3 M | $91.5 M | $142.8 M | $230.1 M | 62.1% |

[60] Q1 2021 10-Q at 8.
[61] Q1 2021 Stockholder Letter at 6.

31

| Year ending 12/31/21 | $74.1 M | $176.1 M | $250.2 M | $384.1 M | 65.1% |

105.     On April 19, 2021, Eagle Eye Research published a report analyzing Skillz's cash revenue based on disclosures the Company made to the SEC in correspondence submitted as part of the SEC's review of the Merger Proxy.[62] These disclosures were <u>not</u> included in the Merger Proxy, or subsequently in 2020 Form 10-K or Registration Statements for the March 2021 Offering. This analysis, which was the first of its kind, used cash deposits net of withdrawals (*i.e.*, money users were taking out of the platform) and developer profits (*i.e.*, the share of each contest earnings that Skillz paid to the game developers) to estimate Skillz net cash revenue, exclusive of Bonus Cash. Eagle Eye found, based upon consultation with accounting experts and data provided to the SEC (but not to public investors), that between **53% and 71% of Skillz GAAP revenue was non-cash revenue for the years 2018, 2019, and 2020.**

106.     Given the large amount of Bonus Cash awarded (*see* ¶ 105, *supra*), and Skillz's practice of recognizing revenue from "each game regardless of how the entry fees are paid,"[63] the Company's failure to disclose the large percentage of non-cash revenue was a material omission that enabled Defendants to foster the misleading impression that Skillz's platform was actually delivering "Extraordinary User Engagement," with users paying to enter more contests because of its superior matching ability and content (*see* ¶ 100, *supra*) when, in fact, the majority of "spend" on the Skillz platform (which the Company reported as revenue) was from Bonus Cash.

107.     Skillz's failure to disclose information regarding the high percentage of non-cash revenue also concealed the risks created by the Company's End User Incentive Program and its dependance on Bonus Cash. As Eagle Eye explained, although Skillz billed Bonus Cash as a non-redeemable incentive, its practice of treating all winnings over a user's entry fee as 100% real cash that could be withdrawn, had

---

[62] *See* FEAC Letter to SEC dated October 13, 2020 at 9.
[63] Merger Proxy at 190 (emphasis added).

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                          CASE NO: 3:21-cv-03450

the effect of converting at least some of the Bonus Cash awarded to users into real cash liability.[64] As a result, Eagle Eye found Skillz was **incurring $3 in liability for every $2 in revenue recognized**—an unsustainable proposition.

108.   Not surprisingly, Skillz stock tanked on the release of the Eagle Eye report, falling by 6.61% to $12.55 on April 19, 2021, losing approximately $254 million in investor

109.   Analysts' questioning about Skillz's use of Bonus Cash and high percentage of non-cash revenue following the Eagle Eye report on the Company's Q1 2021 earnings call confirmed the materiality of that information. For example, Brian Fitzgerald of Wells Fargo Securities LLC focused specifically on the amount of "promotional work you're doing" and how "you deploy that promotional activity relative to gamer activity, well, relative to gaming wins to ameliorate or manage any exposure there."

110.   Skillz's response was telling. In answering Mr. Fitzgerald, Defendant Chafkin not only acknowledged the existence of the Eagle Eye report but, in attempting to rebut its analysis, admitted for the first time that only 60% of Skillz revenue was attributable to cash deposits stating: "short reports calculated our net deposits minus developer profit share as between 19% and 47% of our GAPP revenue in 2019 and 2020. This is simply not true . . . **The actual number is 60%.**"[65]

111.   Further confirming the materiality of this information, Citigroup Global Markets analyst Jason Bazinet also focused on Skillz's non-cash revenue and cash deposits during the Q1 2021 Earnings

---

[64] For example, consider two users who deposit $3 and receive $3 each in Bonus Cash. These two users pay $6 ($3 in cash, plus $3 in Bonus Cash) to enter a Skillz contest that pays $10 to the winner (such as the "Expert 1-card" contest in Blackout Bingo). Of the $12 ($6 in cash, $6 in Bonus Cash) Skillz will take $2 (which will be split with the developer) and pay $10 to the winning user. However, because Skillz treats anything over the user's entry fee as 100% real cash, the user who won $10 ends up with $7 in withdrawable cash (i.e., the $3 in real money they paid to enter, plus the $4 over the entry fee) even though only $6 in actual cash were paid by both users to enter the contest. The user's ability to withdraw as real money more than the total amount of cash paid into the game reflects a liability for Skillz.

