1    LATHAM & WATKINS LLP
     Matthew Rawlinson (Cal. Bar No. 231890)
2    Daniel R. Gherardi (Cal. Bar No. 317771)
     *matt.rawlinson@lw.com*
3    *daniel.gherardi@lw.com*
     140 Scott Drive
4    Menlo Park, CA 94025-1008
     Telephone: +1.650.328.4600
5

6    Melanie M. Blunschi (Cal. Bar No. 234264)
     *melanie.blunschi@lw.com*
7    505 Montgomery Street, Suite 2000
     San Francisco, CA 94111
     Telephone: +1.415.391.0600
8

9    *Attorneys for Defendants Skillz Inc., Andrew Paradise, Casey Chafkin, Miriam Aguirre, and Scott Henry*

10

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13              SAN FRANCISCO DIVISION

| | |
|---|---|
| 14  THOMAS JEDRZEJCZYK, SONNY CHUNG,<br>15  KEVIN TINKELMAN, and DAVID LEWIS,<br>individually, and on behalf of all others similarly<br>16  situated,<br>17          Plaintiffs,<br>18  v.<br>19  SKILLZ INC., f/k/a FLYING EAGLE<br>ACQUISITION CORP., ANDREW PARADISE,<br>20  CASEY CHAFKIN, MIRIAM AGUIRRE, and<br>SCOTT HENRY,<br>21          Defendants. | Case No.: 3:21-cv-03450-RS<br><br>**DEFENDANTS' NOTICE<br>OF MOTION AND MOTION TO<br>DISMISS LEAD PLAINTIFFS'<br>SECOND AMENDED<br>CONSOLIDATED COMPLAINT<br>FOR VIOLATIONS OF FEDERAL<br>SECURITIES LAWS;<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT<br>THEREOF**<br><br>Hearing: January 19, 2023<br>Time: 1:30 p.m.<br>Location: Courtroom 3 – 17th Floor<br>Judge: Hon. Richard Seeborg |

22

23

24

25

26

27

28

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         **PLEASE TAKE NOTICE** that on January 19, 2023, at 1:30 p.m., or as soon thereafter as

3    the matter may be heard, in the United States District Court for the Northern District of California,

4    located at 450 Golden Gate Avenue, San Francisco, California, Defendants Skillz Inc. ("Skillz" or

5    the "Company"), Andrew Paradise, Casey Chafkin, Miriam Aguirre, and Scott Henry (with Skillz,

6    "Defendants"), will move to dismiss the Second Amended Consolidated Complaint for Violations

7    of Federal Securities Laws ("SAC") (Dkt. No. 136), filed by Lead Plaintiffs Thomas Jedrzejczyk,

8    Sonny Chung, Kevin Tinkelman, and David Lewis (collectively, "Plaintiffs").

9         Defendants move pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the

10   Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiffs have not cured the defects

11   that this Court identified when it dismissed the Amended Complaint (Dkt. No. 76): Plaintiffs still

12   do not allege particularized facts establishing any false or misleading statements or omissions,

13   have not pleaded with particularly that any Defendant acted with scienter, and have not adequately

14   alleged that the revelation of any undisclosed truth caused their alleged losses.

15                          <u>**ISSUES TO BE DECIDED**</u>

16        1.    Whether Plaintiffs' claim under Section 10(b) of the Exchange Act should be

17   dismissed for failure to plead with particularity a false statement of fact, scienter or loss causation.

18        2.    Whether Plaintiffs' claim under Section 20(a) of the Exchange Act should be

19   dismissed for failure to plead a predicate violation.

20        3.    Whether Plaintiffs' claims should now be dismissed with prejudice.

21    Dated: September 19, 2022                    Respectfully submitted,

22

23                                               LATHAM & WATKINS LLP

24                                               By */s/Matthew Rawlinson*
                                                 Matthew Rawlinson
25

26                                               *Attorneys for Defendants Skillz Inc., Andrew*
                                                 *Paradise, Casey Chafkin, Miriam Aguirre, and*
27                                               *Scott Henry*

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................ 1

II. BACKGROUND ................................................................................................................ 2

    A. The Defendants ................................................................................................ 2

    B. The Short Reports ............................................................................................ 3

    C. Skillz's Continued Growth .............................................................................. 4

    D. Procedural History ........................................................................................... 4

III. LEGAL STANDARD ........................................................................................................ 5

IV. ARGUMENT ..................................................................................................................... 5

    A. Plaintiffs Do Not Allege A Material Misrepresentation Or Omission ..................................................................................................................... 5

        1. Skillz Did Not Misrepresent Download Rates ................................... 5

        2. Skillz Presented Its Financial Results Appropriately ........................ 8

        3. Skillz Did Not Misstate Its Synchronous Play Capabilities .............. 10

        4. Skillz Did Not Misrepresent Its User Engagement ............................ 12

    B. Plaintiffs Do Not Adequately Plead Scienter ................................................. 14

    C. Plaintiffs Do Not Adequately Plead Loss Causation ...................................... 19

        1. The Short Reports Are Not Corrective Disclosures ........................... 20

        2. Plaintiffs' Remaining "Corrective Disclosure" Does Not Correct Any Challenged Statement ................................................... 22

    D. Any Control Person Claim Fails Along With The Other Claims ..................... 23

V. CONCLUSION .................................................................................................................. 23

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## CASES

4

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
5     532 F. Supp. 3d 189 (E.D. Pa. 2021) ....................................................................14

6 *In re AnaptysBio, Inc.*,
    2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) .........................................................18
7

8 *Applestein v. Medivation, Inc.*,
    2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ..........................................................6

9 *In re Cadence Design Sys., Inc. Sec. Litig.*,
10     654 F. Supp. 2d 1037 (N.D. Cal. 2009) ..................................................................15

11 *In re Cisco Sys. Inc. Sec. Litig.*,
    2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) .........................................................15
12

13 *In re Cloudera, Inc. Sec. Litig.*,
    2021 WL 2115303 (N.D. Cal. May 25, 2021) .........................................................17

14 *In re Cornerstone Propane Partners, L.P.*,
15     355 F. Supp. 2d 1069 (N.D. Cal. 2005) ..................................................................15

16 *In re Diebold Nixdorf, Inc., Sec. Litig.*,
    2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) .........................................................15
17

18 *In re Dropbox, Sec. Litig.*,
    2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) .........................................................14

19 *In re Fusion-io, Inc. Sec. Litig.*,
20     2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ...........................................................14

21 *Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ................................................................................20
22

23 *In re Herbalife, Ltd. Sec. Litig.*,
    2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) .........................................................23

24 *Hessong v. Pinterest, Inc.*,
25     2021 WL 4339193 (N.D. Cal. Sept. 23, 2021) ....................................................9, 13

26 *Hong v. Extreme Networks*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ...........................................................7
27

28 *In re Intrexon, Corp. Sec. Litig.*,
    2017 WL 732952 (N.D. Cal. Feb. 24, 2017) .......................................................20, 22

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)...................................................................6, 9

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ...........................................................................22

*Manger v. LeapFrog Ents., Inc.*,
   252 F. Supp. 3d 837 (N.D. Cal. 2017) ............................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..........................................................................................9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...................................................................14, 19

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .......................................................................20

*Mulquin v. Nektar Therapeutics*,
   510 F. Supp. 3d 854 (N.D. Cal. 2020) .................................................20, 21, 23

*In re Nimble Storage, Inc.*,
   2016 WL 7209826 (N.D. Cal. Dec. 9, 2016) ...................................................12

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ............................................................................5

*Paciga v. Invuity Inc.*,
   2019 WL 3779694 (N.D. Cal. Aug. 12, 2019) .................................................16

*Percoco v. Deckers Outdoor Corp.*,
   2013 WL 3584370 (D. Del. July 8, 2013) .......................................................18

*In re Pixar Sec. Litig.*,
   450 F. Supp. 2d 1096 (N.D. Cal. 2006) ..........................................................19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...................................................................12, 14, 16

*In re Progenity, Inc. Sec. Litig.*,
   2021 WL 3929708 (S.D. Cal. Sept. 1, 2021)...................................................10

