UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS JEDRZEJCZYK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> SKILLZ INC., et al., <br><br> Defendants. | Case No. 21-cv-03450-RS <br><br> **ORDER GRANTING MOTION TO DISMISS** |

# I. INTRODUCTION

Plaintiffs in this putative securities class action aver violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 by Skillz Inc. ("Skillz") and its corporate officers. In the operative Second Amended Consolidated Complaint ("SACC"), Plaintiffs outline a series of averred misrepresentations and/or omissions of fact made by Defendants between December 16, 2020, and May 4, 2021. Pending here is Defendants' motion to dismiss. As discussed in greater detail below, Plaintiffs have still not adequately pleaded their Exchange Act claims, and the motion is therefore granted.

# II. BACKGROUND[1]

The factual background of this case is laid out more completely in the prior order granting

---

[1] The factual background is based on the averments in the SACC, which must be taken as true for purposes of this motion, and documents of which the Court may take judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Defendants' motion to dismiss the amended consolidated complaint. *See* Dkt. 131 ("MTD Order"), at 2–4. To summarize, Skillz, a mobile gaming technology company, operates a "competitive gameplay platform" that allows third-party developers to build and market games in which users can play in free or paid "contests" against each other. *Id.* at 2. The Skillz business model "involves two steps: (1) user acquisition, and (2) user engagement." Dkt. 136 ("SACC") ¶ 29. The former "refers to the process of getting new users to download and play games that integrate with Skillz's platform," while the latter "focuses on converting users that download games into paying users by getting them to spend money to enter a paid contest." *Id.* ¶¶ 29–30. The second step is critical, as Skillz only generates revenue by "collecting a percentage of the entry fees" for paid contests occurring in these games. MTD Order, at 2. Skillz went public on December 16, 2020, which was followed by a second public offering in March 2021; its stock price fluctuated throughout this time period.

Plaintiff Thomas Jedrzejczyk and three other Skillz shareholders brought this putative class action on May 7, 2021, under the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a); SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; and the Securities Act of 1933, 15 U.S.C. § 77k. Defendants moved to dismiss, and that motion was granted on July 5, 2022, with leave to amend.[2] The order noted that Plaintiffs had failed adequately to plead falsity and scienter with respect to any of their five bases under the Exchange Act. In addition, the order suggested that Plaintiffs "will face challenges in establishing loss causation due to their reliance on short seller reports." MTD Order, at 11–12. The order further dismissed the Securities Act claims.

In the SACC, Plaintiffs renew only their claims under the Exchange Act and Rule 10b-5 against Skillz and four of its current or former corporate officers. Plaintiffs aver that Defendants made false and misleading statements and/or failed to disclose material facts that fall into four

---

[2] Plaintiffs named several additional groups of Defendants in the amended consolidated complaint, including members of Skillz's board of directors and underwriters of Skillz's March 2021 public offering. *See* MTD Order, at 2–3. They do not renew these claims for relief in the SACC. *See* SACC, at 1 n.1.

ORDER GRANTING MOTION TO DISMISS
CASE NO. 21-cv-03450-RS

2

categories: (1) Defendants misrepresented the state of download rates for Skillz's most popular and profitable games; (2) Defendants publicly reported metrics that painted an overly rosy picture of Skillz's paid user engagement and failed to capture accurately the company's revenue model; (3) Defendants overstated the availability of "synchronous" games on the Skillz platform; and (4) Defendants failed to disclose that user engagement and growth was "attributable to aggressive and uneconomic spending on paid user incentives," SACC ¶ 100. Defendants have again moved to dismiss the SACC in its entirety.

### III. LEGAL STANDARD

#### A. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-movant. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

#### B. Exchange Act Claims

Section 10(b) of the Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for

the protection of investors." 15 U.S.C. § 78j(b). Pursuant to Section 10(b), the SEC has promulgated Rule 10b-5, which provides, *inter alia*, that "[i]t shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). To establish a violation of either Section 10(b) or Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Section 20(a) provides a derivative claim to Section 10(b) aimed at "controlling persons," *see* 15 U.S.C. § 78t, and thus liability under Section 20(a) requires an underlying finding of liability under Section 10(b). *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

To allege falsity under the pleading standards established by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(b)(1)). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). The Exchange Act does not "create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), but "'once defendants [choose] to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharma., Inc.*, 840 F.3d 698, 705 (9th Cir.