[65] Q1 Earnings Call, at 7.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                         CASE NO: 3:21-cv-03450

Call. Mr. Bazinet asked the Company directly whether "given this focus on sort of GAAP revenue versus sort of cash deposits, can you guys can give net cash deposited at the end of the year, and the end of the quarter, so investors can sort of try and do their own counts, or is that something that we'll have to wait till the K comes out or some other SEC filing."[66]

112.    The Company not only refused to provide the requested information but admitted that it had strategically withheld that data from investors. As Defendant Paradise explained, despite recognizing that "net deposit basis after the bulk of profit share would be another way of potentially looking at our gross profits," the Company made a choice not to disclose that information, stating: "we're always struggling with the balance of disclosing as much as possible to enable shareholders to understand our business, but also ***protecting the business*** and trying to balance those two things."[67]

113.    Here, much like the Company's choice to report MAU metrics used by ad-driven companies, "protecting the business" meant "avoid[ing]" reporting net deposits, which analysts (and investors) viewed as material, in favor of numbers derived from "GAAP principles" borrowed from "other publicly traded platform marketplace companies" that obscured the Company's high percentage of non-cash revenue and dependence on Bonus Cash to drive user engagement. This was misleading as once the Company chose to report information regarding its End User Incentive Program and Engagement Marketing spend along with its revenue, Section 10(b), like the SEC's MD&A guidelines in Release No. 33-10571, required the Company to provide "further material information …necessary in order to make the presentation of the metric, in light of the circumstances under which it is presented, not misleading." This, as a minimum, would have included the information about Skillz's users net deposits that analysts asked for during Skillz's Q1 2021 earnings call and the Defendant Paradise admitted the Company intentionally withheld.[68]

---

[66] *Id.* at 10.
[67] *Id.*
[68] *Id.* at 7.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

114.    Defendant Paradise's attempt to justify this choice in response to Mr. Bazinet's question only further highlighted the misleading nature of Skillz's prior statements. According to Paradise, the Company chose to report only GAAP numbers because they gave a "better indication of long-term profitability" by "help[ing] people understand that we expect a material portion of the [indiscernible] marketing dollars, we get substituted with cash over time." However, as demonstrated above, this justification was belied by the fact that the Company's spending on Engagement Marketing and dependence on Bonus Cash increased over time, continuing to grow "**slightly faster than revenue,**"[69] as Paradise admitted, rather than being replaced.

115.    Paradise's explanation was further undermined when later that year, as part of Skillz Q4 2021 investor update, the Company announced that it would cut back on Bonus Cash spending and adjust its business model to focus on improving its content, launching new product features, and—most importantly—improved marketing efficiency via lowered engagement marketing.[70] Specifically, during the Q4 2021 earnings call, Defendant Paradise stated that "[i]n 2022 … we will transition from our strategy of revenue growth at all costs to increasing profitable growth and efficiency." Later, in response to an analyst question about how Skillz would approach marketing in the upcoming year, Defendant Chafkin admitted the prior Bonus Cash spending had been unproductive: "**the reality is, we spen[t] more than we should have** and as we orient towards a more profitable 2022, we are already reducing both our engagement marketing and user acquisition budgets." And in response to another question about marketing spend, Chafkin admitted some of the user incentives that Skillz offered were "**actually cannibalizing existing player spend in the system**" as reflected in the high non-cash revenue figures attributable first reported by Eagle Eye.[71]

---

[69] Q1 2021 Stockholder Letter at 6.
[70] Q4 2021 Stockholder Letter at 9.
[71] Q4 2021 Earnings Call at 3–4.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                          CASE NO: 3:21-cv-03450

116.    Ultimately, Skillz was forced to reckon with its Bonus Cash and Engagement Marketing spending addiction, as the stock price only continued to decline to below $2 once investors began to appreciate the truly unsustainable nature of Skillz's business.

## ADDITIONAL ALLEGATIONS REGARDING
## THE INDIVIDUAL DEFENDANTS' SCIENTER

117.    As alleged herein, Defendants acted with scienter because they (i) knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated in the issuance or dissemination of such statements or documents in primary violation of the federal securities laws. As detailed herein, Skillz and the Individual Defendants, who are the Company's most senior executives, by virtue of their receipt of information reflecting the true facts regarding Skillz, their control over, and/or receipt and/or modification of Skillz's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Skillz, participated in the fraudulent scheme alleged herein.

118.    The Individual Defendants, because of their positions with Skillz, made and/or controlled the contents of the Company's public statements during the Class Period. The Individual Defendants were provided with or had access to the information alleged herein to be false and/or misleading prior to their issuance and had the ability and opportunity to provide accurate information or cause inaccurate information and statements to be corrected. Because of their positions and access to material non-public information, and their participation in making and/or authorizing virtually all of the misstatements at issue, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed, which made their positive representations materially false and misleading.

119.    Defendant Paradise has acknowledged that "I regularly have the opportunity to share our vision, performance, and outlook," with institutional investors. Moreover, Paradise affirmatively

36

communicated with Company stockholders through web-based financial reporting sites such as Seeking Alpha. Paradise stated that the purpose of the Blog was to provide "broad context" directly to Skillz shareholders. Paradise also authorized and/or signed the Company's SEC filings, was identified on the cover page of the Merger Proxy, disseminated a Stockholder Letter on a quarterly basis to Company shareholders, and participated in quarterly earnings calls that were accessible to all public investors.

120. Skillz's senior management, including the Individual Defendants, was personally involved in all aspects of Skillz's platform. Skillz's gaming platform was the primary, if not sole, driver of Company revenues, and senior management was intimately involved in crafting and monitoring its platform. For example, CW#1 confirmed that key metrics such as game downloads and installations, the number of paying users and amount of entry fees paid by paying users in game competitions were tracked on a real time basis and available to Skillz management through the Tableau Dashboard. Paradise, Chafkin and other senior officers discussed the key metrics at weekly Revenue meetings.