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ..........................................................................5

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ............................................................................5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

iii

DEFS.' MOT. TO DISMISS SAC
3:21-CV-03450-RS

1

2
*Rok v. Identiv, Inc.*,
   2017 WL 35496 (N.D. Cal. Jan. 4, 2017) .................................................................19

3
*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ....................................................................................19

4

5
*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................................12

6
*Veal v. Lendingclub Corp.*,
   2020 WL 3128909 (N.D. Cal. June 12, 2020) ....................................................16, 19

7

8
*Weston Family P'ship v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) .....................................................................................12

9
*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ..........................................................................7, 21, 22

10

11
*In re Yahoo! Inc. Sec. Litig.*,
   2012 WL 3282819 (N.D. Cal. Aug. 10, 2012) .........................................................11

12

13
*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ..................................................................................8, 9

14

15
**REGULATIONS**

16
17 C.F.R. § 242.200 ..........................................................................................................4

17
18
19
20
21
22
23
24
25
26
27
28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3          Plaintiffs' few "new" allegations in the SAC do not overcome the specific failings noted

4   by the Court in its order granting Defendants' motion to dismiss Plaintiffs' Amended Complaint.

5   *See* July 5, 2022, Order Granting Motions to Dismiss (Dkt. No. 131, "Order"). Plaintiffs' claims

6   should again be dismissed for the same reasons outlined in that  Order: Plaintiffs still have not

7   plead with particularity that any Defendant made any statement that was false or misleading when

8   made, much less did so with the intent to deceive. On top of that, Plaintiffs have not pled any

9   corrective disclosure that revealed the "truth" of some previously undisclosed fraud. Defendants

10  now seek dismissal of the SAC with prejudice.

11         Plaintiffs challenge four categories of alleged misstatements, each of which was addressed

12  and rejected in the Court's prior Order:

13         **Download Rates.** As they did in the Amended Complaint, Plaintiffs claim that Skillz's

14  statements about *overall* revenue growth for games (including games that are no longer the most

15  downloaded) were somehow revealed to be misleading by a biased short seller's report about

16  download rates for *three* Skillz games. But the Court already recognized that the short seller's

17  allegations say nothing about how much revenue those three games (much less all games) were

18  generating as users continued to play them after the initial download. Order at 8-9. Plaintiffs' only

19  new challenge is to Skillz's warning to investors that *if* games become "less popular" and *if*

20  "suitable replacements" are not found, Skillz's business "could suffer"—an unexceptional

21  observation that Plaintiffs have not pled to be misleading or delivered with the intent to deceive.

22         **Revenue Metrics.** This challenge is nearly identical to the Amended Complaint: Plaintiffs

23  argue that certain revenue submetrics should have been disclosed sooner, but they still do not claim

24  any of the revenue figures that were disclosed were inaccurate or explain how the failure to slice

25  and dice revenue in different ways rendered Skillz's otherwise accurate revenue statements

26  materially false or misleading. As the Court previously held, Defendants are not required to

27  disclose all possible submetrics, so Plaintiffs cannot state a claim on this basis. *Id.* at 10. Plaintiffs'

28  addition of hearsay from an insufficiently specified "Confidential Witness" about what they

allegedly overheard from another unidentified person at the Company does not change the result.

**Synchronous Play.** In the Amended Complaint, Plaintiffs alleged that Skillz falsely claimed to offer synchronous gameplay. Plaintiffs now *admit* that synchronous games were offered on the Skillz platform, but pivot to a vague complaint about the perceived quality of the games, complaining that the games available through Skillz were not the same as those offered by "large game studios." But Skillz never said they were the same, and Plaintiffs offer no facts indicating that the statements Skillz actually made were false or misleading, much less made with scienter.

**User Engagement.** Despite the Order dismissing statements of "sticky" user engagement as puffery (Order at 9), Plaintiffs again challenge the same statements—but this time based on slightly different but equally amorphous claims about user incentives such as Bonus Cash. But Skillz consistently explained how incentive programs worked and accounted for those incentives in its financial statements. The SAC is devoid of any facts indicating that Skillz's statements about user engagement were false, misleading, or made with an intent to defraud.

On top of the persistent deficiencies in pleading falsity and scienter, none of the four categories of alleged statements can support a claim for an additional reason that the Court noted in its prior order: Plaintiffs have not pled (and cannot plead) loss causation. *See id.* at 11-12. Plaintiffs' main purported "corrective disclosures" are two reports from financially interested short sellers. Courts routinely find that such reports cannot serve as the basis for a properly pled claim of loss causation, given their drafters' obvious interest in favor of causing a price decline. In any event, none of Plaintiffs' corrective disclosures actually reveals new, improperly withheld information to the market that contradicts or corrects any challenged statement. In fact, Skillz's stock price either *increased* or rapidly rebounded after nearly all of the alleged corrective disclosures, belying any contention that they revealed some fraud.

Put simply, nothing in Plaintiffs' SAC improves upon the allegations this Court dismissed in the Amended Complaint. The SAC should be dismissed with prejudice.

## II.   BACKGROUND

### A.    The Defendants

Founded in 2012, Skillz's mission is to make electronic sports accessible to everyone via

a "mobile gaming platform that allows individuals to play video games in contests against each other, using their smartphone or tablet." SAC ¶¶ 2, 25. On December 16, 2020, Skillz went public by merging with Flying Eagle Acquisition Corporation (the "Merger"). *Id.* ¶ 18.

Skillz produces a Software Development Kit that third-party developers can use to integrate their games with Skillz's platform. *Id.* ¶ 26. Users then download the games integrated with Skillz's platform for free. *Id.* Users can either play "practice" contests for free, or "paid" contests where they wager money for a chance to win cash and other prizes by competing against other users. *Id.* ¶ 28. Skillz offers user incentives, including "Bonus Cash," to incentivize users to convert into paying-users and to attract new users to games on the Skillz platform. *Id.* ¶ 31.

Skillz currently generates revenue by collecting a percentage of the total entry fees deposited in paid contests. *Id.* ¶ 32. In the future, Skillz anticipates that it will introduce advertising and other offerings so that it can monetize all users, not just those who enter paid competitions. Ex. A (10/13/2020 SEC Correspondence) at 9.

The individual defendants are current and former Skillz executives. SAC ¶¶ 20-23. Andrew Paradise is Skillz's co-founder and Chief Executive Officer. *Id.* ¶ 20. Casey Chafkin is its co-founder and Chief Revenue Officer. *Id.* ¶ 21. Scott Henry was Chief Financial Officer during the purported Class Period. *Id.* ¶ 22. Miriam Aguirre was Chief Technology Officer. *Id.* ¶ 23.

### B.    The Short Reports

On March 8, 2021, short seller Wolfpack Research published a report questioning Skillz's projections of future revenue. *See* Ex. B (the "Wolfpack Report") at 1.[1] The Wolfpack Report claimed that unspecified third-party data showed download rates for three games developed on the Skillz platform were slowing at certain points in time. SAC ¶ 54; Ex. B (Wolfpack Report) at 1. The Wolfpack Report also alleged that Skillz's platform cannot "adequately handle" synchronous play and matchmaking for "large studios." SAC ¶ 91; Ex. B (Wolfpack Report) at 10.

On April 19, 2021, short seller Eagle Eye Research published an anonymous report claiming that Skillz was recognizing revenue from incentives it had given players to participate in games developed on the Skillz platform. SAC ¶ 105; Ex. C (the "Eagle Eye Report") at 1.

---

[1] Plaintiffs erroneously allege the Wolfpack Report was published on March 8, 2020. SAC ¶ 53.

DEFS.' MOT. TO DISMISS SAC
3:21-CV-03450-RS

1    Both Wolfpack and Eagle Eye admitted to holding short positions in Skillz stock ***at the***

2    ***time of their reports***, meaning they had borrowed Skillz shares and sold them at market price,

3    betting that Skillz's stock price would decline so they could purchase replacement shares at a lower

4    price before they needed to return the borrowed shares. *See* 17 C.F.R. § 242.200 (defining "short

5    sale"); Ex. B (Wolfpack Report) at 1; Ex. C (Eagle Eye Report) at 1. In other words, both had an

6    incentive to cause Skillz's stock price to decline before they were due to cover their short sales.