ORDER GRANTING MOTION TO DISMISS
CASE NO. 21-cv-03450-RS
4

2016) (second alteration in original) (quoting *Berson*, 527 F.3d at 987).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). "[T]he complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005). To plead scienter adequately under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference," the Supreme Court has held, "must be more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. In evaluating the sufficiency of a plaintiff's allegations of scienter, courts "must consider the complaint in its entirety" and inquire "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23. A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. The existence of a motive is relevant, but not dispositive, to establishing scienter. *See Matrixx*, 563 U.S. at 48.

Finally, loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Ultimately, the issue is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). Plaintiffs often plead loss causation by identifying a "corrective disclosure," in which the "practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).

## IV. DISCUSSION

Plaintiffs present four categories of averred misleading statements of fact they claim give rise to Section 10(b), Rule 10b-5, and Section 20(a) liability. Defendants argue Plaintiffs have still failed to establish falsity, scienter, or loss causation with respect to any of them. Each of these

categories is inadequately pleaded as false or misleading, and each is discussed in turn.

**A. Declining Game Downloads**

First, Plaintiffs aver that Defendants misled investors by failing to disclose that the download rates of Skillz's top games were declining in the second half of 2020 and the first quarter of 2021. Citing a September 2, 2020 investor call, among other statements, Plaintiffs allege that the company's ongoing representation that these games "were 'not shrinking or disappearing' and even 'continue[d] to grow, often quite substantially, after being displaced from the number one position,'" was misleading in light of these "plummeting growth rates." SACC ¶¶ 52, 58 (alteration in original); *see also id.* ¶ 55 fig. This was material because Skillz noted how important it was for the business to grow its user base and convert more users to paying users; declines in top downloads, therefore, foreshadowed future reductions in revenue growth. Plaintiffs identify further deceit in Defendants' statement that the number of downloaded games per paying user had increased between 2015 and 2020. They argue this was misleading because Defendants did not reveal whether these (paying) users were actually paying to play any of these newly downloaded games, and, in fact, most of the games "generated little or no revenue." *Id.* ¶ 51. The truth was finally revealed, Plaintiffs argue, when the Wolfpack Report, a report by a short seller, was released on March 8, 2021, and revealed that downloads for "the three games responsible for 88% of [Skillz's] revenues" had begun to drop. *Id.* ¶ 54. The Report's findings were "substantially confirmed" by Plaintiffs' confidential witness. *Id.* ¶ 59.

The prior order noted that this category fell on the "weakest end" of Plaintiffs' falsity allegations, and the SACC does little to change that conclusion. MTD Order, at 8. It remains the case that these statements are simply "not inconsistent with the 'revelation' that the top three games were decreasing in download rates," *id.* at 9, insofar as a slower rate of growth nonetheless reflects growth. At an even more basic level, it is unclear whether the September investor call statements, on which Plaintiffs heavily rely, are referring to *download* growth, as Plaintiffs suggest, or *revenue* growth, as Defendants claim. This distinction is important given that the top games could have decreasing download rates while still bringing in increased revenue. *See* Dkt.

148, at 4. This, too, undermines Plaintiffs' argument that the statements were misleading. Finally, even if the average paying user was only primarily paying to play three of the ten games they had downloaded, this growth in total downloaded games by paying users could simply be relevant to the growth of Skillz's ecosystem generally. In other words, assuming Skillz relied on both increasing total downloads *and* converting non-paying users to paying users, *see* SACC ¶ 49, Defendants' statement would suggest that the first half of that plan had been successful. These averments, in short, do not sufficiently plead the necessary element of falsity.

Even if Plaintiffs were able to plead falsity, their scienter pleadings would still fall short. The fact that Skillz's corporate officers generally had access to internal metrics does not support a "strong inference" of scienter, nor does Defendant Paradise's response to an investor in which Plaintiffs allege he dodged a question regarding game downloads. To the extent Paradise did so, the excerpts of his response are at least equally consistent with the inference that he was reiterating why positive download rates were only one component of Skillz's business strategy.