121. On March 12, 2021 Skillz filed its 2020 Form 10-K. The Form 10-K was signed by all of the Individual Defendants except Aguirre. Appended as Exhibits 31.1 and 32.1 to the 2020 Form 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendant Paradise certified that "the [2020 Form 10-K] does not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "the information included in the [2020 Form 10-K] fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]". Defendant Henry signed Exhibit 32.2 and certified that the "[2020 Form 10-K] fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

### A. Defendants' Statements and Disclosures Contradicting Their Prior Disclosures Are a Strong Indicator of Scienter

122.     Defendants' public statements and disclosures effectively conceded the falsity of their prior disclosures and are strongly indicative of their scienter. For example, in the Merger Proxy Statement, they touted Skillz's platform capabilities with respect to synchronous game play for its users. Specifically, the Individual Defendants stated that they "offer[ed] a wide range of contests for the users. We enable game genres that can be played: (i) asynchronously; (ii) turn-based synchronously; or (iii) synchronously." The Individual Defendants reiterated the same statements in the March 2021 Registration Statement and March 2021 Prospectus and Skillz's 2020 Form 10-K. Yet, within six weeks after the March 2021 Offering, in which Defendants Paradise, Chafkin and Aguirre pocketed $241 million from the sale of 10.3 million Skillz shares, Defendant Paradise acknowledged that "synchronous play" was only in the "testing phase."

123.     Defendants' public statements and disclosures effectively conceded the falsity of their prior disclosures and are strongly indicative of scienter. For example, in the Merger Proxy Statement, they touted Skillz's platform capabilities with respect to synchronous game play for its users. Specifically, the Individual Defendants stated that they "offer[ed] a wide range of contests for users. We enable game genres that can be played: (i) asynchronously; (ii) turn-based synchronously; or (iii) synchronously." The Individual Defendants reiterated the same statements in the March 2021 Registration Statement and March 2021 Prospectus and Skillz's 2020 Form 10-K. Defendants also represented they were **"expanding the reach of the platform to enable new games ranging from real-time strategy, to fighting, to racing, to first-person shooters."** Yet, within six weeks of the March 2021 Offering, in which Defendants Paradise, Chafkin, and Aguirre pocketed $241 million from the sale of 10.3 million Skillz shares, Defendant Paradise acknowledged that "synchronous play" was only in the "testing phase."

124.     Defendants' misleading statements about synchronous play was not an inadvertent error but rather consistent with their practice of exaggerating the Company's current capabilities and financial condition while omitting adverse facts that would have tempered investors' expectations about Skillz's

growth that was driving Skillz's stock price. This handsomely benefited the Individual Defendants, who sold shares in the March 2021 Offering.

125.    Moreover, the reversal of their public statements and disclosures within a short time frame supports a strong inference that the Individual Defendants knew or recklessly disregarded that their representations were materially false and misleading when made.

**B.    Defendants Promoted the Irrelevant MAU Metric to Assuage Analysts and Then Reversed Course And Engaged In Damage Control**

126.    The Merger Proxy issued in advance of Skillz's going public Merger included Skillz's financial results for the nine months ended September 30, 2020 (the "Nine Months Results"), and for the year ended December 31, 2019 as compared to December 31, 2018 ("2019 Results"). The February 2021 Registration Statement also included Skillz's Nine Months Results and 2019 Results.

127.    The "Nine Months Results" and 2019 Results were materially misleading in misattributing Skill's revenue growth primarily to an "**increase in MAUs**" driven by sales and marketing investment to acquire new paying users.[72] Attributing revenue growth to MAUs was misleading because, unlike an ad-driven website or business, where all MAUs generate revenue for the company since they receive ads, here 85–90% of MAUs on Skillz's platform did not pay to play games and, as a result, did not generate any revenue. Only a small percentage of MAU who entered into a paid contest (referred to as "Paying MAU"), generated revenue for Skillz.

128.    Just over a month after the release of the February 2021 Registration Statement, Defendants reversed their position in reporting financial results for Q4 and year-end 2020 included in the 2020 Form 10-K and March 2021 Registration Statement. This time around, Defendants attributed revenue growth to an "**increase in paying MAUs**" driven by sales and marketing investment to acquire new paying users,[73] not MAUs.

---

[72] Merger Proxy at 84; February 2021 Registration Statement at 66.
[73] 2020 10-K at 13; March 2021 Registration Statement at 52.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

129.     Defendants also changed their prior disclosure of 2019 Results, this time attributing 2019 revenue growth to an "**increase in paying MAUS**" driven by sales and marketing investment to acquire new paying users, not MAUs.[74]

130.     Defendants conceded their prior disclosure had resulted in market uncertainty. Defendant Chafkin acknowledged in the Q1 2021 earning call that Skillz's "**report[ing] on [MAUs] when we went public … seems to have created more confusion**."[75] In other words, he acknowledged that investors were misled by the inaccurate MAU disclosures which led them to believe the Company was focused primarily on increasing the gross number of users on the platform, although most users played games for free and generated no revenue.

131.     Defendants sought to convey this in advance of the Merger by presenting analysts and investors with familiar MAU metrics used by apps and websites that generated advertising revenue to drive up the stock price. Specifically, Defendants' focus on highlighting MAU and ARPU to the exclusion of the more relevant key metrics, paying users and ARPPU that were monitored and accessible though Tableau, was strategically designed and not the result of error or oversight.