7    On the day of the Wolfpack Report, Skillz's stock price declined by 10.9% from $27.45

8    the day prior to close at $24.45, SAC ¶ 93, but completely recovered just three days later, closing

9    at $27.78 on March 11, 2021. Ex. D (Yahoo! Finance). On the day of the Eagle Eye Report, Skillz's

10   stock price declined 6.61%, from $15.11 the day prior to $14.11, SAC ¶ 108, but more than

11   recovered just two days later to close at $16.76 on April 21, 2021. Ex. D (Yahoo! Finance).

12   ### C.    Skillz's Continued Growth

13   Despite the short reports' gloomy outlook, before and during the Class Period, Skillz

14   demonstrated strong growth in its revenues, user base, and paying user base. Ex. E (11/30/20 Form

15   S-4/A) at 170, 180; *see also* Ex. F (2020 Form 10-K) at 39; Ex. G (Q1 2021 Press Release); *see*

16   *also* SAC ¶¶ 38, 67, 127. Between 2019 and 2020, Skillz achieved 92% growth in revenue; a

17   62.5% increase in Monthly Active Users ("MAUs"), and 50% growth in paying MAUs. Ex. F

18   (2020 Form 10-K) at 27, 40, 43. In the first quarter after the Merger, Skillz achieved "record-

19   breaking" results, "21 consecutive months of revenue growth," and a "Paying to Playing MAU

20   ratio" that was eight times higher than the industry average. Ex. G (Q1 2021 Press Release).

21   ### D.    Procedural History

22   On October 8, 2021, Plaintiffs filed the Amended Complaint asserting claims under the

23   Exchange Act and the Securities Act of 1933 (the "Securities Act") against Defendants, as well as

24   members of the Skillz board of directors and the underwriters in Skillz's March 2021 secondary

25   public offering. Defendants moved to dismiss. *See* Dkt. Nos. 105, 108.

26   The Court dismissed Plaintiffs' Exchange Act claims for failure to plead that any

27   challenged statement was false when made or made with an intent to deceive or defraud investors.

28   Order at 8, 10-11. The Court also noted that Plaintiffs "will face challenges in establishing loss

1   causation due to their reliance on short seller reports." *Id.* at 11-12. After pressing Plaintiffs'

2   counsel at hearing on whether they could plead standing, the Court dismissed the Securities Act

3   claims for failure to plead standing or an actionable misstatement or omission. *Id.* at 13-15.

4        Plaintiffs filed the SAC on August 4, 2022. Plaintiffs did not attempt to replead their

5   Securities Act claims and dropped the Board and underwriter defendants, but they repeated a

6   subset of their prior Exchange Act allegations.

7   **III.   LEGAL STANDARD**

8        To state a claim under Section 10(b) of the Exchange Act, plaintiffs must plead, among

9   other things, a material misrepresentation or omission of fact, scienter, and loss causation. *See*

10  Order at 8; *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Claims must

11  meet the exacting pleading standards of Rule 9(b) and the PSLRA, which "appl[y] to all elements

12  of a securities fraud action." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th

13  Cir. 2014) *see also* Order at 8.

14  **IV.   ARGUMENT**

15       **A.   Plaintiffs Do Not Allege A Material Misrepresentation Or Omission**

16       Plaintiffs' falsity theories still suffer the same flaws the Court identified when it dismissed

17  the Amended Complaint. Plaintiffs repeat their challenges to Skillz's statements regarding (1)

18  growth rates in app downloads; (2) user-based revenue metrics; (3) synchronous game play; and

19  (4) user engagement. SAC ¶¶ 48-116. But Plaintiffs still do not explain what is false or misleading

20  about any of the challenged statements, much less allege particularized facts indicating that they

21  were false when made. This dooms their claims. *See Retail Wholesale & Dep't Store Union Local*

22  *338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017).

23       1.   <u>Skillz Did Not Misrepresent Download Rates</u>

24       Nearly all of Plaintiffs' challenges related to download rates were considered and rejected

25  in the Order, and their thin additions to the SAC fare no better. SAC ¶¶ 48-64.

26       *First*, Plaintiffs challenge Skillz's statements regarding overall revenue growth for games

27  (including for games that were previously top games), arguing they were false because initial

28  download rates for three games allegedly were slowing. SAC ¶ 50. The Court unequivocally

dismissed the prior challenge to these same statements:

> The challenged statements indicate that Defendants revealed which game held the most downloads rotated over time, and implied that even games that were no longer the most popular were still gaining downloads…. **This is not inconsistent with the "revelation" that the top three games were decreasing in download rates**: in the face of a decrease, the title is still gaining downloads. Indeed, it could mean that a title continues to grow at a substantial rate if its original download rate was especially high.

Order at 8-9 (emphasis added). Plaintiffs' allegations in the SAC are directly recycled from the Amended Complaint and fail for the same reasons.

Plaintiffs try to put a new spin on their challenge to the statements about game revenue by including a new graphic they created to depict supposedly sharply declining download rates in the second half of 2020. SAC ¶ 55. But Plaintiffs' graphic is misleading: to create the image they include in the SAC, Plaintiffs took a graph from the Wolfpack Report but omitted the substantial increase in downloads that occurred in the third quarter 2020.[2] When the full data is included, it undermines Plaintiffs' claims. In any event, even if it were accurate, the image Plaintiffs created would not change the core point in the Court's reasoning—Skillz could still have substantial revenue growth and even significant continued growth of new users even if download *rates* decreased, as total downloads continued to increase (and, in any event, Skillz's revenue comes from users continuing to play the games long after the initial free download). *See* Order at 8-9.

*Second*, Plaintiffs claim that investors were somehow misled into thinking that increasing user downloads meant increased paying users. SAC ¶ 50. Specifically, Plaintiffs challenge Skillz's statements that (1) its business depends on "maintaining a successful platform for third-party developed games that users *will download* and pay cash entry fees to compete for cash with other users," and (2) paying-monthly active users ("paying-MAU") is "a function of both the number of new installs or downloads" as well as convincing users to compete in paid contests. *Id.* ¶¶ 48-49.

---

[2] The chart also should be disregarded because its source is entirely unknown: the Wolfpack Report cites to the Company's S-4 and unspecified "Third party app data" as sources for slowing download rates. Ex. B (Wolfpack Report) at 3, 6. But the S-4 does not mention user downloads of any games. *See* Ex. H (11/17/20 Form S-4/A) at 57. The Wolfpack Report does not specify what "Third party app data" it is using. Ex. B (Wolfpack Report) at 3, 6. Courts routinely disregard data like this—for which the basis, provenance, and reliability is unknown—as insufficient to plead falsity. *See, e.g.*, *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 804 (S.D.N.Y. 2020); *Applestein v. Medivation, Inc.*, 2011 WL 3651149, at *6 n.3 (N.D. Cal. Aug. 18, 2011).

1    That challenge also fails. Skillz did not equate downloads to paying users and instead stated that

2    *both* (downloads *and* paying-users) were necessary for growth. In the Merger proxy, Skillz told

3    investors that its business "depends on maintaining a successful platform for third-party developed

4    games that end-users will download and pay entry fees to compete for cash or other prizes of real

5    world value with other end-users." Ex. E (11/30/20 S-4/A) at 57; SAC ¶ 48. Skillz also stated that

6    paying-MAU was a function of ***both*** new downloads ***and*** convincing users to enter into paid

7    contests. SAC ¶ 49. Plaintiffs' allegations are insufficient to plead falsity. *See, e.g.*, *Hong v.*

8    *Extreme Networks*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017) (rejecting falsity

9    allegations where "the reasons Plaintiffs offer[ed] as to why the statements [we]re false or

10   misleading b[o]re no connection to the substance of the statements themselves"); *See Wochos v.*

11   *Tesla, Inc.*, 985 F.3d 1180, 1193 (9th Cir. 2021) (affirming dismissal where "the complaint does

12   not plead any facts to establish that [the] representation was false").