The loss causation pleadings fare no better. The prior order suggested that Plaintiffs would face "serious challenges" in arguing that the Wolfpack Report was a corrective disclosure, given the adverse financial incentives of the Report's authors. *See* MTD Order, at 11–12 (citing *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 873 (N.D. Cal. 2020)). Even assuming the Report can be considered a corrective disclosure, *see In re BofI Holding Litig.*, 977 F.3d 781, 790 (9th Cir. 2020), Plaintiff's loss causation theory is undercut by the fact that, as the SACC states and then attempts to explain away, Skillz's stock price dipped but then rebounded in the days following the Report's release. *See* SACC ¶ 172; *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021). Thus, Plaintiffs fail to plead adequately that Defendants' statements regarding download rates were false or misleading.

### B. User and Revenue Metrics

Plaintiffs next argue that Defendants made misleading disclosures in 2020 and 2021 as to Skillz's metrics on user engagement and revenue generation. While Defendants disclosed to investors the average revenue per user, they failed to report what Plaintiffs contend is the most

relevant metric: average revenue per paying user ("ARPPU"). Plaintiffs argue the decision not to report ARPPU separately meant that investors could not "accurately assess paying user engagement," which was crucial given that Skillz's ARPPU was allegedly declining through the second half of 2020. SACC ¶ 77. Defendants attempted to obscure this downturn by instead focusing primarily on reporting the platform's monthly average users ("MAU"). This was also misleading, Plaintiffs contend, because it gave them the "impression that adding users to the Skillz platform was the primary factors [sic] driving revenues," when it was really just a "vanity metric." *Id.* ¶ 70. Indeed, Defendant Chafkin, one of Skillz's officers, conceded as much in a May 4, 2021 earnings call, when he allegedly stated that MAU was not "a metric that correlates with our business performance." *Id.* ¶ 4.

Notwithstanding Defendants' seemingly inconsistent statements about the metrics Plaintiffs identify, the SACC does not plead adequately that these statements were false or misleading. As the Ninth Circuit has repeatedly instructed, "section 10(b) and Rule 10b-5 prohibit only misleading and untrue statements, not statements that are incomplete." *Rigel Pharm.*, 697 F.3d at 880 n.8 (citing *Matrixx*, 563 U.S. at 43–45); *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014)). Here, Defendants were not obligated to disclose any and all metrics relevant to their business — just those that, if omitted, would "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. Plaintiffs' burden, then, is to show why it was necessary for Defendants to reveal more information about Skillz's paying users, namely by sharing ARPPU metrics. The SACC fails to do this.

At bottom, Plaintiffs' argument turns on not only Defendants' failure to reveal Skillz's ARPPU, but also on their "myopic focus on the MAU metric," a focus for which there was allegedly "no business justification." SACC ¶ 78. Yet there was a plausible business justification: growing the pool of Skillz users, as Plaintiffs recognize. *See id.* ¶ 29. None of the statements Plaintiffs cite suggest there was a one-to-one correlation between increased MAU and increased revenue. Rather, at the end of the day, it was critical to convert more users to paying users. For

instance, the Merger Proxy Statement and February 2021 Registration Statement, cited repeatedly by Plaintiffs, clearly states that Skillz's year-over-year revenue increase was "attributable primarily to a 91% increase in MAUs, driven by sales and marketing investment *to acquire new paying users*." *Id.* ¶ 38 (emphasis added). Plaintiffs do not claim that Defendants at any point misstated how Skillz made money, for instance, by misleadingly stating that Skillz was an ad-based platform whose revenue growth was directly proportional to its MAU growth. The SEC comment letter, also cited by Plaintiffs, makes this clear by noting that "only 10% of [Skillz's] MAUs enter into paid contests." *Id.* ¶ 136. That higher numbers of MAUs may have also helped Skillz provide a more cognizable metric to Wall Street investors does not negate the fact that getting more users on the platform was a prerequisite to having a larger pool of potential users to convert into paying users — and thus, ultimately, higher revenue.

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017), is an instructive counterexample. There, Twitter made statements indicating it was experiencing positive MAU growth, but it failed to disclose that its daily average user metrics ("DAU") were "stagnant," which would "eventually cause MAU growth to stall." *Id.* at 1125 (alteration omitted). The plaintiff thus adequately averred that the failure to report DAU was misleading, because the negative DAU trends "made [the stated] MAU growth implausible." *Id.* at 1137. Here, by contrast, Skillz's ARPPU and MAU are, while perhaps related, not contingent: a negative trend in one does not *ipso facto* negate a positive trend in the other. Thus, Plaintiffs have not adequately pleaded that these statements were false or misleading.[3]

**C. Synchronous Gameplay**

Plaintiffs further argue that Defendants overstated the Skillz platform's ability to offer synchronous games. For instance, Defendants stated that Skillz "offer[ed] a wide range of contests for the users," including "game genres that can be played: (i) asynchronously; (ii) turn-based

---

[3] That Defendants arguably should have disclosed these metrics to the SEC is a question separate and apart from whether the statements were misleading under the Exchange Act. *See NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1054–55 (citing *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000)).