132.     CW#1 reported that "[a]fter realizing that Wall Street cared about monthly active users," senior management launched an initiative called the "MAU Burst," which allocated $3.2 million with the goal of hitting 950,000 installations through December 2020. The DFPA advised CW#1 that "senior leadership are [sic] aware we're making a pretty large efficiency tradeoff for MAU." The MAU Burst "needs to stop on December 31, as it's only useful to get our Q4 MAU number. It's a lot of spend, but it's worth it to potentially maintain quarter over quarter MAU levels, as **it's a measure that Wall Street will look at closely.**"

133.     But following the Merger, Skillz reversed course and properly attributed increase revenues to paying users and for the first time reported ARPPU—which showed a decline in average revenues per

---

[74] 2020 10-K at 13; March 2021 Registration Statement at 52.
[75] Q1 2021 Earnings Call at 6.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

paying user — rather than only reporting the irrelevant increase in ARPU. Defendants Paradise, Chafkin and Henry vociferously engaged in damage control. Chafkin stressed that "the most relevant KPI that everyone should be looking at is Paying M-A-U."[76] Paradise concurred that "Skillz generates nearly all of its revenue from paying players" and Paying MAU "is perhaps the most important metric to our business."[77]

134.    In stark contrast to the prior disclosures, Chafkin sought to minimize the importance of MAU. He stated in no uncertain terms that "MAU, simply put, just isn't a metric that correlates with our business performance."[78] He further explained that "[i]t wouldn't make sense to evaluate a business like Netflix using site visitors rather than subscribers, and that's really the same way we think about it[.]"[79]

135.    Chafkin also explained that from a financial standpoint, MAU was better understood as a company expense, rather than a metric driving revenue. This was so because "the portion of our MAU that are nonpaying users actually cost us money because we provide servers … [and] customer support for them."[80]

136.    Skillz also made a statement in order to present a misleading business model to analysts and investors. On October 6, 2020, Skillz received a comment letter from the SEC specifically questioning the Company's basis for identifying MAU and ARPU as its key metrics. The SEC letter stated:

> **Our Financial Model, page 176**
>
> On page 71 you identify MAU and ARPU as key metrics. **Please disclose MAU and ARPU for each period presented, as well as any other metrics you use in monitoring your ability to attract and retain users.** Also, revise your definition of MAU to clarify whether this measure includes both paying and non-paying users. **Tell us the number of paying users for each period and specifically tell us whether this is a metric used to manage your business and if not, explain why.** Also,

---

[76] Q1 2021 Earnings Call at 5.
[77] *Id.* at 3.
[78] *Id.* at 6.
[79] *Id.*
[80] *Id.*

please discuss how you monitor your ability to convert active users to paying users, quantifying any additional metrics used for each period presented. In this regard, we note your disclosure on page 164 that only 10% of your MAUs enter into paid contests. Refer to Item 303(a)(3) of Regulation S-K and Section 1 of SEC Release No. 33-10751.[81]

137.   In response to the comment letter, Skillz misrepresented to the SEC that **"Paying MAU is not a primary metric that we use to manage our business as our primary focus is on growing the total user traffic on our platform."**

138.   However, beginning with the release of Q4 2020 and year-end results, Defendants Paradise, Chafkin and Henry admitted to investors that "Paying MAU" was a primary metric that Skillz used to gauge revenues, not MAU. They also made clear that "for now, we're focused on growing our Paying MAU." *See* ¶¶ 45–46, *supra*.

139.   The Individual Defendants knew there was no business justification for making inconsistent financial disclosures about revenues in Skillz's initial reporting periods. Chafkin's assessment of Skillz's paying user-based business model was the same before and after the Merger. Neither he nor the other Individual Defendants have claimed otherwise publicly.

140.   CW#1 has confirmed the falsity of the Individual Defendants' MAU disclosures. CW#1 stated that while employed at Skillz, "we did not even pay attention to MAU [Monthly Average Users]" metric. CW#1 explained that "all of a sudden when [Skillz] went public, they realized Wall Street cared about MAUs." *See* ¶ 40, *supra*.

141.   Similarly, the March 2021 Registration Statement represented, contrary to their prior statements, that Paying MAU was the primarily driver of 2020 revenues. Further, for the first time they identified ARPPU (which is derived from only Paying MAU) as a key metric and revealed that ARPPU had declined year-over-year from 2019.

---

[81] SEC Comment Letter at 6.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

142.     Defendants' failure to disclose the declines in ARPPU also violated the express guidance that the SEC provided Defendants to consider under SEC Rel. No. 33-10571.[82] Release 33-10751 independently required accurate disclosure of paying MAU and ARPPU in the Merger Proxy and February 2021 Registration Statement.

143.     Release No. 33-10571 expressly provides "guidance on disclosure of key performance indicators and metrics" in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). The Release notes that "[f]or each business, there is a limited set of critical variables which presents the pulse of the business," and "emphasized that … 'companies should consider whether disclosure of all **key variables** and other factors **that management uses to manage the business would be material to investors, and therefore required.**"[83] The SEC explained that the standard for materiality is the same as that used in determining violations of the federal securities laws"[84]

144.     The Release instructed companies to identify and address those key variables that are necessary for an understanding and evaluation of the individual company. Such company-specific sales metric could include "same store sales or revenues per subscriber."[85]

145.     Moreover, consistent with the requirements of the federal securities laws, the discussion of metrics should include "further material information, …necessary in order to make the presentation of the metric, in light of the circumstances under which it is presented, not misleading." The SEC expressly stated that this requirement was intended to apply to several non-GAAP metrics including "total customers/subscribers" and **"average revenue per user."**[86] These were metrics that Skillz reported on.