13      *Third*, Plaintiffs again challenge Skillz's statement that, as of September 2020, "paying

14   users" have "10 Skillz games installed" compared to "3 games installed in 2015." SAC ¶ 51;

15   Amended Complaint ¶¶ 82, 109. Puzzlingly, Plaintiffs now allege this statement was misleading

16   because it omitted "whether any of these paying users actually paid to play any of those games."

17   *Id* ¶ 51. But the very quote Plaintiffs challenge is speaking about ***paying users***, which Plaintiffs

18   themselves define as being "comprised solely of players who paid entry fees to compete for cash

19   with other users." SAC ¶ 37.

20      *Finally*, Plaintiffs now challenge Skillz's warning that if certain games become "less

21   popular… and we are unable to identify and market suitable replacements, our business and

22   prospects could suffer." SAC ¶ 58. Plaintiffs claim this disclosure was misleading because three

23   games were already "less popular." *Id.* But Plaintiffs again cherry-pick their quote. Skillz warned

24   that if games are removed from the platform or become less popular in terms of "*revenue*" and

25   replacements are not found, the business could suffer. Ex. H (11/17/20 Form S-4/A) at 15. That

26   has nothing to do with downloads, but rather concerns revenues that only come *after* download.[3]

27

28   _____
     [3] For all the reasons above, nothing that Plaintiffs' CW allegedly says creates a claim, but in any event, it lacks sufficient basis to support proper allegations of fact. The CW is still not described

1   And, in fact, revenue from the top-three games Plaintiffs mention *increased* from 2019 to 2020.

2   *Id.*; Ex. I (3/16/21 Form S-1/A) at 12.

3                    2.   <u>Skillz Presented Its Financial Results Appropriately</u>

4          Plaintiffs once again argue that Skillz's disclosures of revenues for the nine months ended

5   September 30, 2020, were misleading because they attributed revenue increases to an "increase in

6   MAUs, driven by sales and marketing investment to acquire new paying users," and because they

7   did not disclose Plaintiffs' preferred metric of average revenues per paying user ("ARPPU"). SAC

8   ¶¶ 65-67. According to Plaintiffs, attributing revenues to user increases was misleading because

9   only paying-users generate revenue, and not disclosing ARPPU—which purportedly declined

10  slightly over two quarters in 2020—misled investors as to Skillz's financial state. *See* SAC ¶ 70.

11  But, again, the Court has already considered and dismissed these very allegations. The Court held:

12          Defendants were not required to disclose all possible metrics…. Plaintiffs
            have not adequately alleged that the failure to report certain metrics, or a
13          switch in what metrics were reported, rise to the level of falsity.

14                              *        *        *

15          Further, the statements Plaintiffs cite in which Defendants tout the
            importance of an increase in MAUs include in the same sentence a focus on
16          developing new paid users.

17  Order at 10 & n.5. Plaintiffs add nothing to the SAC that should change the Court's prior

18  conclusion. For the same reasons described in detail in Defendants' prior motion to dismiss

19  briefing, Dkt. No. 105 at 13-17, the challenge to Skillz's revenue disclosures should again fail.

20          The little that Plaintiffs do add to the allegations the Court already dismissed does not

21  render any challenged statement false or misleading. *First*, Plaintiffs try to repackage their theory

22  as an alleged failure to disclose a material adverse trend, but Plaintiffs have not alleged the

23  existence of any adverse trend, much less one that a reasonable investor would have viewed as

24  _____

25  with "sufficient particularity to establish their reliability and personal knowledge." *Zucco*
    *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009) (disregarding
26  insufficiently particular CW allegations). Plaintiffs do not improve on their CW allegations in the
    SAC, continuing only to allege that the CW held an undefined "management role" in the "Revenue
27  Department" and participated in undated "meetings and events" with Defendants Paradise and
    Chafkin. SAC ¶ 40. The CW apparently only worked at the Company for a few months and left in
28  March 2021. *Id.*; *Zucco*, 552 F.3d at 996. In any event, the CW's allegations do not undermine any
    of Plaintiffs' challenged statements.

1  "significantly alter[ing] the 'total mix' of information made available," as required to state a

2  securities claim.[4] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (citation omitted);

3  *see also Hessong v. Pinterest, Inc.*, 2021 WL 4339193, at *7 (N.D. Cal. Sept. 23, 2021) (dismissing

4  securities fraud action where plaintiff alleged "no facts... supporting the existence of negative

5  'trends'" in domestic MAUs or ARPU at the time challenged statements were made). While

6  Plaintiffs allege ARPPU was declining for two quarters in 2020, Plaintiffs do not show that two

7  quarters is a "trend," nor any material adverse impact on Skillz's business given Skillz was meeting

8  and raised its revenue guidance during the Class Period. *See* Ex. G (Q1 2021 Press Release).

9      *Second*, Plaintiffs' new reference to third-hand hearsay from an unnamed "director of

10  financial planning and analysis" ("DFPA") adds nothing and does not establish any adverse trend.

11  *See* SAC ¶¶ 42-44, 79. The SAC alleges that the unidentified DFPA "explained" to the CW from

12  the Amended Complaint that the Company was focusing on building MAU in late 2020 because

13  it allegedly was a "measure that Wall Street will look at closely." *Id.* ¶ 43. Plaintiffs claim that the

14  CW "understood" from the DFPA that the quality of the "installs" did not matter. *Id.* ¶ 44. Those

15  allegations on their face do not have any bearing on whether or not there was a material adverse

16  trend related to ARPPU. In any event, Plaintiffs do not allege any facts that would lend credibility

17  to the CW's late-breaking supposed conversations with the mysterious DFPA. Plaintiffs do not

18  allege *when* the conversation occurred, *where*, or *why* the CW—who allegedly worked in the

19  Revenue Department—would be concerned with a drive to generate more users.[5] *See Zucco*, 552

20  F.3d at 995-96; *see also Long Miao*, 442 F. Supp. 3d at 798-800 (discussing contexts in which

21  courts are "loathe... to sustain as sufficiently particular securities fraud complaints based on

22  uncorroborated statements by CWs" including statements that "cannot situate in time relevant

23  occurrences"). And courts are especially skeptical of uncorroborated allegations from unidentified

24  sources "who are sourced secondhand—with whom plaintiffs' counsel have not themselves

25  interacted." *Long Miao*, 442 F. Supp. 3d at 800. In any event, Plaintiffs' allegations do not render

26  ---

    [4] ARPPU may have declined in certain portions of 2020, but it increased in the first quarter of
27  2021, negating any alleged trend. *See* Ex. J (Q1 2021 Shareholder Letter).

    [5] Even assuming the CW's involvement in a drive to increase MAUs, this would contradict
28  Plaintiffs' other argument discussed above that MAUs did not play any role in Skillz's revenue
    planning. *See supra* Section IV.A.1.

Skillz's financial statements misleading. They confirm that in 2020, the Company and the market were focused on building Skillz's user base generally. *See* SAC ¶ 43; Ex. H (11/17/20 Form S-4/A at 168) ("We plan to monetize [our non-paying users] through non-intrusive, low friction advertisements, virtual goods or brand sponsored prizes").

*Third*, the SAC also adds a challenge to Skillz's disclosure that "third-party developers and investors rely on our key metrics as a representation of our performance…. [I]f advertisers, platform partners or investors do not perceive end-user metrics to be accurate representations of the end-user base or end-user engagement, our reputation may be harmed" as misleading because Skillz did not disclose ARPPU. SAC ¶ 77. This argument fails for the same reasons described above, including because Skillz is not required to disclose Plaintiffs' preferred submetrics. *See supra* Section IV.A.2. Moreover, Plaintiffs omit two key parts of the risk disclosure: just before Plaintiffs' quoted language, Skillz disclosed that "there are inherent challenges in measuring usage and user engagement across the end-user base," and in the same paragraph as Plaintiffs' quoted language, Skillz disclosed that "[w]e regularly review and may adjust our processes for calculating our internal metrics." Ex. H (11/17/20 Form S-4/A) at 72. In light of these disclosures, plus the fact that Skillz disclosed the total number of users, the percentage of those users who were paying-users, and average revenues per user, Plaintiffs cannot plausibly argue that a reasonable investor reviewing Skillz's public filings in their "entirety" would have been "misled about the nature of their investment" because a single additional submetric (ARPPU) was not also disclosed. *In re Progenity, Inc. Sec. Litig.*, 2021 WL 3929708, at *8 (S.D. Cal. Sept. 1, 2021).