1   synchronously; or (iii) synchronously." SACC ¶ 88. Defendants argue that these statements speak
2   only to Skillz's *ability* to offer these games, not the *availability* of any; the prior order reached the
3   same conclusion. *See* MTD Order, at 10.

4   While Plaintiffs now elaborate on the difficulty of developing synchronous games and
5   provide examples of popular synchronous games available on other platforms, *see* SACC ¶¶ 86–
6   89, these additional averments have little to do with Defendants' alleged false statements. It
7   remains the case that, as the prior order noted, "a reasonable investor would know Skillz is not a
8   game developer and that a statement about what is enabled on the platform is not equivalent to
9   what games are made available using the platform." MTD Order, at 10. Several of the statements
10  Plaintiffs include in the SACC only reinforce this conclusion. For instance, in the investor call on
11  March 12, 2021, Defendant Paradise did not claim that Skillz produced synchronous games, but
12  merely that it "enable[d]" them — and even then, that this was the direction the platform was
13  heading, not that it was necessarily capable of doing so then and there. SACC ¶ 90 ("We're
14  expanding the reach of the platform to enable new gaming genres ranging from real-time strategy,
15  to fighting, to racing, to first-person shooters."). In addition to its inadequate showing of falsity,
16  the SACC's showing of loss causation as to these statements is undercut by the stock price
17  rebound that occurred shortly after the release of the Eagle Eye Report, another short seller report
18  that Plaintiffs claim to be the relevant corrective disclosure. *See id.* ¶ 179. Plaintiffs again
19  acknowledge this rebound, and again attempt to explain it away. Therefore, the claim that these
20  statements were false or misleading is also pleaded insufficiently.

21  **D. User Engagement and Bonus Cash**

22  Finally, Plaintiffs argue that Defendants' statements regarding the platform's
23  "extraordinary user engagement" were misleading because they failed to disclose that this
24  engagement was "driven not by [Skillz's] superior matchmaking ability, or the amount of games
25  on its platform, but rather was attributable to aggressive and uneconomic spending on paid user
26  incentives known as 'Bonus Cash.'" *Id.* ¶ 100. While the SACC rearranges the pieces of this
27  argument from the prior complaint, they still form the same shape. As the prior order held,

"statements such as touting a 'stickier, more engaging, and continuously improving' user experience and a 'vibrant and growing ecosystem' are non-actionable puffery." MTD Order, at 9 (citing *Intuitive Surgical*, 759 F.3d at 1060)). Nothing in the SACC warrants revisiting this conclusion.

Plaintiffs cite to *In re Quality Systems, Inc. Securities Litigation*, 865 F.3d 1130 (9th Cir. 2017), for the proposition that "general statements of optimism, then taken in context, may form the basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Id.* at 1143 (internal quotation marks omitted) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). The difference here is that Plaintiffs have not adequately alleged that user engagement was performing poorly — in contrast to, for instance, a case in which a corporate executive "reassur[ed] investors that 'everything [was] going fine' with FDA approval when the company knew FDA approval would never come." *Id.* (second alteration in original) (describing *Warshaw*, 74 F.3d at 959). Even if user engagement was buoyed by Defendants' cash incentives, Plaintiffs have not shown that these statements were so directly contradictory to the truth that they can give rise to an actionable omission. Thus, Plaintiffs have not adequately pleaded falsity with respect to these statements. Even if they did, they would struggle to plead loss causation for the same reasons explored above regarding the Wolfpack Report and the corresponding stock price rebound.

## V. CONCLUSION

Plaintiffs have failed to plead adequately their claims under Section 10(b) and Rule 10b-5 for any of the categories of alleged false or misleading statements discussed above. Accordingly, their Section 20(a) claim fails as well. The motion to dismiss is therefore granted, without leave to amend. A separate judgment will enter.

**IT IS SO ORDERED**.

Dated: March 1, 2023

_____
RICHARD SEEBORG
Chief United States District Judge