---

[82] SEC Comment Letter at 6.
[83] Release 33-10751 at 2 (quoting SEC Rel. No. 33-8350 (Dec. 19, 2003)).
[84] *Id.* at 2 n.5 (citing *TSC Industries, Inc v. Northway, Inc.*, 426 U.S. 438 (1976)).
[85] *Id.* at 3.
[86] *Id.* at 4 n.11.

146.     Here, despite SEC guidance to the contrary, Defendants chose to solely disclose the increase in MAU and ARPU (which is derived from the MAU population comprised of more than 85–90% non-paying users), without also disclosing the far more significant ARPPU metric, which at best obscured the fact that average revenues generated by paying users were declining during the second half of 2020 and the full year. These facts, together with the Individual Defendants' admissions about Skillz's paying user business model, support a strong inference that Defendants knew or recklessly that the Nine Months Results and the 2019 Results were materially misleading and violated the federal securities laws and SEC Rel. 33-10751, which directed Skillz to disclose "all key variables and other factors that that management uses to manage the business [that] would be material to investors, and therefore **required**."

147.     Similarly, the Paradise's contradiction of his representations attesting to the accuracy of the 2020 financial statements supports a strong inference of scienter. The alternative inference, that Skillz used a MAU-based business model before the Merger in which "Paying MAU [was] not a primary that we use to manage our business," and suddenly revered course once the Company went public, defies reality and is contradicted by admission after admission by Defendants Paradise, Chafkin, and Henry, as well as CW#1's explanation of the business model.

C.     **Paradise Refused to Answer Analysts' Questions Concerning the Decline in Downloads of Games on Skillz**

148.     Skillz touted the substantial growth of its top games, even after being displaced as the number one title. However, Defendants knew that the rate of download growth of its top games had plunged from more than doubling monthly year over year in Q1 2020 to a paltry 2% in January 2021 and turned negative in February 2021. Defendants concealed this negative trend from shareholders and the market and engaged in misdirection.

149.     During the March 12 Earnings Call, Defendant Paradise was specifically asked by Michael Graham of Canaccord Genuity, Inc. to confirm that "download activity might be slowing down a little bit in some of those key games" and discuss its impact on Skillz's business:

Q. I wanted to start off with a question just about game concentration and revenue concentration. Through your own disclosures, we know that you have a lot of concentration of revenue and a few games. I think that's been by design, just sort of marketing around those games to grow the ecosystem there, but I just wonder if you can comment on your philosophy there, in general, and then I believe there was a third-party report out there, suggesting that download activity might be slowing down a little bit in some of those key games, and I just wonder if you could maybe talk about what you're seeing there, and how that's shaping the business going forward?

150.    However, Paradise avoided answering the question, diverting the discussion to another unrelated metric, "GMV," that had nothing to do with whether downloads were declining or not. Paradise's failure to plainly acknowledge the downturn in download growth and its adverse impact on the growth of Skillz paying user base—in stark contrast to how Skillz had embraced that correlation when it was increasing—furthered his misleading agenda that only emphasized the Company's positive trends while excluding material adverse facts that would have enabled investors to engage in a more realistic and balanced assessment of the Company's financial performance and prospects.

**D.    Defendants Knowingly Failed to Disclose Net Cash Deposits Needed to Assess Skillz's Bonus Cash-Fueled End User Incentive Program**

151.    Defendants intentionally withheld material information regarding Skillz's high percentage of non-cash revenue, attributable to Bonus Cash, and its net cash deposits, which was necessary to assess the risks and success of Defendants' exceedingly expensive End User Incentive Program.

152.    The Eagle Eye report explained that, although Skillz billed Bonus Cash as a non-redeemable incentive, its practice of treating all winnings over a user's entry fee as 100% real cash that could be withdrawn, had the effect of converting at least some of the Bonus Cash awarded to users into real cash liability. As a result, Eagle Eye found Skillz was incurring $3 in liability for every $2 in revenue recognized.

153.    The net cash approach was material to analyst and investors. During the Q1 2021 Earnings Call, Defendant Chafkin conceded for the first time that non-cash revenues comprised 40% of

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL

CASE NO: 3:21-cv-03450

GAAP revenue (based upon 60% net cash deposits), thus admitting that Bonus Cash was material in assessing the Company's operating results. See ¶ 111, *supra*.