### 3. Skillz Did Not Misstate Its Synchronous Play Capabilities

Plaintiffs continue to challenge Skillz's statements regarding its enablement of synchronous gameplay. SAC ¶¶ 84-97. Once again, the Court dismissed this very challenge:

> The challenged statement therefore concerns capability, not availability. As a reasonable investor would know Skillz is not a game developer and that a statement about what is enabled on the platform is not the equivalent to what games are made available using the platform, there is an inadequate showing that a reasonable investor would have been misled.

Order at 10. Moreover, a reasonable investor would also be able to determine that synchronous gameplay was "enabled" given that the games on the Skillz platform—including synchronous games—are publicly available information. Plaintiffs' repeat challenge should again be dismissed.

In light of the Court's ruling, Plaintiffs simply make up an entirely new theory about why the statements were misleading, but the new theory is even more deficient than the original claim. Specifically, Plaintiffs now *admit*—in direct contradiction of the essence of their original claim— that Skillz *did* and *does* enable third-party app developers to create synchronous games on the Skillz platform. *See* SAC ¶ 91. Plaintiffs now claim, though, the quality of the games is not good because they are "simple" and "produced by small game studios." *Id.* ¶ 87. But the statements Plaintiffs challenge say nothing about the quality of synchronous games developed by third parties. And, once again, the nature and quality of the games available on the platform was, at any given time, public and readily available to anyone who cared to look.

Even putting that aside, the challenged statements are not actionable. The statements in Paragraphs 84 and 85 are not actionable as they were made outside of the putative Class Period. *See In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *13 n.5 (N.D. Cal. Aug. 10, 2012). And each of the statements is also nonactionable puffery:

- "Skillz is making fair competition accessible for everyone, everywhere.... [including features] ranging from head-to-head tournaments, to multi-hundred-thousand-player week-long leagues, and exciting live events." *Id.* ¶ 84.

- Synchronous gameplay "creates strong social immediacy and reciprocity, which in turn builds player retention," "works well in games with engaging and immersive design elements," and "integrates successfully with games maintaining a large existing player base that is heavily motivated by competition and social play." *Id.* ¶ 85.

- "We offer a wide range of contests for the users. We enable game genres that can be played: (i) asynchronously, (ii) turn-based synchronously, or (iii) synchronously." *Id.* ¶¶ 88-89.

- "We're expanding the reach of the platform to enable new gaming genres ranging from real-time strategy, to fighting, to racing, to first-person shooters. These are incredibly popular genres, and Skillz is uniquely positioned to deliver the same fidelity, trust, and reliability that have been hallmarks of our platform since inception. Synchronous content will deliver even higher player engagement than we've seen before and will further expand our universe of players, and more importantly, perhaps, payers." *Id.* ¶ 90.

1   Statements describing "exciting" events, "strong social immediacy," and gameplay that "works

2   well" with "engaging and immersive design elements" are precisely the sort of "feel-good

3   monikers" courts hold to be nonactionable. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical*,

4   *Inc.,* 759 F.3d 1051, 1060 (9th Cir. 2014); *In re Nimble Storage, Inc.*, 2016 WL 7209826, at *10

5   n.16 (N.D. Cal. Dec. 9, 2016) (statements concerning "growing... base" and "vibrant" demand

6   inactionably vague); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141-42 (N.D. Cal. 2017)

7   (statements that company was making "algorithms better and driving continuous improvements in

8   engagement" are non-actionable puffery).

9               4.    Skillz Did Not Misrepresent Its User Engagement

10      Lastly, Plaintiffs renew their challenge to Skillz's statements about "user engagement,"

11   including it being described as "extraordinary," and that "more content" and user matching lead to

12   "stronger engagement," which creates a "stickier, more engaging, and more continuously

13   improving experience for our players." SAC ¶ 99. Once again, the Court has already considered

14   these claims and rejected them:

15              Next, as for alleged misstatements about userbase engagement or growth,
                statements such as touting a "stickier, more engaging, and continuously
16              improving" user experience and a "vibrant and growing ecosystem" are
                non-actionable puffery.
17

18   Order at 9.

19      Plaintiffs do nothing substantive to address the Court's reasoning, but merely repackage

20   the argument, now asserting that the same statements were misleading because user engagement

21   was not "driven" by "superior matchmaking ability" or the number of games on Skillz's

22   platform, but by "aggressive and uneconomic spending on paid user incentives." SAC ¶ 100.

23      This claim fails because there is no connection between the statements and the alleged

24   falsity. Skillz stated that its platform, generally, has proven "engaging and sticky." *Id.* ¶ 99. And

25   it separately discussed its improving matchmaking abilities and how that contributes to "stronger

26   engagement." *Id.* Plaintiffs do not allege that these statements were false. *Weston Family P'ship

27   v. Twitter, Inc.*, 29 F.4th 611, 621-22 (9th Cir. 2022) (rejecting inference when context "makes

28   clear" document did not say what Plaintiffs attempt to infer). Skillz did not say matchmaking and

number of games were the *only* contributors to user engagement, *see* SAC ¶ 99, and Plaintiffs do not otherwise explain how user engagement and matchmaking relate to user incentive programs. *See Hessong*, 2021 WL 4339193, at *6 (rejecting falsity allegations where "there are no facts alleged showing why the lukewarm and generalized growth statements about users" could be false concerning unrelated "growth rate or ARPU").

Even putting this aside, Skillz consistently disclosed the specifics of its user incentive programs, how they worked, and how they factored into revenue. In the very documents Plaintiffs cite, Skillz included robust descriptions of its "End-User Incentive Programs," including "Bonus Cash, which is targeted to "specific end-users, typically those who deposit more frequently or have not made a deposit recently." Ex. H (11/17/20 Form S-4/A) at 192. Skillz further described that it targets "groups of end-users differently, offering specific promotions it thinks will best stimulate engagement." *Id.* Skillz's financial statements also disclosed how user incentive programs are factored into revenues as a reduction in revenue or sales and marketing expense, including dollar amounts of the reductions in revenue and marketing expenses. *See, e.g.*, Ex. F (2020 Form 10-K), at 50, 62-63.

Plaintiffs also allege for the first time that Skillz misleadingly omitted non-cash revenue from its financial statements, which concealed some supposed risk of financial ruin. SAC ¶¶ 106-07 & n.64. But even a cursory review of Skillz's public filings exposes the flaws of Plaintiffs' arguments. Plaintiffs offer a hypothetical involving only two users whose entry fees were evenly split between cash deposits and Bonus Cash resulting in the winner receiving more cash than was deposited by the two users. *Id.* ¶ 107 n.64. But that hypothetical ignores reality. Skillz disclosed that user incentives only account for approximately 7% of user entry fees. Ex. F (2020 Form 10-K) at 40. And Skillz explained that Bonus Cash "***cannot be withdrawn and can only be used by end-users to enter paid entry fee contests***." *Id.* at 41 (emphasis added). Skillz also disclosed the underlying figures Plaintiffs claim were omitted—both the average amount of revenue generated by MAUs (e.g., $6.93 for the nine months ended September 30, 2020), as well as the average monthly cost of end-user incentives (e.g., $2.87 for the same period). *See* Ex. H (11/17/20 Form S-4/A) at 181.