154.   The materiality of this information was confirmed by questioning from analysis a CitiGroup and Wells Fargo during the Company's Q1 2021 earnings call that focused on the company's promotional activity and cash revenue in the wake of the Eagle Eye report. CitiGroup analyst Jason Bazinet, in particular, asked whether the Company would "give net cash deposited at the end of the year, and the end of the quarter, so investors can sort of try and do their own counts." Not only did Paradise refuse to provide the requested information but he admitted that it had strategically withheld that data from investors. While acknowledging that the "net deposit basis after the bulk of profit share would be another way of potentially looking at our gross profits," Paradise chose not to disclose that information. Paradise's rationale was that the Company had to "balance … disclosing as much as possible to enable shareholders to understand our business, [with] protecting interests of the business[.]"[87]

155.   Defendants chose to "protect the interests of the business" by avoiding reporting net deposits in favor of numbers derived from "GAAP principles" borrowed from "other publicly traded platform marketplace companies." However, this reporting obscured the high percentage of non-cash revenue, and thus Skillz's dependence on Bonus Cash to drive user engagement—which only became apparent when net cash deposits were factored into the mix, as the Eagle Eye Report first recognized.

156.   Defendants fail to explain how they were "protect[ing] the interest of the business" by withholding key information needed to assess whether the use of Bonus Cash to achieve growth was sustainable. This evidences a danger of misleading investors—that was either known to Defendants or so obvious that Defendants must have known of it—that Defendants concealed under the pretext of "protect[ing] the business."

157.   Defendants' decision to only disclose GAAP numbers without the context provided by another metric, net cash deposits, violated SEC Release 33-10571. Moreover, Defendants' justification

---

[87] Q1 2021 Earnings Call Transcript at 10.

that GAAP numbers alone gave a "better indication of long-term profitability" by "help[ing] people understand that we expect a material portion of the [indiscernible] marketing dollars, we get substituted with cash over time," has no merit. This rationale was purely pretext that was belied by the fact that Bonus Cash had increased dependence on Engagement Marketing expenses that continued to grow "slightly faster than revenue"[88] (rather than being replaced by cash over time), and the Company's decision later that year to abandon its Bonus Cash strategy and slash spending now that the Merger and March 2021 Offering were complete and insiders had already extracted personal profit from Skillz.

### E.    The Proprietary Platform Is Its Only Core Operation

158.    Skillz's proprietary platform is at the heart of its business model. Skillz identified the platform as its principal core strength:

> **Deep Technology Moat:** We have invested extensively in developing our proprietary platform, resulting in many significant inventions and a broad portfolio of 58 granted or pending patents worldwide. We currently analyze 1.5 billion data points per day which we use to enhance our data-driven algorithms, continuously fortifying our position as a leading competitive mobile gaming platform.
>
> **Strong Network Effects:** Compelling competitive content on our platform attracts users, and increases the size of our audience, which, in turn, attracts more developers to create new interactive experiences using our platform, producing a powerful network effect.[89]

159.    According to Skillz, its "proprietary platform revolutionizes and democratizes the mobile gaming industry and allows us to deliver gaming experiences that our player community trusts and loves and "levels the playing field" for every developer."[90]

160.    Skillz touted the uniqueness and benefits of its platform. Skillz stated that "[t]he scales and engagement of our consumer and developer communities drive brands to join our platform, which

---

[88] Q1 2021 Stockholder Letter at 6.
[89] March 2021 Registration Statement at 3 (emphasis in original).
[90] *Id.* at 1.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                              CASE NO: 3:21-cv-03450

offers a highly differentiated competitive mobile gaming experience. Our platform creates a mutually beneficial environment where the player experience is enriched by the brands and the brands activate their audiences through interactive content."[91]

161.    Since the platform was a core aspect of Skillz's business operations, the Individual Defendants tracked and monitored every possible key metric from its platform on a real time basis, including the average daily time a user spent on the platform, the number of games that users play, the total number of tournaments hosted on its platform and the number of users who paid to enter those tournaments, the number of MAUs and Paying MAUs, average revenues generated, and the numbers of games downloaded by Skillz's users, and the "marketing payback period" (the number of days it takes Skillz to earn back its customer acquisition costs.) These and other metrics were accessible to the Individual Defendants on Skillz's Tableau Dashboard.

162.    Given their involvement in the Company's core operations, and the fact that the Individual Defendants routinely publicly discussed the leading metrics *inter alia*, at Revenue meetings held weekly, as well as in the Company' SEC filings, investor presentations and earnings calls, supports a strong inference of knowledge that their public statements misrepresented or omitted material information about the key metrics. Accordingly, it would be absurd for the Individual Defendants to be unaware of Skillz's key metrics, the Company's capability regarding synchronous play, declining download growth rates, amount of non-cash revenue from Bonus Cash, dependence on paid incentives to create user engagement, and the impact this information had on the Company's business operations and prospects.

---

[91] *Id.*

48

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

**F.    Defendants Personally Profited By Selling Their Skillz Stock At Inflated Prices While in Possession of Material Non-Public Information**

163.    The Individual Defendants were highly motivated to personally profit from the sale of Skillz common stock in the March Offering at inflated prices.

164.    Defendants Paradise, Chafkin, and Aguirre personally profited by selling a large percentage of their Skillz holdings (more than 10 million shares) and collectively received net proceeds of $241.5 million at inflated prices. Defendants' insider trading while in the possession of material non-public information is strong evidence of scienter.