1   Plaintiffs' desire for another submetric of revenue—non-cash revenue or net cash deposits,

2   SAC ¶¶ 110-11—fails for precisely the same reasons as described above with regarding to ARPPU.

3   *See* Section IV.A.2. Plaintiffs have not adequately alleged any independent requirement for Skillz

4   to disclose net cash deposits as a line item in its financial statements. And, in any event, Skillz

5   disclosed top-line revenue and costs of revenue, as well as the reductions in revenue or sales and

6   marketing expenses that it incurred through user-incentive programs. Ex. F (2020 Form 10-K) at

7   43, 50. Investors were provided a wealth of unequivocal information, including dollar amounts,

8   for Skillz's revenues and user-incentive programs. And as Mr. Paradise noted, net cash deposits is

9   just another way of "potentially looking at our gross profits," SAC ¶ 112, but investors could

10  calculate gross profits from the revenue and cost line-items that Skillz disclosed in accordance

11  with GAAP. Plaintiffs' desire for some additional minutia is insufficient to state a securities fraud

12  claim. The securities laws do not "require a rule of completeness" and Plaintiffs have not alleged

13  that Skillz's fulsome financial statements gave an "impression of a state of affairs that differ[ed]

14  in a material way from the one that actually exists."[6] *Intuitive Surgical*, 759 F.3d at 1061; *In re*

15  *Dropbox, Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020) (concluding that factually

16  accurate annual report was not misleading where it did not include particular negative details).

17  **B.      Plaintiffs Do Not Adequately Plead Scienter**

18  "Even if Plaintiffs had adequately pled falsity"—they have not—"they would still have

19  scienter problems." Order at 11. Plaintiffs' SAC again independently fails because they have not

20  established a "strong inference" of a "mental state embracing intent to deceive, manipulate, or

21  defraud." *Id.*; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir.

22  2008). To survive a motion to dismiss, Plaintiffs' factual allegations of scienter must be "more

23  than merely plausible or reasonable," and they must give rise to an inference of scienter that is "at

24

---

25  [6] Plaintiffs' reference to a statement nearly a year after the end of the putative Class Period about
    the Company's goal of a more profitable 2022 has no bearing on whether Skillz's statement
26  regarding user engagement and user incentives were false or misleading *when made*. SAC ¶ 115;
    *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (rejecting
27  falsity argument where plaintiffs alleged challenged statements were "undermined by subsequent
    events"); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 209 (E.D.
28  Pa. 2021) (rejecting falsity argument that the challenged statement "must have been misleading at
    the time it was made" because "liability cannot be imposed on the basis of subsequent events").

least as compelling as any opposing inference of nonfraudulent intent." *Metzler*, 540 F.3d at 1066. This requires facts strongly implying a defendant's "contemporaneous knowledge that [a] statement was false when made." *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *9 (N.D. Cal. Mar. 29, 2013). Plaintiffs' scienter allegations in the SAC are virtually identical to those the Court dismissed in the Amended Complaint, and they should be dismissed once again.

To be clear, Plaintiffs still do not assert—much less allege particularized facts—that any speaker made any challenged statement knowing that it was false or otherwise unsupported. Instead, they return to their litany of half-baked assertions that, whether considered individually or together, continue to remain far less compelling than the inference that Defendants did not believe they were misleading the market. *See In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021) (granting dismissal on scienter grounds where independently insufficient scienter allegations remained insufficient when considered collectively, *i.e.*, "zero plus zero (plus zero plus zero plus zero) cannot equal one") (citation omitted).

**Revenue Submetrics**. The only addition Plaintiffs make to their scienter allegations is to reiterate their claims that Skillz misled investors by disclosing GAAP revenue metrics rather than Plaintiffs' desired financial submetric of "net cash deposits." SAC ¶¶ 151-57. That claim fails for the reasons explained above. *See* Section IV.A.4. In any event, Plaintiffs use buzz words like "knowing" and "intentional," but they do not allege any facts that any Defendant intended to deceive investors by not disclosing net cash deposits. That is plainly insufficient to allege scienter. *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1046 (N.D. Cal. 2009) ("Conclusory allegations that a defendant 'must have known' about particular wrongdoing are, standing alone, generally insufficient."); *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005) ("allegations of violations of GAAP or SEC regulations do not establish scienter").

Plaintiffs' remaining scienter allegations are essentially copy-and-pasted from the Amended Complaint. The Court's Order therefore applies with equal force to the SAC.

**Access to Unspecified Information**. Plaintiffs repeat that Defendants had access to "material non-public information" that "reflect[ed] the true facts regarding Skillz" due to their

1    "positions" at Skillz. SAC ¶¶ 117-18. But Plaintiffs still do not specify what information was

2    received, when, by whom and from whom, or how it bears on any of the challenged statements, as

3    they must to plead scienter with particularity. *See, e.g.*, *Veal v. Lendingclub Corp.*, 2020 WL

4    3128909, at *14 (N.D. Cal. June 12, 2020). At most, Plaintiffs copy verbatim their prior reference

5    to the CW's assertion that certain metrics were "*available* to Skillz management through the

6    Tableau Dashboard." SAC ¶ 120 (emphasis added). Mere access to hypothetical information is not

7    enough, and Plaintiffs do not allege that any Defendant ever accessed the Tableau Dashboard much

8    less concluded it undermined Skillz's public statements. *See Intuitive Surgical*, 759 F.3d at 1063

9    ("Mere access to reports... is insufficient to establish a strong inference of scienter.").

10    **"Contradictory" Statements**. Plaintiffs also repeat their prior allegation that Defendants

11    made contradictory statements supposedly "conced[ing] the falsity" of certain challenged

12    statements and therefore "indicative of their scienter." SAC ¶¶ 122-47. But none of the cited

13    statements are actually contradictory, much less do they demonstrate that any challenged statement

14    was knowingly false when made. *See, e.g.*, *Paciga v. Invuity Inc.*, 2019 WL 3779694, at *6 (N.D.

15    Cal. Aug. 12, 2019) (requiring plaintiffs to allege particularized information known by defendants

16    that contradicted their statements at the time they were made).

17    *First*, Plaintiffs argue that statements that the Company "enable[s] game genres that can be

18    played... synchronously" and was "expanding the reach of the platform to enable new games" were

19    contradicted by a later statement that developers were "actively testing synchronous content on

20    our platform." *See* SAC ¶ 123; Ex. J (Q1 2021 Shareholder Letter) at 1. The Court dismissed this

21    very allegation holding:

22    [e]ven if the statements would have been interpreted by a reasonable
      investor to mean that synchronous gameplay was available, the statements
23    are indeed subject to a contrary interpretation: that Skillz merely offers the
      feature, not that any games are actively employing the feature in fully-tested
24    games. At worst, the statements appear to be poorly worded explanations of
      what games Skillz offered, rather than a statement made with a mental state
25    embracing intent to deceive, manipulate, or defraud.

26    Order at 11 (quotation marks and citation omitted).

27    Plaintiffs' repetition of the same allegations in the SAC is even weaker as Plaintiffs now

28    *admit* that Skillz *did enable* synchronous game play. *See* SAC ¶ 91. Third-party developers' testing

of synchronous games on Skillz's platform *confirms* the accuracy of the Company's statements. Developers could not test synchronous games if that feature was not enabled, and developers testing games is squarely in line with Skillz's statement regarding expanding the platform to enable new games. The Court's prior dismissal of these very allegations—even without Plaintiffs' admission that synchronous gameplay was available—applies with even greater force here.

*Second*, Plaintiffs repackage their prior allegations that Skillz contradicted its financial metrics to now claim Skillz reported certain metrics to "assuage analysts." SAC ¶¶ 126-47. But Plaintiffs are just rehashing their deficient falsity allegations. For example, Plaintiffs continue to peddle the unreasonable allegation that Skillz attributed revenue growth to MAUs, rather than paying-MAU, even though the Court previously dismissed that argument as the same sentence includes a "focus on developing new paid users." Order at 10 n.5; SAC ¶ 127. That Mr. Chafkin later noted that some investors may have been confused by MAU reporting does not mean, as Plaintiffs' claim, that an investor could have been misled as to the source of Skillz's revenues.[7] And Plaintiffs' argument that Skillz omitted the "more relevant key metric" of paying-MAU ignores that Skillz *publicly disclosed* that very metric before the Merger. *See* Ex. A (10/13/20 SEC Corresp.) at 9. Particularly given Skillz's consistent disclosure that only paying users generate revenues, Plaintiffs' allegations do not raise a reasonable inference of scienter.