165.    In total, Defendants received net proceeds of $241.5 million, as follows:[92]

| Defendant | Total Shares Sold on March 22, 2021 | Total Net Percentage of Their Skillz Holdings | Total Net Proceeds |
|---|---|---|---|
| Andrew Paradise | 8.4 million | 12.24% | $196.1 million |
| Casey Chafkin | 1.7 million | 13.49% | $39 million |
| Miriam Aguirre | 274,825 | 11.49% | $6.41 million |
| **Total:** | | | **$241.51 million** |

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET DOCTRINE

166.    The market for Skillz shares were open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statement and/or failures to disclose, Skillz's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Skillz shares and market information relating to Skillz and have been damaged thereby.

167.    The artificial inflation of Skillz's shares were caused by material misrepresentations and/or omissions made prior to and throughout the Class Period, as particularized in this Complaint. As

---

[92]    *See* March 2021 Prospectus, at 88–94.

49

described herein, from the announcement of the Merger Agreement in September 2020 through May 4, 2021, the close of the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Skillz's business and financial condition. These material misstatements and/or omissions created an unrealistically positive assessment of Skillz's financials and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements resulted in Plaintiffs and other members of the Class purchasing Skillz shares at such artificially inflated prices, and each of them has been damaged as a result.

168.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Skillz shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- The Company filed periodic public reports during the Class Period and participated in the submission of SEC filings in advance of the December 2020 merger;

- Skillz regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Skillz's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

169.     Based on the foregoing, the market for Skillz securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                              CASE NO: 3:21-cv-03450

1  the prices of the securities, and Plaintiffs and the members of the Class are entitled to a presumption of

2  reliance upon the integrity of the market.

3      170.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of

4  reliance established by the Supreme Court in *Affiliated UTE Citizens of the State of Utah v. United States,* 406

5  U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation

6  of a duty to disclose such information, as detailed above.

7                                    **LOSS CAUSATION**

8      171.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the

9  economic loss suffered by Plaintiffs and the Class.

10     172.    During the Class Period, Plaintiffs and the Class purchased Skillz's shares at artificially

11 inflated prices and were damaged thereby. The price of Skillz shares significantly declined when the

12 misrepresentations made to the market, and/or the information alleged herein to have been concealed

13 from the market, and/or the effects thereof, were revealed, causing investors' losses.

14     173.    For example, on the day of the Wolfpack Report was released, shares of Skillz's

15 plummeted by nearly 11% to close at $24.45, substantially in response to (i) revelations about the

16 evaporation of download growth rate for the Company's top games during the second half of 2020 and

17 early 2021, which showed the misleading nature of the Company's statements about growth of the top

18 games and (ii) large studios' unwillingness to produce synchronous games for the Skillz platform because

19 the platform was not robust enough, which partially corrected prior misleading statements. Skillz's shares

20 lost approximately $762 million in market value that day.

21     174.    Skillz's stock price temporarily rebounded after the Wolfpack Report was released due

22 primarily to three converging factors. First, on March 9, 2021, Skillz falsely denied the accuracy of the

23 information contained in the Wolfpack Report, advising investors in a statement emailed to

24

25

26

27                                       51

28 SECOND AMENDED CONSOLIDATED COMPLAINT
   AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

Seekingalpha.com that the Wolfpack Report contained "numerous errors and misleading statements."[93] However, the Company did not specifically challenge any of the factual information in the report relating to growth rate declines for game download or the status of synchronous play on the platform.

175.    Second, on March 10, 2021, Skillz announced its year-end and Fourth Quarter results for 2020 which saw its revenue slightly beat analyst expectations (though it concealed other issues with the Company). Skillz's 2020 Form 10-K and Q4 2020 Earnings Call soon followed on March 12, 2021.

176.    Third, on March 10, 2021, Cathie Wood, the high-profile CEO of Ark Investment Management, an investment management firm that manages several actively managed exchange traded funds with over $50 billion in assets, invested in Skillz. Specifically, the Ark Next Generation Internet ETF added Skillz to its index purchased 486,500 shares of Skillz. Ark's purchase prompted other funds and traders, who mimicked Ark's trades, to also buy Skillz stock, driving its shares upward. These factors led analyst Drew Crum of Stifel Nicholas & Co., Inc. (which followed Skillz stock) to conclude that they would "quell some of the concerns" at least in the short term.

177.    Skillz's stock price continued to rise in anticipation of the March 2021 Offering, which closed at $24 per share on March 19, 2021. Defendants Paradise, Chafkin, and Aguirre unloaded over 10 million shares and reaped $241.5 million from the sale. Skillz shares declined following the March 2021 Offering, falling to $15.11 by April 14, 2021.

178.    As a result of the information published in the Eagle Eye Report (*see* ¶¶ 106–08, *supra*) regarding the Company's End User Incentive Program and its dependence on Bonus Cash, which accounted for a huge percentage of non-cash revenue, Skillz stock declined 6.61% to close at $12.55 on April 19, 2021, losing approximately $254 million in market value. No other disclosure of material

---

[93]  https://seekingalpha.com/news/3670594-skillz-says-wolfpack-report-contains-numerous-errors-misleading-

statements?source=feed_f&utm_campaign=twitter_automated&utm_content=news&utm_medium=social&utm_source=twitter_automated

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

information substantially contributed to the decline in Skillz's stock price immediately following the release of the Eagle Eye Report on April 19, 2021.