Moreover, the fact that Skillz later disclosed additional submetrics of revenue does not have any bearing on Defendants supposed intent at the time of the challenged statements. Plaintiffs repeat their inadequate reliance on the unnamed DFPA, whose supposed allegations are both untethered in time and third-hand hearsay through the CW. SAC ¶ 132; *see also supra* Section IV.A.2. But Plaintiffs offer no "contemporaneous facts that would establish a contradiction

---

[7] Plaintiffs also include a passing reference to investors being led to believe the Company was focused on increasing the gross number of users on the platform. SAC ¶ 130. This is similarly unavailing. The Company disclosed that paying-users alone generate revenue. *See* Ex. H (11/17/20 Form S-4/A) at 182; SAC ¶ 45. It also disclosed that it had a future goal of monetizing *all* users. Ex. A (10/13/20 SEC Corresp.) at 9; SAC ¶ 136. That the Company later noted that "*for now*, we're focused on growing our Paying MAU," SAC ¶ 138 (emphasis added), does not contradict that the Company also wanted to monetize all users, nor does it contradict that to grow paying-MAU, Skillz had to also grow MAU. And in any event, given that Skillz disclosed that the percentage of overall users that are paying-users stays relatively constant, a greater number of MAUs would necessarily mean a greater number of paying-users.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SILICON VALLEY

DEFS.' MOT. TO DISMISS SAC
3:21-CV-03450-RS

between the alleged materially misleading statements and reality." *In re Cloudera, Inc. Sec. Litig.*, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021).

**"Refusal" to Answer Question**. Plaintiffs next argue (again) that Mr. Paradise's scienter is apparent from his "refus[al]" to answer a question regarding "slowing" download rates for certain games. SAC ¶¶ 148-50. This is nearly verbatim from the Amended Complaint, and is simply a rehashing of Plaintiffs' falsity arguments. In any event, Mr. Paradise answered the question: the analyst asked how perceived decreased download rates were "shaping the business," *id.* ¶ 149, and Mr. Paradise explained that the Company's "previous number on[e] titles, [] actually all continued to grow in [Gross Marketplace Volume (or, in other words, revenue)], even after being displaced from their position." *Id.* ¶ 63. That is not surprising: users normally only download an app once, but then continue to use it indefinitely, meaning that app downloads may decrease (so that the app may no longer be the most downloaded game on the platform) even as the app continues to grow in the total amount of entry fees paid by users (who have already downloaded the app) for that game's contests. *See* Ex. E (11/30/20 Form S-4/A) at 3. Again, Plaintiffs have not identified any fact that would render this exchange inaccurate, much less a strong inference of scienter. *See In re AnaptysBio, Inc.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021) (rejecting "evasive" answers to questions as basis for scienter).

**Core Operations**. Plaintiffs next carbon copy the exact same allegations from the Amended Complaint that because Skillz's platform is the "heart of its business," Defendants must have known they were supposedly misrepresenting Skillz's "key metrics." SAC ¶¶ 158-62. The Court dismissed that theory in the Amended Complaint, and Plaintiffs' failure to add *anything whatsoever* to their allegation requires the same result here. Order at 10-11.

As before, Plaintiffs still fail to meet the significant threshold for relying on a core operations theory to raise a compelling inference of scienter. *See Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *5 (D. Del. July 8, 2013) ("Only in rare instances can core operations alone allow inferences of scienter."). What is missing from Plaintiffs' pleading is how knowledge of Skillz's business metrics in general has any bearing on their claims. Plaintiffs allege Skillz Defendants had access to "every possible key metric," SAC ¶ 161, but do not explain how any of

those metrics undermined the challenged statements—especially when Plaintiffs do not dispute that nearly all of those metrics were positive, such as steadily increasing revenues or paying MAUs. Without tying any supposedly known metric to the falsity of a challenged statement, Plaintiffs' core operations theory fails. *See Manger v. LeapFrog Ents., Inc.*, 252 F. Supp. 3d 837, 847 (N.D. Cal. 2017) (rejecting core operations theory of scienter where what has been "missing from the beginning are facts that the [metrics purportedly known by defendants] meant that the [challenged] statements… were false or misleading"); *Veal*, 423 F. Supp. 3d at 816 (rejecting scienter claim based on knowledge of "day-to-day workings of the company's business" absent allegations of "specific information conveyed to management and related to the fraud").

**Stock Sales**. Plaintiffs also repeat their scienter allegations based on stock sales by three Defendants in Skillz's March 2021 underwritten secondary public offering, again through nearly verbatim allegations as were dismissed in the Amended Complaint. SAC ¶¶ 163-65; Order at 10-11. Plaintiffs still do not allege that any of those stock sales were "unusual" or "suspicious." *See In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104 (N.D. Cal. 2006). Indeed, the SAC still lacks any allegation of Defendants' stock sale history. Moreover, the three insiders sold no more than 13.49% of their Skillz holdings in the offering, SAC ¶ 165, and Plaintiffs do not allege that the other named Defendant (or any of the other insiders they abandoned their claims against) sold *any* shares. Sales of a small portion of holdings by only a few defendants has been rejected as a basis for inferring scienter. *See Metzler*, 540 F.3d at 1067 (noting that "[w]e typically require larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter" where one defendant made no sales and another 37% of his holdings); *see also Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (insider selling 17% of holdings insufficient to plead a compelling inference of scienter).[8]

## C.     Plaintiffs Do Not Adequately Plead Loss Causation

As the Court noted, Plaintiffs "face challenges in establishing loss causation due to their reliance on short seller reports." Order at 11. Nonetheless, Plaintiffs continue to rely almost

---

[8] Plaintiffs also cite certifications by Messrs. Paradise and Henry under the Sarbanes-Oxley Act ("SOX"). SAC ¶ 121. It is well-settled that SOX certifications do not support an inference of scienter. *See, e.g.*, *Rok v. Identiv, Inc.*, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4, 2017).

1   exclusively on the same unsubstantiated short-seller allegations as in the Amended Complaint that

2   do not reveal any previously undisclosed "truth." SAC ¶¶ 171-81. Even the non-short-seller

3   allegations Plaintiffs advance in support of their deficient loss causation theories do not show that

4   "the revelation of [the alleged] misrepresentation or omission was a substantial factor in causing a

5   decline in the security's price." *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 870 (N.D.

6   Cal. 2020). Plaintiffs have not advanced any specific facts demonstrating "that the defendant

7   revealed the truth through 'corrective disclosures' which caused the company's stock price to drop

8   and investors to lose money." *Id.*

9               1.      The Short Reports Are Not Corrective Disclosures

10          Plaintiffs' primary theory of loss causation fails at the threshold because it is based on self-

11  interested short reports that do not "reveal" any "truth" to the market. *See, e.g.*, SAC ¶¶ 173-74,

12  178-79. Beyond the fact that Courts routinely reject self-interested short seller reports as

13  "corrective disclosures,"[9] the short reports here did not "correct" anything.

14          **Wolfpack Report**. Plaintiffs again latch onto two negative assertions in the Wolfpack

15  Report: that download rates of certain games were allegedly slowing and that Skillz's platform

16  purportedly was not "robust enough" for unnamed "large studios" to develop synchronous games.