179.    Skillz shares temporarily rebounded after the Eagle Eye Report was published. However, an important factor driving Skillz's rising stock price was that certain ETFs had included Skillz in their indexes and were purchasing large amounts of Skillz stock. For example, from April 21–23, 2021, the ARK Next Generation Internet ETF purchased an additional 5.07 million shares of Skillz stock making it one of Skillz's major stockholders.

180.    On May 4, 2021, in connection with the release of Skillz's Q1 2021 financial results, Skillz clarified (i) prior disclosures about the relative significance of MAU and paying users to the Company's business model, and (ii) that its highly touted synchronous gameplay capability was still in development, with only a handful of developers testing synchronous content. The disclosures which were a substantial factor in 8.72% price decline on May 5, 2021 As a result, the shares lost another $350 million in market value.

181.    As of the date of this Second Amended Complaint, Skillz share price remains below the price prior to each of the three corrective disclosures identified above.  The prices of Skillz's stock during the Class Period is illustrated below:

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                      CASE NO: 3:21-cv-03450

SKLZ

**NO SAFE HARBOR**

182.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ material from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Skillz and Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to Defendants' positions with Skillz, and access to Skillz's material information that was unavailable to the public, Defendants knew that the

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                    CASE NO: 3:21-cv-03450

adverse facts described herein were not disclosed to and were being concealed from investors. Defendants are liable for the false statements and omissions alleged herein.

## **PLAINTIFFS' CLASS ALLEGATIONS**

183.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased publicly traded Skillz common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Skillz and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

184.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Skillz securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

185.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

186.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interest antagonistic to or in conflict with those of the Class.

187.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                              CASE NO: 3:21-cv-03450

- whether statements made by Defendants to the investing public prior to and throughout the Class Period, misrepresented material facts about the financial condition and business of the Company;

- whether Defendants' public statements to the investing public, prior to and throughout the Class Period, omitted or failed to correct material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants' MDA discussion of their financial statements violated of SEC disclosure rules;

- whether the Defendants caused the Company to supply or disseminate materially false and misleading information prior to and throughout the Class Period

- whether Defendants acted with the requisite level of intent;

- whether the prices of Skillz securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

188.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## <u>COUNT I</u>
### For Violations of Section 10(b) of the Exchange Act
### And Rule 10b-5 Promulgated Thereunder

189.    Plaintiffs repeat and reallege each and every allegation contained above as it fully set forth herein.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                      CASE NO: 3:21-cv-03450

190.     This Count is asserted against the Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

191.     During the Class Period, the Individual Defendants, individually and in concert, directly or indirectly, disseminated, approved, or failed to correct the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

192.     The Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- Employed devices, schemes, and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchased of Skillz securities during the Class Period.

193.     The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Skillz's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                                                          CASE NO: 3:21-cv-03450

194.   The Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Skillz personnel to members of the investing public, including Plaintiffs and the Class.

195.   As a result of the foregoing, the market price of Skillz securities was artificially inflated throughout the Class Period. In ignorance of the falsity of the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Skillz securities during the Class Period in purchasing Skillz securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

196.   Had Plaintiffs and the other members of the Class been aware that the market price of Skillz's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Skillz's securities at the artificially inflated prices that they did, or at all.

197.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

198.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Skillz's securities during the Class Period.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                        CASE NO: 3:21-cv-03450

# COUNT II
## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

199.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as it fully set forth herein.

200.    Prior to and throughout the Class Period, the Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Skillz's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business operations and presentation of its financial condition.

201.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Skillz's business, financial condition, and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

202.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that contained material information that Skillz supplied and/or disseminated in the marketplace prior to the merger and throughout the Class Period concerning the Company's business and results of operations. Prior to the merger and throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Skillz securities.

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL                                              CASE NO: 3:21-cv-03450

203.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including attorney's fees and expert expenses; and

(d)     awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED.

Plaintiffs demand a trial by jury.

Dated:  August 4, 2022

**LOWEY DANNENBERG, P.C**.

By: _____*Christian Levis*_____

    Christian Levis (admitted *pro hac vice*)
    David C. Harrison (admitted *pro hac vice*)
    Andrea Farah (admitted *pro hac vice*)
    Scott Vincent Papp (admitted *pro hac vice*)
    44 South Broadway, Suite 1100
    White Plains, New York 10601
    Tel: 914-997-0500
    Email:  clevis@lowey.com
    Email: dharrison@lowey.com
    Email:  afarah@lowey.com
    Email:  spapp@lowey.com

    *Counsel for Lead Plaintiffs*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
    Reed R. Kathrein (139304)
    715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
    Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
    reed@hbsslaw.com
    danielles@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
    Steve W. Berman (*Pro Hac Vice forthcoming*)
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
    steve@hbsslaw.com

    *Counsel for Plaintiff Lewis*

**SCHUBERT JONCKHEER & KOLBE LLP**
    Willem F. Jonckheer
    Three Embarcadero Center, Suite 1650
    San Francisco, California 94111
    Tel: (415) 788-4220
    Email: wjonckheer@sjk.law

    *Liaison Counsel for Plaintiffs*

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL

CASE NO: 3:21-cv-03450

1

2

## **CERTIFICATE OF SERVICE**

I, Christian Levis, Esq., hereby certify that on August 4, 2022, I authorized a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/     Christian Levis*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED COMPLAINT
AND DEMAND FOR JURY TRIAL

CASE NO: 3:21-cv-03450