17  SAC ¶ 173. But according to Wolfpack itself, its "opinions" were based on information "obtained

18  from public sources"—meaning it was not revealing concealed information. Ex. B (Wolfpack

19  Report) at 15; *see also id.* at 2. This negative spin on public information is precisely what courts

20  reject as the basis of loss causation. *See Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013)

21  ("If every analyst or short-seller's opinion... could form the basis for a corrective disclosure, then

22  every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's

23  ─────────────────────

24  [9] *See Mulquin*, 510 F. Supp. 3d at 873  (rejecting loss causation theory based on report by short
    seller "who had a financial interest in driving [the company's] stock price down and who

25  disclaimed any representation, express or implied, as to the accuracy, timeliness, or completeness
    of any such information or with regard to the results obtained from its use"); *see also Grigsby v.*

26  *BofI Holding, Inc.*, 979 F.3d 1198, 1208 (9th Cir. 2020) (affirming dismissal where loss causation
    relied on short seller's analysis that "did not require any expertise or specialized skills beyond

27  what a typical market participant would possess" and "included the disclaimer that the author
    makes no representation as to the accuracy or completeness of the information"); *In re Intrexon,*

28  *Corp. Sec. Litig.*, 2017 WL 732952, at *7 (N.D. Cal. Feb. 24, 2017) (granting dismissal where loss
    causation was based on short report ).

1  negative analysis of public filings as a corrective disclosure. That cannot be—nor is it—the law.").

2       But more importantly, as noted above, none of the challenged statements has anything to

3  do with the three games whose download rates Wolfpack claimed were slowing, *see supra*

4  Section IV.A.1. Plaintiffs challenge statements related to games on the Skillz platform generally,

5  including a statement that unequivocally notes that previously most-downloaded games will be

6  displaced from that position—that is, their download rates will slow as users download the game

7  (given that they can only download it once).

8       And in an about-face from the Amended Complaint, Plaintiffs admit that Skillz supported

9  synchronous play. *See supra* Section IV.A.3; SAC ¶ 4. Again, Skillz did not talk about the type of

10 third-party developers that may choose to develop games on Skillz's platform, and Wolfpack's

11 unsubstantiated opinion that unnamed "large studios" were "unwilling" to develop certain games

12 on the platform does not "correct" any statement about synchronous gameplay being "enabled."

13      Finally, Plaintiffs attempt to avoid that Skillz's stock price quickly rebounded after the

14 Wolfpack Report was published. SAC ¶¶ 174-76; Ex. D (Yahoo! Finance); *see, e.g.*, *Wochos*, 985

15 F.3d at 1198 (holding that rebounds in stock price after supposed corrective disclosures "refute[]

16 the inference that the alleged concealment of this particular fact caused any material drop in the

17 stock price"). Ironically, Plaintiffs claim Skillz *beating analyst expectations* and a "high-profile"

18 investor investing in Skillz somehow reinforces the Wolfpack Report's opinions. SAC ¶ 175. If

19 anything, increasing revenues and high-profile investments confirm that the negative spin of an

20 author with an interest in causing Skillz's stock price to decrease was not a corrective disclosure.

21      **Eagle Eye Report**. Plaintiffs' reliance on the Eagle Eye Report published on Twitter is

22 even weaker. *Id.* ¶¶ 178-79. Like the Wolfpack Report, the Eagle Eye Report states it is based on

23 a review of Skillz's "publicly available financial information" and cites only to the Company's

24 public filings, Wikipedia, and public news articles related to the market in general or unrelated

25 companies. *See* Ex. C (Eagle Eye Report). And the Eagle Eye Report is admittedly "anonymous,"

26 which further diminishes its reliability. Ex. C (Eagle Eye Report) at 10; *Mulquin*, 510 F. Supp. 3d

27 at 872 (rejecting loss causation allegations based on report "published by an anonymous short

28 seller who had a financial interest in driving [the company's] stock price down") (internal quotes

omitted). In any event, all that the Eagle Eye Report does is take the very financial statements Skillz published and their disclosed accounting for user incentives to allege Skillz's revenue incorporated non-cash sources. Ex. C (Eagle Eye Report). But that does not "correct" anything. Repackaging public information in a negative way is not a corrective disclosure. *See Intrexon*, 2017 WL 732952, at *7.

Again, Plaintiffs try to avoid that Skillz's stock price quickly rebounded by pointing to the fact that investors were purchasing "large amounts" of Skillz stock. SAC ¶ 179; Ex. D (Yahoo! Finance). But independent investors buying Skillz stock despite Eagle Eye's negative spin on public financial filings confirms that Eagle Eye's unsupported opinions were not a "corrective disclosure" in the eyes of investors. *See, e.g.*, *Wochos*, 985 F.3d at 1198.

### 2. Plaintiffs' Remaining "Corrective Disclosure" Does Not Correct Any Challenged Statement

As with the Amended Complaint, as a fallback to their insufficient short-seller-based loss causation theories, Plaintiffs pivot to alleging Skillz's disclosure of quarterly financial results on May 4, 2021, revealed some previously concealed fraud about (1) the "relative significance of MAU and paying users to the Company's business model," and (2) that a "handful of developers" were "testing synchronous content." SAC ¶ 180. Neither of those supposed "revelations" corrects any challenged statement, much less does it "reveal" some previously undisclosed fact. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (affirming dismissal based on failure to allege that a "revelation of fraudulent activity" caused the stock price decline).

*First*, for the same reasons Plaintiffs' challenged statements regarding the source of Skillz's revenue are not false, Plaintiffs' allegation that the May 4, 2021 disclosure of quarterly financial results including Plaintiffs' preferred revenue submetrics does not reveal any undisclosed fraud. *See* Section IV.A.2. At most, Skillz took the opportunity after its first quarter as a public company to provide investors with additional information about its business. *See* SAC ¶¶ 81-83. Skillz continued to disclose the metrics it disclosed previously and just added more, none of which contradicted any prior disclosure. And Plaintiffs' claim that only in May 2021 did Skillz disclose the "relative significance of MAU and paying users to the Company's business model" is

disingenuous at best given that Skillz has consistently disclosed to investors that it only generates revenue from paying users. *See* Ex. H (11/17/20 Form S-4/A).

*Second*, Plaintiffs cannot cherry-pick a date where Skillz stock price declined and allege that decline—which occurred on the same day Skillz announced investors should not rely on its prior financial statements due to a financial restatement related to SPAC warrants—was the result of a disclosure that actually happened months before. Plaintiffs admit that Skillz disclosed all of Plaintiffs' preferred revenue submetrics in announcing annual financial results in early *March* 2021. *See* Ex. K (Q4 2020 Press Release) (disclosing MAU, ARPU, paying-MAU, and ARPPU); SAC ¶ 69 (admitting Defendants "began reporting ARPPU as a key metric in the Company's 2020 annual results"). The reason for Plaintiffs' convenient hindsight pleading is clear: Skillz's stock price *increased* by nearly 10% after those metrics were announced in March. *See* Ex. D (Yahoo! Finance). But Plaintiffs cannot manufacture a loss causation argument where the May 2021 earnings announcement did not reveal anything new to the market. *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *7 (C.D. Cal. Mar. 16, 2015).

*Third*, the disclosure that third-party developers were testing certain synchronous games also does not "correct" Skillz's prior statements that synchronous gameplay was enabled. As the Court recognized, Skillz "does not create synchronous games itself, and instead offers a platform upon which developers may create games with synchronous gameplay." Order at 10. The disclosure that developers were designing synchronous games *confirms* Skillz's statements; it does not *correct* anything.

In sum, while Skillz's stock price may have temporarily fallen on certain dates, the disclosures on those dates do not reveal the "truth" of any false statement, and thus do not amount to corrective disclosures sufficient to plead loss causation. *Mulquin*, 510 F. Supp. 3d at 870.

## D.   Any Control Person Claim Fails Along With The Other Claims

Because Plaintiffs do not state a primary violation of the securities laws, their "control person" claim under Section 20(a) necessarily fails. Order at 12.

## V.   CONCLUSION

For the reasons stated above, the SAC should be dismissed.

1   DATED: September 19, 2022                    Respectfully submitted,

2                                                LATHAM & WATKINS LLP

3                                                By /s/Matthew Rawlinson
                                                 Matthew Rawlinson
4

5                                                *Attorneys for Defendants Skillz Inc., Andrew*
                                                 *Paradise, Casey Chafkin, Miriam Aguirre,*
6                                                *and Scott Henry*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28